ACCEPTED
03-14-00706-CV
5234415
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/11/2015 3:11:14 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00706-CV

## IN THE THIRD COURT OF APPEALS
## AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/11/2015 3:11:14 PM
JEFFREY D. KYLE
Clerk

## ENTERGY TEXAS, INC.,
### Appellant

### v.

## PUBLIC UTILITY COMMISSION OF TEXAS,
### Appellee

## APPELLANT ENTERGY TEXAS, INC.'S
## MOTION FOR THE COURT TO TAKE JUDICIAL NOTICE
## AND RESPONSE TO STATE AGENCIES' MOTION TO STRIKE

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellant Entergy Texas, Inc. ("ETI") files this motion for the Court to take judicial notice and response to Appellee State Agencies' Motion to Strike Portions of ETI's Reply Brief. In support of its own motion, and in opposition to State Agencies' motion, ETI shows this Court as follows.

This is a suit for judicial review of the final order of the Public Utility Commission of Texas in its rate case expense Docket No. 40295. ETI challenges the Commission's decision principally because it is an unexplained, after-the-fact departure from prior Commission practice in two different respects. First, ETI pointed out that the Commission has never before disallowed the rate case expenses associated with making unsuccessful arguments about financially-based

incentive compensation. *See* ETI's Appellant's Brief at 17-18. Second, ETI pointed out that the Commission has never before used a "proxy" to quantify a disallowance for rate case expenses. *See id.* at 27-28. In support of both these arguments, ETI cited several prior Commission decisions to show what the Commission's prior practice has been. *See id.* at 17-18, 27-28, & Appendix D. This Court has specifically acknowledged it may consider how the Commission has treated other utilities in past dockets to determine whether a particular policy is new in a given case. The Court so ruled even though the Commission's decisions in the past dockets were not part of the administrative record in the contested case under review. *See Oncor Elec. Delivery Co. LLC v. Public Util. Comm'n of Tex.,* 406 S.W.3d 253, 267 (Tex. App. – Austin 2013, no pet.).

In its Appellee's Brief, the Commission argued its allowance of rate case expenses in previous dockets is distinguishable because the utilities' arguments in those cases were different from ETI's argument in this case. *See* Commission's Appellee's Brief at 33. The Commission said ETI "shows no examples" of previous cases analogous to this one. *Id.*

The Commission also argued that its use of a proxy in this case was consistent with the way it quantified a disallowance in another docket. *See id.* at 44. Specifically, the Commission argued that it disallowed fifty percent of the expenses associated with the testimony of Cities' witness Dr. Goodfriend in

2

Docket No. 28840.  The Commission suggested that the percentage disallowed did not reflect the actual expenses associated with the witness's flawed testimony.  *Id.* at 45-46.  State Agencies made the same argument in their Appellee's Brief.  *See* State Agencies' Appellee's Brief at 26.[1]

To correct Appellees' assertions about these matters (which are outside the administrative record), ETI provided more detail about the previous Commission dockets at issue.  ETI appended to its Reply Brief copies of its witness's testimony about financially-based incentive compensation in two previous dockets.  These documents show that ETI made the same arguments about incentive compensation in those two dockets as it did in this case.  *See* ETI's Reply Brief at Appendices A & B.  These documents were presented to directly refute the Commission's characterization of the arguments made in previous dockets.

ETI also provided a link in its Reply Brief to the testimony of Dr. Goodfriend in Docket No. 28840.  This document shows that the Commission's disallowance of fifty percent of the expenses of this testimony correlates almost exactly to the portion of the witness's testimony that the Commission determined was "flawed."  This document, too, was presented to directly refute the arguments

---

[1] Docket No. 31433, cited by State Agencies, is the rate case expense docket severed from rate case Docket No. 28840.  *See Proceeding to Consider Rate Case Expenses Severed from Docket No. 28840 (Application of AEP Texas Central Company for Authority to Change Rates)*, Docket No. 31433.  As both the Commission and ETI have pointed out in briefing, most public filings at the Commission are available on the Commission's interchange at: http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgSearch.asp . The "Control Number" is the Docket Number for each proceeding.

that the Commission and State Agencies made about the basis for the disallowance in that previous case.

Nevertheless, State Agencies have moved to strike not only these documents, but the portions of ETI's brief that mention them. This Court should deny State Agencies' motion and take judicial notice of the documents at issue.

ETI has not presented these documents in support of the truth of their content. ETI has presented the documents only to establish that they were filed, and the nature of the matters the witnesses discussed, in prior dockets. These documents were filed with the Commission, a state agency. They are publicly available, and their authenticity is readily verifiable. This Court can, therefore, take judicial notice of these documents for the limited purposes ETI presents them. Tex. R. Evid. 201(b); *Freedom Communications, Inc. v. Coronado,* 372 S.W.3d 621, 623 (Tex. 2012); *Office of Pub. Util. Counsel v. Public Util. Comm'n,* 878 S.W.2d 598, 600 (Tex. 1994); *Vickers v. State*, No. 06-14-00072-CR, 2015 WL 1882910, *6 n.11 (Tex. App. – Texarkana Apr. 27, 2015, no pet. h.); *Katy Intern., Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 94 n.20 (Tex. App. – Houston [14th Dist.] 2014, no pet. h.); *Hendee v. Dewhurst*, 228 S.W.3d 354, 377 n.30 (Tex. App. -- Austin 2007, pet. denied).

State Agencies also curiously complain that ETI has not provided "specific citations" for these documents. The existence and location of these documents in

the Commission's files are clear from ETI's Reply Brief, as the documents themselves are attached to the brief. However, to dispel any concern that the documents attached to ETI's Reply Brief are not authentic, readily-verifiable public documents, ETI attaches certified copies of the documents to this motion. A certified copy of the document that appears as Appendix A to ETI's Reply Brief (Dr. Hartzell's Direct Testimony in Docket No. 34800) is attached to this motion as Appendix A.[2] A certified copy of the document that appears as Appendix B to ETI's Reply Brief (Dr. Hartzell's Direct Testimony in Docket No. 37744) is attached to this motion as Appendix B. A certified copy of Dr. Goodfriend's testimony in Docket No. 28840, to which ETI linked in its Reply Brief, is attached to this motion as Appendix C.[3]

ETI respectfully requests the Court take judicial notice of the nature of the content of the following documents, and the fact they were filed in the following Commission dockets:

- Direct Testimony of Jay C. Hartzell, Ph.D., EGSI Remand Exhibit No. 72, in Public Utility Commission Docket No. 34800;

---

[2] This testimony was first filed as part of Entergy Gulf States, Inc.'s application in Docket No. 34800 and is also available on the Commission's interchange, *Application of Entergy Gulf States, Inc. for Authority to Change Rates and to Reconcile Fuel Costs,* Docket No. 34800, Item 1, Bates No. 5531, at:
http://interchange.puc.state.tx.us/WebApp/Interchange/Documents/34800_1_563631.PDF .
[3] This testimony is also available on the Commission's interchange, *Application of AEP Texas Central Company for Authority to Change Rates,* Docket No. 28840, Item 338, at:
http://interchange.puc.state.tx.us/WebApp/Interchange/Documents/28840_338_425996.PDF .

5

- Direct Testimony of Jay C. Hartzell, Ph.D., ETI Exhibit No. 14, in Public Utility Commission Docket No. 37744; and

- Redacted Direct Testimony of Sarah J. Goodfriend, Ph.D., filed February 9, 2004, on behalf of Cities Served by AEP Texas Central Company, in Public Utility Commission Docket No. 28840.

ETI also respectfully requests this Court overrule State Agencies' motion to strike these documents and the sentences of ETI's reply brief that discuss them. ETI further requests any other relief to which it may show itself justly entitled.

Respectfully submitted,

**DUGGINS WREN MANN & ROMERO, LLP**


By: _/s/ Marnie A. McCormick_
    John F. Williams
    State Bar No. 21554100
    jwilliams@dwmrlaw.com
    Marnie A. McCormick
    State Bar No. 00794264
    mmccormick@dwmrlaw.com
    P. O. Box 1149
    Austin, Texas 78767-1149
    (512) 744-9300
    (512) 744-9399 _fax_

    **ATTORNEYS FOR APPELLANT**
    **ENTERGY TEXAS, INC.**

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with counsel representing the Public Utility Commission of Texas, State Agencies, and the Office of Public Utility Counsel, and they oppose this motion. Counsel for Texas Industrial Energy Consumers, an intervenor in the district-court proceeding, does not agree to or oppose this motion.

*/s/ Marnie A. McCormick*
Marnie A. McCormick

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties via electronic service on the 11th day of May, 2015:

Elizabeth R. B. Sterling
Environmental Protection Division
Office of the Attorney General
P. O. Box 12548 (MC 066)
Austin TX  78711-2548
*Counsel for Appellee Public Utility Commission of Texas*

Rex D. VanMiddlesworth
Benjamin Hallmark
Thompson Knight LLP
98 San Jacinto Blvd., Ste. 1900
Austin TX  78701
*Counsel for Intervenor Texas Industrial Energy Consumers*

Katherine H. Farrell
Sara R. Hammond
Administrative Law Division
Office of the Attorney General
P. O. Box 12548 (MC018-12)
Austin TX  78711-2548
*Counsel for Appellee State Agencies*

Ross Henderson
Office of Public Utility Counsel
1701 N. Congress Ave., Ste. 9-180
P. O. Box 12397
Austin TX  78711-2397
*Counsel for Intervenor Office of Public Utility Counsel*


  */s/ Marnie A. McCormick*
Marnie A. McCormick

APPENDIX A


Direct Testimony of Jay C. Hartzell, Ph.D
PUC Docket No. 34800

EGSI Exhibit No. 72

DOCKET NO. 34800

| APPLICATION OF ENTERGY | § | PUBLIC UTILITY COMMISSION |
| GULF STATES, INC. FOR | § | |
| AUTHORITY TO CHANGE RATES | § | |
| AND TO RECONCILE FUEL COSTS | § | OF TEXAS |

DIRECT TESTIMONY

OF

JAY C. HARTZELL

ON BEHALF OF

ENTERGY GULF STATES, INC.

CERTIFIED TO BE A TRUE AND CORRECT
COPY OF THE ORIGINAL ON FILE WITH THE
PUBLIC UTILITY COMMISSION OF TEXAS
CENTRAL RECORDS DIVISION

BY:

DATE: 5-11-2015

SEPTEMBER 2007

DOCKET NO. _____

ENTERGY GULF STATES, INC.
DIRECT TESTIMONY OF JAY C. HARTZELL
2007 TEXAS RATE CASE

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Witness Identification and Qualifications | 1 |
| II. | Purpose and Organization of Testimony | 2 |
| III. | Financial-Based Incentive Compensation as a Tool for Improving Consumer Welfare | 4 |
| | A. The Positive Effect of Incentive Compensation on Utility Customer Welfare | 4 |
| | B. The Reasons for Providing Financial-Based Incentive Compensation | 10 |

EXHIBIT

Exhibit JCH-1          Resume

I.    WITNESS IDENTIFICATION AND QUALIFICATIONS

Q.    PLEASE STATE YOUR NAME, OCCUPATION, AND BUSINESS ADDRESS.

A.    I am Jay C. Hartzell. I am an Associate Professor of Finance at the McCombs School of Business at the University of Texas at Austin. My work address is Department of Finance, The University of Texas at Austin, 1 University Station B6600, Austin, Texas, 78712.

Q.    FOR WHOM ARE YOU TESTIFYING?

A.    I am testifying on behalf of Entergy Gulf States, Inc. ("EGSI").

Q.    PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND AND PROFESSIONAL EXPERIENCE.

A.    I provide my complete resume in my Exhibit JCH-1. In brief, I obtained a Bachelor of Science degree (cum laude) from Trinity University in May 1991, with majors in Business Administration and Economics. After graduating, I went to work as a consultant for Hewitt Associates, in The Woodlands, Texas. Hewitt is a consulting firm that specializes in benefits and compensation. While there, I specialized in the area of defined contribution plans. I left Hewitt to go to graduate school at the University of Texas at Austin in 1993. I completed my PhD in finance there in May 1998. Upon graduating, I took a job as an Assistant Professor of Finance at New York University's Stern School of Business, where I worked

until 2001. At that time, the University of Texas at Austin hired me as an Assistant Professor at the McCombs School of Business ("McCombs School"), where I have worked since. I was promoted to the rank of Associate Professor (with tenure), effective in the fall 2006. I also now serve as the Director of the Real Estate Finance and Investment Center at the McCombs School.

Q. WHAT ARE YOUR MAIN AREAS OF RESEARCH?

A. My primary research interest is in the area of corporate governance. This area encompasses several topics, including executive compensation, the role of institutional investors, mergers and acquisitions, and boards of directors. I have also written papers in the area of real estate finance, with many of these also focusing on the areas of corporate governance, using data from that industry.

## II.    PURPOSE AND ORGANIZATION OF TESTIMONY

Q. WHAT IS THE PURPOSE OF YOUR TESTIMONY?

A. EGSI has asked me to comment on the use of financial-based goals in a company's incentive compensation plans, and how those goals affect consumer welfare. I first address the factors specific to the utility industry that support the conclusion that the presence of financial-based goals in an incentive compensation plan is consistent with consumers' interests. I then turn to the broader topic of how an incentive compensation plan

including financial measures provides incentives to a firm's employees to take actions that improve customer welfare.

Q. WHY ARE YOU QUALIFIED TO ADDRESS THESE SUBJECTS AND TO PROVIDE THIS TESTIMONY?

A. In addition to my formal training as a student, I have studied and conducted research on corporate governance, including executive compensation, for more than 10 years, starting with work in graduate school, including my dissertation. Since that time, I have written nine papers on corporate governance topics, plus my dissertation. Six of those have been published in peer-reviewed academic journals, including the top such journals in the field of finance. I have presented and discussed papers on corporate governance (including compensation) at the major conferences in the field. I have also taught related topics to PhD students, as part of a PhD class in empirical corporate finance.

Q. DO YOU SPONSOR ANY EXHIBIT?

A. Yes. My exhibit is listed in the table of contents to this testimony.

III.    FINANCIAL-BASED INCENTIVE COMPENSATION AS A TOOL FOR
IMPROVING CONSUMER WELFARE

Q.    WHAT IS YOUR UNDERSTANDING OF THE COMMISSION'S RATEMAKING TREATMENT OF A UTILITY'S INCENTIVE COMPENSATION EXPENSES?

A.    It is my understanding that in recent cases, the Public Utility Commission has had a policy of excluding from base rates compensation that is based on the firm's financial measures, but has allowed compensation that is based on operational measures such as quality of service, reliability, public safety, cost control, power plant performance, reduction of absenteeism, and cost containment.

Q.    WHAT ISSUES REGARDING INCENTIVE COMPENSATION WILL YOU ADDRESS?

A.    I will comment on the coexistence of these two types of incentives (financial-based and operational-based), and the role of financial-based incentives in ultimately contributing to customer welfare.

A.    The Positive Effect of Incentive Compensation on
Utility Customer Welfare

Q.    IS THERE A LINK BETWEEN CUSTOMER WELFARE AND A FIRM'S FINANCIAL PERFORMANCE?

A.    Yes. Satisfied customers clearly experience greater customer welfare, all else equal, as they are happy with the products they consume. This is

true not only for customers in unregulated industries, but also for customers in regulated industries. For example, customers who experience fewer power outages will suffer less disutility from being without power, but will also spend less time and expend fewer resources compensating for outages, or complaining about the service they have received.

In addition to benefiting customers, greater satisfaction tends to benefit the firm, as well. Satisfied customers are likely to buy more of the firm's products, which leads to higher revenues and profits, and a higher stock price, all else equal. Satisfied customers are also more likely to be retained as customers, and customer retention helps the firm's profitability via higher net revenues than they would have experienced without such satisfaction. Companies with better reputations for customer satisfaction are also more likely to attract new customers who can learn of firms' reputations prior to making their purchasing decisions. At the same time, because improved customer satisfaction tends to lead to improved financial performance, the prospect for improved financial results can play a positive role in motivating managers to improve customer welfare.

Although regulated utility companies do not deal with the same type of competitive dynamics faced by unregulated companies, the general concepts related to customer satisfaction still apply. For example, potential industrial customers and other large users face choices when they decide where to locate a new facility (a factory, a campus, etc.) or

whether to expand a current facility or instead build a new one, or whether to produce their own power rather than rely on the local utility company. Holding the rates they are offered constant, if the customer has a facility in a location with an electricity provider who provides good service, then the customer's satisfaction with that service would make the customer more likely to expand that facility, and would make the customer less likely to look for alternative locations or to self-generate, all else equal. A customer that is more likely to expand in the current location rather than look elsewhere would in turn benefit the financial performance of the customer's current utility company.

This conceptual link between customer welfare and financial performance also applies to residential utility customers. Residential customers can choose, for example, between gas (including propane) appliances and electrical appliances. The more satisfied they are with their electrical service provider, the more likely they are to choose electrical appliances (all else equal). This customer behavior in response to good service again leads to better financial performance for the electric utility.

Q. WHY WOULD TODAY'S FINANCIAL HEALTH OF THE FIRM POSITIVELY AFFECT FUTURE CUSTOMER WELFARE?

A.     I can see at least five channels through which a more financially successful company will be associated with greater customer welfare both now, and in the future.

First, companies that are financially healthy will be able to raise capital at lower cost. Put another way, companies that are less healthy financially and therefore are more likely to enter into financial distress (including bankruptcy) will face higher costs of capital. These higher costs of capital will in turn lead to higher rates for customers and lower customer welfare. This channel is straightforward: as a company gets closer to distress, the expected costs of distress increase, and lenders (including bondholders) charge more for their loans to the firm. Because the cost of debt is one of the key components of the cost of capital, these higher borrowing costs lead to a higher overall cost of capital. In addition, if the higher costs of capital are large enough, this effectively limits the less healthy firm's access to funds, implying that financially healthy firms have broader access to capital than their less healthy counterparts. This cost of capital effect is especially relevant to the utility industry given the industry's reliance on large capital spending projects and use of debt capital.

Second, in an industry where prices that firms can charge are regulated, if managers have incentives to increase financial performance, then this will lead them to focus on cutting costs. By linking managers' pay to stock price, for example, managers will, among other goals, attempt

to increase stock price by operating more efficiently. This improved efficiency will lead to a lower cost basis in the future than what one would have observed without such incentives, which will in turn lead to lower future prices for customers (compared to what would likely have been charged otherwise) and increased customer welfare.

Third, the utility industry is characterized by high fixed costs of production and economies of scale. This cost structure implies that larger firms can operate at lower marginal costs (all else equal). Thus, as higher customer service or satisfaction leads to greater customer attraction and retention, these in turn lead to growth in the customer base and revenues. The magnitude of these effects may be smaller for a regulated utility than for a firm in an unregulated industry, but I see no reason why the effects would not still be present and go in the same direction. Such growth in revenues is associated with greater financial performance, but the increase in size allows the firm to produce more cheaply due to the large fixed costs in the industry and economies of scale. These cost savings again materialize in lower future rates for customers (compared to what they would have been without the growth in the firm's operations).

Fourth, managers who care about the financial performance of the company are more likely to make better investment decisions. The stock market, via analysts who follow the firm's behavior and traders who act based on their beliefs about the firm's prospects, acts as a monitor of a wide range of managerial actions, including investment decisions. Stock-

price based incentives can help discipline managers, and constrain them from investing in ways that might not benefit the firm.

Fifth, companies that are less healthy financially – or, to put it another way, closer to financial distress – will likely experience greater costs, which will in turn be passed on to customers. This is because stakeholders who have relationships with the company will demand more favorable terms from the firm in order to compensate them for the greater risk of dealing with a less healthy company. For example, consider a supplier who sells machinery to a utility company that is not financially healthy (or is believed to be near distress). Such a supplier will likely demand higher prices from the utility before committing to any sort of investment in a relationship with the utility, in order to compensate for the risk that the revenues from the relationship may cease to exist before the supplier can recoup its costs. These effects are predicted to be stronger where firm-specific investments are required – such as customized machinery – or, the relationship is expected to have a longer term. In addition, suppliers to less healthy firms (firms that are nearer distress) are likely to provide less attractive terms of trade – for example, requiring cash payment rather than accepting trade credit. Both of these – higher prices or worse trade and credit terms – will materialize as higher costs for the utility, which will in turn likely be passed on to customers via higher prices for energy. Similar arguments can be made for other stakeholders of the firm, such as employees of the firm. Employees of firms that are more

likely to become financially distressed will likely demand higher wages in order to compensate them for the risks they face in working for such a company. Absent a sufficient wage differential, financially distressed firms are likely to lose skilled and talented employees and to find it difficult to attract good new ones, further exacerbating these firms' situations.

In summary, by providing managers with incentive compensation that is based in part on the financial performance of the firm, managers have incentives to keep the firm financially healthy. A utility's financial health is very likely to benefit customers via lower costs than otherwise would be experienced, which in turn lead to lower rates than otherwise would be the case. These lower costs occur because of (i) a lower cost of capital; (ii) more efficient operations; (iii) greater scale of production; (iv) better investment decisions by managers; and (v) better prices and/or terms from stakeholders, such as suppliers and employees.

B.    The Reasons for Providing Financial-Based Incentive Compensation

Q.    WHAT TOPICS DO YOU DISCUSS IN THIS SUBSECTION OF YOUR TESTIMONY?

A.    I explain how incentive compensation is used as an effective tool in aligning the interests of a firm's employees and its stakeholders, including the firm's customers and shareholders. I also discuss how this improved incentive alignment motivates a firm's employees to take actions that tend to ultimately benefit the firm—including customers and shareholders.

Q.  WHAT IS THE BASIC UNDERLYING THEORY OF INCENTIVE COMPENSATION AS IT APPLIES TO A PUBLICLY-TRADED COMPANY?

A.  The traditional paradigm of incentive-based compensation centers around the role of incentive pay in solving a "moral hazard" problem, where the principals involved cannot observe the actions of an agent who acts on their behalf. This agent is expected to act in a way that maximizes his or her personal welfare, which is not necessarily the same set of actions that would maximize the welfare of the principals. This potential conflict of interest, termed an agency problem, gives rise to a role for incentive compensation. Because the principals cannot observe or write contracts based on the agent's actions (because it is assumed that those actions cannot be observed or legally verified), incentives are put in place such that the agent is more likely to benefit when they take the course of action that is desired by the principals. Specifically, the agent receives higher pay when he or she takes actions that benefit the principals. Understanding this, the agent is more likely to take those actions desired by the principal – put forth more effort, pick better projects, or shirk less, for example.

The typical view in finance is from the perspective of the shareholders: shareholders are the principals and owners of the firm, and they hire managers to act as agents on their behalf. Incentive pay has a role in that it provides for greater compensation to managers when there

are indications that they took actions that benefited shareholders. One of the most fundamental and accepted theoretical results from the principal-agent academic literature is that an agent's pay should be linked to a particular performance measure (such as stock price, accounting profits, or a score based on customer satisfaction) if that measure provides an additional informative signal of the manager's actions.

If a principal (such as the Commission) has a goal of maximizing customer welfare, then the same principal-agent theory still applies. In this context, pay should optimally be related to any performance measure that contains marginally useful information about whether managers acted in a way that is consistent with maximizing customer welfare. In other words, even if the goal is to maximize customer welfare, pay should also be related to financial performance so long as the financial performance measures contain some additional information about customer welfare.

Q. HOW CAN INCENTIVES BASED ON FINANCIAL MEASURES IMPROVE MANAGERS' FOCUS ON CURRENT AND FUTURE CUSTOMER SERVICE?

A. In the extreme, this most basic principal-agent theory is developed in a one-period setting, without regard to future periods. In this set-up, the manager acts, outcomes are realized at the end of the period (depending in part on those actions), and the manager receives his or her pay.

A more realistic setting would allow for multiple periods, where both managers and principals would have to consider not only their immediate actions, but also their expected future actions, and trade-offs between what they choose to do today versus what they may receive in the future. This more realistic setting leads to another common problem or incentive conflict between managers and principals: these parties having differing time horizons. Typically, managers are expected to have a shorter-term focus than otherwise would be optimal. As a result of their possibly shorter time horizons, managers may make decisions that focus solely on the short term at the expense of the long-term. Incentive compensation tied to measures that look both to the short-term (such as the current year's earnings) and long-term (such as stock price) is an accepted solution to extend the managers' time horizons, and to balance short-term and long-term perspectives, in decision-making and execution.

Q.    DOES EXTENDING THE MANAGERS' TIME HORIZONS HAVE A POSITIVE EFFECT ON EXPECTED CONSUMER WELFARE?

A.    Yes. In the context of maximizing customer welfare, the horizon of the manager is an important issue. To the extent the Commission wishes to maintain and enhance customer welfare not only in the short-run, but also in the future, financial measures like stock price performance play a useful role in an incentive compensation structure in order to accomplish this objective.

In addition to providing incentives for managers to optimize their decisions in the current year, a financial-based incentive plan can provide this perspective by capitalizing the long-term benefits of managers' decisions. In other words, via incentives based on financial performance measures such as stock price, the expected long-term impact of managers' decisions has immediate impact on financial performance measures, thereby affecting managers' pay and incentives. Stock prices are based on the present value of the firm's expected future cash flows. So, by making a manager's compensation depend on stock price, one ties the manager's wealth to expected future cash flows. This makes him or her more willing to make decisions that produce long-term benefits for the firm, even if it is at the cost of short-term cash flows or profits.

Q. HOW DO FINANCIAL-BASED INCENTIVES EXTEND THE MANAGERS' TIME HORIZONS TO THE BENEFIT OF CONSUMER WELFARE?

A. To see how incentive pay affects customer welfare over multiple years, first take an extreme hypothetical example where managers are only compensated based on this year's customer welfare. This could create an incentive for the manager to make decisions that would sacrifice the future of the firm (and its customers) for the benefit of the immediate welfare of customers. The manager might "over-invest" in immediate customer service, weakening the firm's future financial position and its ability to provide high-quality, low cost service in the future. With limited resources,

the firm might decide to pay for this "over-investment" in immediate customer service by taking money from long-term maintenance spending or capital investment that would produce long-term efficiency or productivity gains.

But, by linking a manager's pay at least in part to the financial health of the firm, one forces the manager to think about more than just the short term, and to consider future years and the future performance of the firm when they decide on a course of action. If the manager over-invested in immediate customer welfare, then it would weaken the firm's financial position and potentially, consumers' future welfare. Conversely, by weighing not only immediate customer welfare, but also financial measures like stock price that are related to the firm's short- and long-term viability, the manager has the incentive to position the firm to provide higher levels of customer welfare in the future.

Q. WHY SHOULD THERE BE A POSITIVE RELATION BETWEEN CUSTOMER WELFARE AND FINANCIAL PERFORMANCE?

A. Back to the basic theory, then, financial measures should be part of the manager's compensation structure if one wants to maximize customer welfare so long as those financial measures are related to (or are signals of) customer welfare. This is plausible and reasonable for several reasons. First, customer welfare is difficult to measure completely, so it is unlikely that objective customer-based measures that one can use in a

compensation structure will fully capture what is trying to be measured. Then, so long as the firm's financial performance is positively correlated with customer welfare, in this period or in the future, financial performance should optimally enter the compensation structure with positive weight (meaning that the manager receives greater compensation when the financial performance of the firm is greater). The accepted literature on compensation theory is clear that less-noisy (*i.e.*, more accurate) signals of managers' actions are preferred over noisier (less accurate) signals, but even noisy signals of managers' actions should be included in the optimal compensation contract. Thus, so long as a financial measure such as stock price is correlated with customer welfare (beyond what the operational measures can explain), then it should enter the compensation structure of the manager. The more accurate it is as a signal, the greater weight (or bigger role) it should receive.

Q. ARE THESE FINANCIAL THEORIES SUPPORTED BY EMPIRICAL EVIDENCE?

A. Yes. There are multiple empirical studies published in peer-reviewed academic journals that report evidence consistent with these hypotheses.

Q. HOW DO THESE EMPIRICAL STUDIES SUPPORT THESE HYPOTHESES?

A.   There is a wealth of existing empirical evidence that is supportive of these theories. First, published papers have shown that customer satisfaction measures are positively correlated with firms' financial performance. In other words, firms with higher customer satisfaction scores tend to have better financial performance, not worse. This fact from the data is consistent with the arguments above that more satisfied customers are expected to result in higher profits and better overall financial performance. This finding also suggests that financial measures can play a positive role in motivating managers to improve customer welfare. This result of a positive relation between financial performance and customer satisfaction is inconsistent with the idea that managers tend to maximize financial performance to the detriment of customers, which should help alleviate some fears that contracts incorporating financial-performance incentives will lead managers to diminish their customers' welfare for the sake of greater financial performance and higher compensation. In the data, financial success tends to be associated with greater customer satisfaction, not less.

There is also evidence that higher customer satisfaction scores are associated with higher market values across firms. This empirical result is consistent with the widely-held notion that the stock market is a mechanism by which the long-term benefits of customer welfare are capitalized into a present value measure. This result that higher customer satisfaction scores are associated with higher market values has been

shown for a broad set of companies in general, and also for the utility industry in particular.

Empirical evidence also suggests that these relations between customer satisfaction and financial performance change as customer satisfaction becomes very high. This change is consistent with the idea that there are diminishing (financial) returns to improving customer satisfaction, implying that it becomes more and more expensive to keep improving customer satisfaction. Such an increasing cost of customer satisfaction is consistent with the notion discussed earlier that providing managers with incentive compensation that is only based on this period's customer welfare measures might lead managers to over-invest in current customer welfare to the detriment of the long-term financial health of the firm, potentially endangering future customer welfare, as well. As also discussed earlier, including measures such as stock price in the compensation structure of managers can help provide incentives for managers to not only consider the immediate welfare of customers, but to also weigh future years' customer welfare and the financial health of the company when they make decisions while running the firm.

The evidence on firms in or near financial distress is also consistent with the opinions presented earlier that firms that are more likely to enter into financial distress are more likely to encounter significant costs of distress, which could materialize in the form of higher future costs for customers and lower future customer welfare (compared to the costs that

would have been realized without the firm in distress). There is evidence that firms with more debt (relative to their equity) suffer more when their industries do not do well. Heavily indebted firms tend to invest less and lose more sales in industry downturns when compared to their less-indebted industry counterparts, which would be expected to lead to higher average costs in industries with economies of scale, such as the utility industry. In addition, it has been shown that these firms with more debt tend to be penalized by customers and suppliers, again leading to greater costs than what one would have experienced without such distress.

Q. CAN YOU DRAW ANY CONCLUSIONS BASED UPON THESE COMMONLY ACCEPTED ECONOMIC AND FINANCIAL PRINCIPLES?

A. Yes. These theoretical arguments are intuitive and based on sound, commonly accepted economic and financial principals Thus, it is possible to draw conclusions based upon the application of logic to fundamental finance principles. In my opinion, the existing empirical evidence is supportive of the conclusion that incentive compensation structures that include financial-based performance measures tend to benefit consumers.

Q. DOES THIS CONCLUDE YOUR PREFILED DIRECT TESTIMONY?

A. Yes.

This page has been intentionally left blank.

# APPENDIX B

Direct Testimony of Jay C. Hartzell, Ph.D
PUC Docket No. 37744

DOCKET NO. *37744*

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | PUBLIC UTILITY COMMISSION |
| TEXAS, INC. FOR AUTHORITY | § | |
| TO CHANGE RATES AND | § | OF TEXAS |
| RECONCILE FUEL COSTS | § | |

Record Copy

JUL 1 3 2010

𝒦𝒫

DIRECT TESTIMONY

OF

JAY C. HARTZELL, PHD.

ON BEHALF OF

ENTERGY TEXAS, INC.

CERTIFIED TO BE A TRUE AND CORRECT
COPY OF THE ORIGINAL ON FILE WITH THE
PUBLIC UTILITY COMMISSION OF TEXAS
CENTRAL RECORDS DIVISION

BY: _____

DATE: 5-11-2015

DECEMBER 2009

ENTERGY TEXAS, INC.
DIRECT TESTIMONY OF JAY C. HARTZELL, PHD.
2009 RATE CASE

TABLE OF CONTENTS

Page

I.    Background and Introduction    1

II.   Overview of the Issues Surrounding Incentive Compensation    3

III.  The False Dichotomy Between Compensation Tied to "Financial" Measures and Compensation Tied to "Operational" Measures; and the Benefits of Cost Control, Profitability, and Stock Price Measures    8

IV.   Costs to Customers of Discouraging the Use of Incentive Compensation That is Linked to Cost Control, Profitability and Stock Prices    18

V.    Response to Common Arguments Against Incentive Compensation Linked to Cost Control, Profitability and Stock Prices from the Customers' Perspective    23

VI.   Empirical Evidence Supporting Testimony    25

VII.  Conclusion    28

EXHIBITS

EXHIBIT JCH-1    Curriculum Vitae of Jay C. Hartzell

I.    BACKGROUND AND INTRODUCTION

Q.    PLEASE STATE YOUR NAME, TITLE, AND BUSINESS ADDRESS.

A.    My name is Jay C. Hartzell.  I am an Associate Professor of Finance at the McCombs School of Business at the University of Texas at Austin.  My business address is Department of Finance, The University of Texas at Austin, 1 University Station B6600, Austin, Texas 78712.

Q.    ON WHOSE BEHALF ARE YOU TESTIFYING?

A.    I am testifying on behalf of Entergy Texas, Inc. ("ETI" or the "Company").

Q.    PLEASE STATE YOUR EDUCATION, PROFESSIONAL AND WORK EXPERIENCE.

A.    I obtained a Bachelor of Science degree (cum laude) from Trinity University in May 1991, with majors in Business Administration and Economics.  After graduating, I went to work as a consultant for Hewitt Associates, in The Woodlands, Texas.  Hewitt is a consulting firm that specializes in benefits and compensation.  While there, I specialized in the area of defined contribution plans.  I left Hewitt to go to graduate school at the University of Texas at Austin in 1993.  I completed my PhD in finance there in May 1998.  Upon graduating, I took a job as an Assistant Professor of Finance at New York University's Stern School of Business, where I worked until 2001.  At that time, the University of Texas at Austin hired me as an Assistant Professor at the McCombs School of Business

("McCombs School"), where I have worked since. I was promoted to the rank of Associate Professor (with tenure), effective in the fall 2006. Beginning in the fall of 2008, I was given the title of Allied Bancshares Centennial Fellow. I also now serve as the Executive Director of the Real Estate Finance and Investment Center at the McCombs School. My current curriculum vitae is attached as Exhibit JCH-1.

Q.   HAVE YOU PREVIOUSLY TESTIFIED BEFORE A REGULATORY COMMISSION?

A.   Yes. I have submitted written testimony on incentive compensation issues and testified on behalf of the Company before the Public Utility Commission of Texas ("Commission" or "PUCT") in PUCT Docket No. 34800, and on behalf of Entergy Louisiana, LLC before the Louisiana Public Service Commission on incentive compensation issues in Docket No. U-20925. I have also submitted written testimony on behalf of Entergy Arkansas, Inc. before the Arkansas Public Service Commission on incentive compensation issues in Docket No. 09-084-U.

Q.   WHAT IS THE PURPOSE OF YOUR TESTIMONY?

A.   The purpose of my testimony is to discuss the extent to which incentive compensation – including compensation based on dollar-based measures such as cost control, profitability, and stock prices – is linked to and benefits customers' interests for companies such as ETI.

## II. OVERVIEW OF THE ISSUES SURROUNDING INCENTIVE COMPENSATION

Q. WHAT FORMS OF INCENTIVE COMPENSATION DO YOU FOCUS ON IN YOUR TESTIMONY?

A. The focus of my testimony is on incentive compensation that is linked to cost control measures (for operating costs and capital expenditures), profitability measures (including earnings and operating cash flow), and stock prices. Compensation that is linked to these sorts of measures – for companies generally and for ETI in particular – include annual incentive plans, long-term incentive plans, restricted stock grants, and stock option grants. The compensation could come in the form of cash (as in annual incentive plans), stock or stock-based units (as in ETI's long-term incentive plan, or "LTIP"), or options.

Q. WHAT IS YOUR UNDERSTANDING OF HOW COMPENSATION BASED ON COST CONTROLS, PROFITABILITY AND STOCK PRICES HAS BEEN CHARACTERIZED IN RECENT PUCT RATE DECISIONS?

A. In such cases, compensation that is linked to cost controls, profitability and stock prices as discussed in the previous question has commonly been referred to as incentive compensation that is based on "financial measures." This category of incentives has been distinguished from incentive compensation that is based on measures that are not denominated in dollars, such as customer satisfaction, reliability, and

safety metrics, which has commonly been categorized as incentive compensation based on "operational measures." As I discuss later in my testimony, I view this as a false dichotomy for the purposes of assessing whether customers benefit from a particular form of incentive compensation.

Q WHY DO FIRMS USE INCENTIVE COMPENSATION IN GENERAL, AND COMPENSATION BASED ON COST CONTROLS, PROFITABILITY AND STOCK PRICES MORE SPECIFICALLY?

A. Incentive compensation is a prevalent tool used to attract, motivate, and retain the qualified and talented employees needed to ensure that a business can continue to operate successfully. To understand why it is so widely used, it is first useful to draw a distinction between the *level* and *form* of compensation. The level of compensation can be thought of as the total dollar value of compensation received by an employee from all sources, including salary, cash incentive-based pay, the value of long-term incentives such as stock performance units and options granted (albeit typically applicable to a much smaller group of employees), and the value of benefits. In order to attract and retain employees, this level needs to be in line with the labor market for a particular type of employee, whether it is an engineer, a maintenance worker, or a chief executive officer. Otherwise, all things equal, that same employee will take a job with a company that is offering the more attractive level of pay and

benefits. Company witness Kevin G. Gardner discusses the overall reasonableness of ETI's level of compensation in his direct testimony.

Q. HOW DOES THE FORM OF COMPENSATION DIFFER FROM THE LEVEL OF COMPENSATION?

A. The form of compensation can be thought of as the split of total compensation across these components – for example, how much is paid via salary versus annual incentive-based compensation. Holding the total level of compensation fixed at the proper market level, the form of compensation is important because it can help motivate employees to engage in behaviors that positively impact the operational efficiency of the firm, or positively affect its cost structure. At the same time, the form of compensation is important to attract and retain certain types of employees that offer a skill set or a particular talent that is important to the company's operations. For example, if a compensation plan provides for incentive payments if goals are met – such as controlling costs at some level – then according to basic economic theory, employees will be motivated to work harder toward those goals. More subtly, such incentive pay will tend to attract and retain employees who believe that they are especially good at controlling costs because they will expect higher compensation under such a plan. This implies that a firm seeking to manage costs will find it valuable to institute such an incentive compensation plan as part of the

design of the *form* of compensation, while keeping the *level* of compensation at a competitive market-based amount.

Q. WHAT IS YOUR UNDERSTANDING OF THE COMMISSION'S PREVIOUS VIEW ON ALLOWING THE RECOVERY OF INCENTIVE COMPENSATION EXPENSE THROUGH RATES?

A. My understanding of the Commission's recent rulings on this issue is that the Commission has distinguished between compensation tied to what it has termed operational measures and compensation tied to what it has termed financial measures. Generally, the Commission has not allowed for the recovery of incentive compensation tied to financial measures through rates, but has allowed for the recovery of incentive compensation tied to operational measures. The core rationale for this distinction has been that it has not been sufficiently demonstrated that incentive compensation linked to financial measures is in the public interest or of direct benefit to customers. The decisions in those previous cases, however, do not reflect a review or consideration of the relevant literature or other matters I discuss below, all of which support a conclusion that allowing utilities to use incentive pay based on cost control, profitability, and stock prices is properly viewed as in the public interest and is expected to be of direct benefit to customers.

Q. HOW WOULD YOU SUMMARIZE YOUR OPINION ON THE ISSUE OF WHETHER INCENTIVE COMPENSATION BASED ON COST CONTROLS, PROFITABILITY, AND STOCK PRICES BENEFITS CUSTOMERS?

A. In my opinion, a well-designed compensation plan that includes incentive compensation tied to cost controls, profitability, and stock prices would tend to provide greater benefit to customers than an otherwise similar compensation plan that did not include any such incentive compensation. I discuss the details below, but the overarching basis for my opinion is as stated above: incentive compensation based on cost control, profitability, and stock prices helps companies attract, motivate, and retain talented employees, and by doing so, both customers and shareholders directly benefit. Moreover, if ETI's incentive compensation were *only* based on non-dollar-based measures such as safety and reliability, customers would tend to be worse off, because such a plan would not provide employees with incentives to look after the financial health of the Company. The important point is that customers and shareholders both benefit from well-designed, balanced compensation plans that provide employees with the appropriate level of compensation and that include incentives based on cost control, profitability, stock prices, *and* non-dollar-based measures such as reliability, safety and customer satisfaction.

III. THE FALSE DICHOTOMY BETWEEN COMPENSATION TIED TO "FINANCIAL" MEASURES AND COMPENSATION TIED TO "OPERATIONAL" MEASURES; AND THE BENEFITS OF COST CONTROL, PROFITABILITY, AND STOCK PRICE MEASURES

Q. DO YOU AGREE WITH THE OPINION THAT INCENTIVE COMPENSATION LINKED TO WHAT THE COMMISSION HAS TERMED "FINANCIAL MEASURES" DOES NOT PROVIDE DIRECT BENEFITS TO CUSTOMERS?

A. No. Based on its previous rulings, the Commission appears to be categorizing as "financial" all incentive performance measures that have been labeled as such by the utility and that are based on dollar amounts. These include not only measures such as earnings per share, but also measures designed to promote cost containment.[1] In reading these decisions and the debates among the parties discussed therein, much of the discussion seems to take it as given that incentives linked to financial (or dollar-based) measures, regardless of their specific characteristics, do not benefit customers. As a result, the competing viewpoints reflected in these decisions seem to address mainly whether to label particular measures as operational or financial.[2]

Instead of focusing on whether a particular measure is dollar-based or not – and therefore, whether incentives linked to that measure are "financial" or "operational" based on the above dichotomy – I think it is

---

[1] For example, see PUC Docket No. 28840, PFD at 78.

[2] For example, see PUC Docket No. 35717, PFD at 98.

more worthwhile to return to the primary question: whether specific incentives linked to dollar-based measures (including cost control, profitability, and stock prices) are of benefit to customers.

Q. WHY WOULD INCENTIVE COMPENSATION LINKED TO COST CONTROL, PROFITABILITY, AND STOCK PRICE MEASURES BE OF DIRECT BENEFIT TO CUSTOMERS?

A. This is the case because these measures provide a necessary and important incentive to managers to improve service and control costs. Perhaps the easiest example of a dollar-based measure that could be used in an incentive compensation plan that would benefit customers directly is cost containment. As an example, consider an incentive compensation plan that pays corporate managers an incentive award if costs are suitably contained. On the one hand, such an incentive is likely to benefit shareholders to some extent – managers who work under such a compensation plan will work to control costs in order to achieve their incentive compensation, and to the extent that they are successful, the company will generate greater profits, benefiting shareholders. But customers also directly benefit, because the company has lower costs, and through the regulatory process, customers will ultimately pay lower rates than they otherwise would have paid in the absence of such cost controls.

Q.  WHAT IS THE ROLE OF THE REGULATORY PROCESS IN ENSURING THAT INCENTIVES LINKED TO COST CONTROL BENEFIT CUSTOMERS?

A.  To understand the role of the regulatory process in linking cost control to customer benefit, first consider an extreme example where there is no regulatory lag and rates adjust instantaneously so that any change in a utility's costs is immediately passed through to customers. In this case, a cost-containment incentive clearly directly benefits customers and does not benefit shareholders at all because customers reap the entire benefit of any cost-saving innovations. In the other extreme, if rates never adjust to changes in costs, then a cost-containment incentive benefits shareholders but not customers. Thus, the regulatory process plays the critical role of sharing the gains from cost controls brought about by managerial incentive compensation between customers and shareholders.

Q.  IS THIS POINT THAT CUSTOMERS BENEFIT FROM MANAGERIAL EFFICIENCY A COMMONLY ACCEPTED TENANT OF UTILITY RATE ECONOMICS?

A.  Yes. This idea of a win-win scenario, where both shareholders and customers benefit from managerial efficiency, is not new and is a core idea at the heart of well-established principles of regulatory economics. For example, James C. Bonbright discusses it in his seminal 1961 treatise on utility economics, *Principles of Public Utility Rates.* He notes that a

potential drawback to regulated rates based on cost-plus-return pricing is that it could discourage managerial efficiency because the firm would earn little to no greater return after an efficiency gain because of a resultant change in rates. He goes on to say that regulatory lag can help resolve this problem, for the reasons discussed above. From his discussion, it follows naturally that incentive compensation that links managerial compensation to cost savings would likely be of benefit to customers.

Q. DO THESE PRINCIPLES APPLY TO OTHER FORMS OF INCENTIVE COMPENSATION THAT ARE LINKED TO PROFITABILITY AND STOCK PRICE MEASURES?

A. Yes. While I think that cost containment measures are the most obvious example of incentives that have in some past PUCT cases been categorized as "financial" and yet directly benefit customers, these principles apply to other dollar-based or financial measures as well, such as incentive awards tied to corporate profitability and stock prices.

Q. CAN YOU PLEASE FURTHER ELABORATE ON WHY CUSTOMERS ARE LIKELY TO BENEFIT FROM COMPENSATION THAT IS LINKED TO PROFITABILITY?

A. Yes. There is a direct link between cost containment and company earnings, especially for a regulated utility. Managers with an incentive to increase earnings will focus on controlling or cutting costs in a regulated

industry because it is more difficult to grow revenues. Additionally, the same type of reasoning that supports a linkage between cost containment and customer benefit also applies to incentive measures that focus on containing capital expenditures. If managers can offer the same service while cutting back on capital expenditures by investing more efficiently, then shareholders benefit due to greater short-run cash flows for the company, and customers benefit through the regulatory process through lower recovery for the cost of capital due to a lower capital base.

Q. WHAT TYPE OF INCENTIVE COMPENSATION DO YOU INCLUDE WITHIN THE CATEGORY OF COMPENSATION THAT IS LINKED TO STOCK PRICES?

A. This category would include most long-term incentive plans (including ETI's) that use performance units that are based on stock prices, as well as stock options.

Q. CAN YOU BRIEFLY SUMMARIZE WHY YOU BELIEVE THAT COMPENSATION THAT IS LINKED TO STOCK PRICES BENEFITS CUSTOMERS?

A. Compensation that is linked to stock prices has several advantages for customers as long as it is part of a reasonable, well-designed compensation plan – in other words, as long as the total level of compensation is reasonable compared to the market for similar positions

and the form of compensation is well balanced across dollar-based and non-dollar-based measures. First, compensation that is linked to stock prices helps ensure that managers will consider the financial health of the company when they make decisions, and it is in customers' interests to have the company continue to be financially healthy. Second, stock-based compensation provides an incentive for managers and employees to ensure that the company operates efficiently, and via the regulatory process, lower costs result in lower rates than would otherwise occur. Third, stock-based compensation provides a monitoring mechanism for managerial decision making and the overall quality of management. Fourth, there is an interaction between these effects, as the capital markets will tend to reward efficient long-term investments or capital expenditures that will also lead to lower costs for customers.

Q. DO THESE REASONS THAT COMPENSATION THAT IS LINKED TO STOCK PRICES BENEFITS CUSTOMERS ALSO APPLY TO COMPENSATION THAT IS LINKED TO COST CONTROL AND PROFITABILITY?

A. In general, yes. Stock prices are driven in part by cost control and profitability, so to the extent that managers have an incentive to increase the stock price, they will also have an incentive to control costs and increase profits and cash flows, and vice versa. Of the reasons listed in the previous answer, the first two reasons – incentives to ensure that the

company is financially healthy and that it operates efficiently – are the ones that are most closely shared by compensation based on cost control and profitability.

Q. STARTING WITH THE FIRST REASON YOU MENTIONED, WHY DOES COMPENSATION THAT IS LINKED TO PROFITABILITY AND STOCK PRICES BENEFIT CUSTOMERS BY IMPROVING A COMPANY'S FINANCIAL HEALTH?

A. If compensation that is linked to profitability and stock prices gives managers an incentive to increase their company's earnings, cash flows, and stock price, then this will also provide them with an incentive to ensure that the company remains financially healthy. Stock prices of firms that are in poor financial condition – for example, that have high debt relative to the value of their assets – tend to be lower, all else being equal. Similarly, firms in poor financial condition tend to have lower earnings and operating cash flows. A stronger financial condition will also benefit customers. If a company maintains a financially healthy position, it will tend to have a lower cost of capital that will in turn benefit customers through lower rates. For a discussion of this effect, see Chapter 15 of *Investment Valuation*, by Aswath Damodaran.[3] In addition, the costs of doing business with suppliers (of both goods and services, including labor)

---

[3] ASWATH DAMODARAN, INVESTMENT VALUATION (John Wiley & Sons, 2d ed. 2002).

will remain lower. For example, if a company was not in a financially stable condition, suppliers would tend to demand higher prices or more onerous credit terms, resulting in higher costs that would lead to higher rates than would otherwise occur. These are often termed "indirect costs of financial distress," and are a commonly accepted concept in finance that is supported by empirical evidence as I discuss further below.

Q. CAN YOU FURTHER EXPLAIN HOW INCENTIVE COMPENSATION THAT IS LINKED TO PROFITABILITY AND STOCK PRICES CAN TEND TO LEAD TO LOWER COSTS FOR CUSTOMERS?

A. The first step is to understand that compensation linked to profitability and stock prices will provide managers with an incentive to operate efficiently because, by doing so, a company's profitability (including earnings and cash flow) and stock price will be higher than it would otherwise be. To increase stock price, management tries to maximize the present value of a company's expected cash flows by minimizing expenses and the cost of capital. The role of incentive compensation in motivating managers to minimize the cost of capital component and the associated benefits to customers were discussed earlier. A second channel provided by incentive compensation that can benefit customers is the incentive to maximize the company's cash flows. In a regulated environment, particularly one in which promotion of sales growth is discouraged, it is likely to be more difficult to increase cash flows or profits by growing

revenues, so management will tend to focus on efficient operations and investment.

These lower costs will benefit shareholders in the short run, but customers over the long run. This is due to the regulatory process that directly links operating costs to rates. In fact, it is my understanding that the Formula Rate Plan proposed in this case provides for an even more direct link between cost savings and rates due to the frequency of reviews and reflection of any identified cost savings in customer rates. This channel is similar to the discussion earlier as to why incentive compensation that is based on cost controls will tend to benefit customers.

Q. HOW DOES COMPENSATION THAT IS LINKED TO STOCK PRICES BENEFIT CUSTOMERS VIA THE MONITORING OF MANAGERIAL DECISIONS?

A. One of the functions of the stock market and its various participants is to monitor companies' management. In their efforts to properly value stocks, analysts, portfolio managers, and traders follow companies and continually assess the various decisions, announcements, and pieces of information they produce. In doing so, they act as a monitoring device, ensuring that poor decisions would be punished by a falling stock price, so managers have incentives to invest the shareholders' financial resources efficiently. In this manner, managers help keep customers' costs lower than they might otherwise be in the absence of such monitoring, and

improve the overall quality of service. An example of such evidence, cited in one study, shows that institutional investors can help ensure that management does not act myopically to cut research and development expenditures in order to meet short-term earnings targets.[4]

Q. HOW DO THESE INVESTMENT AND COST EFFECTS INTERACT DUE TO THE STOCK MARKET?

A. An important role for stock-based compensation is to encourage managers to refrain from sacrificing long-run success in pursuit of short-term profit.[5] Stock prices are based not just on a company's performance in the current year, but also on the market's expectations about a company's future performance over many years. This ensures that good investments tend to increase stock prices, even though those investments use cash today in order to produce greater cash flows in the future. This is a critical advantage of stock-based compensation over annual incentive plans that are based on a particular year's (or a few years') performance. Stock-based compensation can help overcome managerial myopia and provide managers with an incentive to make efficient, long-term investments that benefit both customers (due to

---

[4] Brian J. Bushee, *The Influence of Institutional Investors on Myopic R&D Investment Behavior*, 73 THE ACCOUNTING REVIEW, 3 at 305-333 (July 1998).

[5] For example, see M.P. Narayanan, *Form of Compensation and Managerial Decision Horizon*, 31 JOURNAL OF FINANCIAL AND QUANTITATIVE ANALYSIS, 4 at 467-491 (1996).

efficient investments that lead to lower costs) and shareholders (due to higher cash flows). In this case, the testimony of Company witnesses Joseph F. Domino and Chris E. Barrilleaux addressing the Company's expected future capital investments, and that of Company witness Robert R. Cooper regarding long-term resource planning, provide examples of such consideration.

### IV. COSTS TO CUSTOMERS OF DISCOURAGING THE USE OF INCENTIVE COMPENSATION THAT IS LINKED TO COST CONTROL, PROFITABILITY AND STOCK PRICES

Q. WHILE YOUR EARLIER TESTIMONY DISCUSSED THE BENEFITS TO CUSTOMERS OF USING INCENTIVE COMPENSATION THAT IS LINKED TO COST CONTROL, PROFITABILITY AND STOCK PRICES, ARE THERE ALSO NEGATIVE IMPACTS TO CUSTOMERS OF NOT USING STOCK-BASED COMPENSATION?

A. Yes. In my opinion customers would be adversely affected if ETI did not include such incentive compensation in its overall compensation policy.

Q. STARTING WITH AN EXTREME EXAMPLE OF A COMPENSATION POLICY WHERE ALL EMPLOYEES WERE ONLY PAID WITH SALARIES, CAN YOU HIGHLIGHT THE IMPACT TO CUSTOMERS OF SUCH A POLICY?

A. Yes. First, it is useful to note that if employees did not receive any incentive compensation, salaries would have to be much higher in order to

attract and retain the same quality of talent. Second, costs would likely rise and employee performance would likely suffer, as it would be difficult to effectively and efficiently motivate employees to take actions that would benefit shareholders and customers. In my opinion, customers would be worse off under such a policy. This is supported by the principle that individuals respond to incentives (a basic tenet of economics), and by empirical work that shows workers' output responds to the institution of an incentive plan.[6]

Q. WOULD CUSTOMER INTERESTS BE ADVERSELY AFFECTED IF A COMPANY USED SALARY AND INCENTIVES LINKED TO MEASURES THAT HAVE BEEN TERMED "OPERATIONAL" ONLY? IN OTHER WORDS, IF THEY PROVIDED SALARY AND INCENTIVES BASED ON MEASURES LIKE RELIABILITY AND SAFETY, BUT NO INCENTIVES BASED ON COST CONTROL, PROFITABILITY AND STOCK PRICES?

A. Yes. I believe customers would be worse off under such a compensation policy. On the one hand, incentives linked to what have been termed "operational" measures can improve customer welfare because the company can better attract, motivate and retain talented employees. Compared to the hypothetical case where a company compensates its employees with salary only, by using salary and incentives linked to, for

---

[6] Edward P. Lazear, *Performance Pay and Productivity*, 90 THE AMERICAN ECONOMIC REVIEW, at 1346-1361 (December 2000).

example, safety or reliability, the company can pay less in salary and use the associated savings to contribute to the annual incentive plans. On the other hand, such a compensation plan still has substantial problems in the context of customer benefits.

First, there is still no free lunch – employees' salaries and incentive payments linked to operational incentives would have to be larger than they otherwise would be if the firm also offered incentive compensation linked to cost control, profitability and stock prices in order for the firm to compete in the market for labor. Second, such a compensation plan would not provide any incentives for employees and managers to control costs. If employees only had incentives to improve non-cash measures of performance, such as safety and reliability, then they would likely over-invest in these measures relative to what customers might prefer, at the expense of alternative investments that would produce lower costs for customers. For example, if management only had incentives based on wait times when customers called with questions or complaints (plus a base salary), then they would have an incentive to hire enough staff such that customers never had to wait if they called to ask a question. However, if you left it up to customers, they would likely view it as worthwhile to run the risk of having to wait for a little while on rare occasions if it meant that their service was provided at a lower cost and those cost savings were passed along to customers through the regulatory process.

Third, a compensation plan consisting of salary and incentives based solely on annual measures of operational performance could likely lead to "horizon problems." By horizon problems, I mean that managers tend to have a natural tendency, absent incentives, to focus on the short run at the expense of the long run. Stock prices by their nature are forward looking. Taken together, a compensation plan that included incentives based on annual measures such as reliability and customer satisfaction, but not incentives based on cost controls, profitability and especially stock prices, could provide incentives for managers to maximize their immediate compensation at the expense of longer-run benefits that the customer could have enjoyed.[7]

For example, consider a manager facing a decision whether to hire additional staff to answer phones in a call center (and bring down phone wait times) or to invest the same amount in a capital investment to put in place a new, more centralized call center that would produce significantly lower costs several years in the future. If the manager is paid purely in cash compensation including an incentive payment based on current-year customer satisfaction surveys (that would include phone wait times), then the manager would be more likely to forgo the long-term investment project and increase payroll by hiring additional employees in order to maximize his or her incentive pay by implementing the short-term solution

---

[7] See M.P. Narayanan, *Form of Compensation and Managerial Decision Horizon*, 31 JOURNAL OF FINANCIAL AND QUANTITATIVE ANALYSIS, 4 at 467-491 (1996).

today. But, at some point, customers are better off by having slightly longer waits on the phone now but reaping the benefits of lower overall costs in the future. A well-designed compensation plan that includes incentives linked to both customer satisfaction (in this example) and cost control, profitability and stock prices would provide incentives for the manager in this example to properly consider the benefits of such a long-term investment without sacrificing current customer satisfaction.

Q. HOW DOES THE INCLUSION OF INCENTIVE COMPENSATION THAT IS LINKED TO COST CONTROLS, PROFITABILITY AND STOCK PRICES HELP AVOID THESE NEGATIVE OUTCOMES FOR CUSTOMERS?

A. If a company adds compensation that is linked to cost controls, profitability, and stock prices to a compensation plan that includes base salary and incentives based on non-cash based measures in a reasonable way, customers are likely to be better off. Such incentive compensation helps a company attract, motivate, and retain talented employees and gives managers a reason to focus on the long run in addition to the current year's performance, costs, customer service, and the like.

This focus on the longer run is evident in the design of ETI's LTIP and stock option plan. For example, ETI's LTIP bases its payments in a particular year on the achievement of goals over the previous three years, encouraging managers to consider consistent and long-term success as

key objectives. Plus, options granted vest over a three-year period, forcing managers to think about future years and how the firm will be viewed several years into the future. The stock options also have a life of ten years, which provides an additional incentive to focus on the long term. Such a focus on maximizing stock price over a ten-year period is beneficial for all stakeholders. As stock options may be awarded annually, option grants present a rolling ten-year window for those employees who receive them, reinforcing that long-term view. Finally, the provision that requires senior managers to continue to hold stock received via exercising option grants up to a multiple of their salary further encourages longer-run thinking and incentive alignment, as managers cannot exercise all their options for cash and be immune to declines in the firm's financial health.

V. RESPONSE TO COMMON ARGUMENTS AGAINST INCENTIVE COMPENSATION LINKED TO COST CONTROL, PROFITABILITY AND STOCK PRICES FROM THE CUSTOMERS' PERSPECTIVE

Q. HOW DO YOU RESPOND TO THE ARGUMENT THAT INCENTIVE COMPENSATION THAT IS LINKED TO COST CONTROL, PROFITABILITY, AND STOCK PRICES WILL BE DETRIMENTAL TO CUSTOMERS BECAUSE IT WILL CAUSE MANAGERS TO CUT CUSTOMER SERVICE-RELATED EXPENSES TO INCREASE PROFITS?

A. This argument underscores the importance of a well-balanced compensation plan. By including both incentives based on non-dollar

based measures such as customer service, reliability and safety, and incentives based on cost control, profitability and stock price, as does ETI, management will not want to cut one in order to increase the other, but will instead look for balanced decisions that help both.

Q. IS THERE REASON TO BE CONCERNED FROM THE CUSTOMERS' PERSPECTIVE BECAUSE STOCK PRICES AND PROFITS ARE DRIVEN BY MANY OTHER FACTORS IN ADDITION TO CONTROLLING COSTS, OR HAVING A LOW COST OF CAPITAL?

A. No. Avoiding this concern is why firms generally do not use compensation plans that consist solely of stock- or profit-based incentive pay – to do so would be too risky for the employees and would lead to larger overall compensation expense because risk-averse individuals would demand higher compensation levels in order to compensate them for bearing the risk of such a hypothetical plan. This is also why stock- and profit-based incentive compensation is more important at the top of the organization. Senior management can more clearly see (and anticipate) the impact of their actions on the firm's stock price, so stock-based compensation is a more efficient compensation tool for this level of management.

VI.   EMPIRICAL EVIDENCE SUPPORTING TESTIMONY

Q.   ARE THE CONCEPTS IN SUPPORT OF THE CUSTOMER BENEFITS OF INCENTIVE COMPENSATION SUPPORTED BY EMPIRICAL EVIDENCE?

A.   Yes.   As I discuss below, there are multiple studies published in peer-reviewed journals that report evidence that is consistent with my testimony.

Q.   IS THERE EMPIRICAL EVIDENCE THAT THE ADOPTION OF INCENTIVE TARGETS BASED ON STOCK OR EARNINGS PERFORMANCE BENEFITS CUSTOMERS?

A.   Yes. There is a published study that examines the adoption of long-term incentive plans that reward managers with stock or stock-based compensation, where the stock grants are based on long-run profitability.[8] The study finds that after the adoption of such plans, managerial compensation is more closely linked to the interests of managers and stakeholders, including customers.  This is also consistent with the studies I discuss below, such as one that links market value with customer satisfaction.

---

[8]   Alka Arora and Pervaiz Alam, *CEO Compensation and Stakeholders' Claims*, 22 CONTEMPORARY ACCOUNTING RESEARCH, 3 at 519-547 (Fall 2005).

Q. HOW DO OTHER EMPIRICAL STUDIES SUPPORT THE OPINION THAT INCENTIVE COMPENSATION TIED TO STOCK OR PROFITABILITY BENEFITS CUSTOMERS?

A. Earlier, I mentioned two empirical studies that provide support for my opinion that stock-based incentive compensation provides benefits to customers. The first study provides evidence of how the oversight of companies' performance by stock-market participants can affect those firms' investment behavior and curtail managerial myopia.[9] This is one of the channels I discussed earlier by which the presence of stock-based incentive compensation can benefit customers by encouraging managers to focus beyond the short term and think about long-term efficient investments. The second study shows that workers do respond to incentive plans in a manner consistent with the intent behind the plans' design.[10] Thus, if a company adopts a compensation plan that includes incentives based on customer welfare and stock price, one can expect managers to take actions to improve customer welfare and maximize stock price (holding all else equal).

In addition, there is empirical evidence in the literature that firms with higher market values tend to also have higher customer satisfaction, supporting the conclusion that the goals of financial success and customer

---

[9] Brian J. Bushee, *The Influence of Institutional Investors on Myopic R&D Investment Behavior*, 73 THE ACCOUNTING REVIEW, 3 at 305-333 (July 1998).

[10] Edward P. Lazear, *Performance Pay and Productivity*, 90 THE AMERICAN ECONOMIC REVIEW, at 1346-1361 (December 2000).

satisfaction are interrelated.[11] This result has been shown for a broad sample of firms, but also for utilities in particular. This empirical finding is inconsistent with the idea that the most profitable or valuable firms become that way by cutting customer service, and instead suggests that there exists positive feedback between a firm's financial performance (stock price) and customers' welfare, even in the utility industry.

Empirical evidence also exists that some firms hurt their financial performance (stock price) by overinvesting in customer service.[12] This result suggests that including stock price in the compensation plan will help ensure against myopic investments in short-term service that would come at the expense of investments that would produce greater long-term benefits to customers. It also points toward the conclusion that basing incentive compensation for purposes of setting rates solely on operational goals could well be harmful to customers' interests in the long run.

Finally, there is empirical evidence that firms with lower stock prices (or that are less financially healthy) face higher costs and greater risks. For example, some researchers have shown how less financially healthy companies have trouble responding to external shocks, and face higher costs of doing business (through higher wages or worse terms from

---

[11] Christopher D. Ittner and David F. Larcker, *Are Nonfinancial Measures Leading Indicators of Financial Performance? An Analysis of Customer Satisfaction*, 36 JOURNAL OF ACCOUNTING RESEARCH, Supplement 1998 at 1 – 35.

[12] *Id.*

suppliers, for example).[13]  These results support yet another channel by which stock-based incentive compensation should provide direct benefits to customers.  Stock-based incentive compensation encourages managers to maintain a company's financial health, thus leading to more efficient operations and greater cost control than would otherwise occur.

## VII.  CONCLUSION

Q.  DOES THIS CONCLUDE YOUR DIRECT TESTIMONY?

A.  Yes, at this time.

---

[13] Chris Parsons and Sheridan Titman, *Capital Structure and Corporate Strategy* (January 2007).  The article is available at http://ssrn.com/abstract=983553.



APPENDIX C


Redacted Direct Testimony of Sarah J. Goodfriend, Ph.D
PUC Docket No. 28840

SOAH DOCKET NO. 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
PUC DOCKET NO. 28840

R⁸⁸EIVED

2004 FEB -9 PM 2: 21

PUBLIC UTILITY COMMISSION
FILING CLERK

| | | |
|---|---|---|
| APPLICATION OF AEP TEXAS | § | BEFORE THE STATE OFFICE |
| CENTRAL COMPANY FOR | § | OF |
| AUTHORITY TO CHANGE RATES | § | ADMINISTRATIVE HEARINGS |

REDACTED

DIRECT TESTIMONY

OF

SARAH J. GOODFRIEND, PH.D.

ON BEHALF OF

CITIES SERVED BY AEP TEXAS CENTRAL COMPANY

CERTIFIED TO BE A TRUE AND CORRECT
COPY OF THE ORIGINAL ON FILE WITH THE
PUBLIC UTILITY COMMISSION OF TEXAS
CENTRAL RECORDS DIVISION

BY:

DATE: 5-11-2015

FEBRUARY 9, 2004

341

## I. INTRODUCTION AND ORGANIZATION OF TESTIMONY

**Q. PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.**

A. My name is Sarah Goodfriend and my business address is 1500 West 24th Street, Austin, Texas 78703.

**Q. BRIEFLY DESCRIBE YOUR EXPERIENCE AND QUALIFICATIONS RELEVANT TO THIS PROCEEDING.**

A. As an economic consultant specializing in competition and regulatory policy issues, I have twenty-five years of experience in the regulated electric utility and telecommunications industries. Prior to entering graduate school, I was employed as an economist by the Public Utility Commission of Texas ("PUCT"). In 1983, I worked for Carolina Power And Light Company, receiving a Ph.D. in economics from the University of North Carolina at Chapel Hill in 1985. Since that time, I have worked and testified on behalf of the Economic Policy Office of the Federal Energy Regulatory Commission and the Bureau of Economics of the Federal Trade Commission. I returned to the PUCT in 1992 to create an Office of Economic Policy and was appointed a PUC Commissioner in 1993, serving until 1995. Before starting my consulting practice, I joined the Washington D.C. office of MCI Telecommunications Corporation where I was responsible for policy development and providing expert witness testimony. I have been an independent consultant since 1997.

As an independent consultant, I provided expert testimony on behalf of South Texas Electric Cooperative and a Central Power and Light Wholesale Customer group in the AEP-CSW merger proceedings. Since then, as my resume shows, I have

remained active as an advisor or testifying witness on behalf of various market participants in the electric utility and telecommunications industries. Most recently, I have worked as an advisor to a group of Retail Electric Providers ("REPs") pursuant to their participation in the Texas Nodal Team stakeholder meetings. Some of these REPs are active in the TCC service territory.

Q. ON WHOSE BEHALF ARE YOU PROVIDING THIS TESTIMONY?

A. I have been retained by Cities served by AEP Texas Central Company ("Cities"). AEP Texas Central Company ("TCC") is the monopoly TDSP for these Cities in their role as market participants, end-use customers and ratepayers.

Q. WHAT IS THE PURPOSE OF YOUR TESTIMONY?

A. Cities desire that the rates and operations of TCC not hinder the development of a competitive market. Cities' experience with the deregulated market has not been good. I have been asked to identify cross-subsidies, anti-competitive behavior and areas where improvements to quality of service can be made. My testimony evaluates TCC's (1) quality of service to retail customers, (2) request for good cause exception Subst. R. §25.342(f)(D), (3) proposed discretionary service fees and (4) request for pre-approval for recovery of REP bad debt expense.

A. PRINCIPAL FINDINGS AND RECOMMENDATIONS

Q. WHAT ARE YOUR PRINCIPAL FINDINGS?

A. My testimony reaches these principal findings:

1. The quality of service that TCC is providing to REPs, end-use customers and the market is unacceptable and contrary to provisions of the Public Utility Regulatory Act ("PURA").

2. The structure of TCC costs supports difficult to detect cross-subsidy of wholesale operations by using and placing retail ratepayer dollars at risk.

3. TCC's request for a good cause exception to the PUCT's Electric Business Separation Subst. R. § 25.342(f)(D) Other Service would permit greater circumvention of the PUCT's Unbundling Rules than now exists.

4. Transmission Construction Services and Associated Business Development ("ABD") Operation and Maintenance ("O&M") Services are the two categories of service that TCC offers pursuant to the Other Service exception. Neither class of service complies with the requirements of Subst. R. § 25.342(f)(D)(i).

5. TCC's Transmission Construction Service is principally supplied using personnel non-essential to T&D system operations. To avoid future cross-subsidies, TCC's best course of action is to create a stand-alone Construction Services operation separate from the regulated utility business.

6. TCC's non-compliance with requirements of Subst. R. § 25.342(f)(D) Other service is consistent with evidence of high Administrative and General expense but declining staffing/resources for retail operations that Dr. Patton finds and is also a likely reason for the poor service quality for regulated retail operations that Dr. Patton and I find.

7. Various changes need to be made to TCC's proposed Discretionary Service Tariff fees, terms and conditions to improve service quality and better align TCC's tariff offerings with market needs.

8. TCC's request for pre-approval for deferral and inclusion of any REP bad debt expense is premature and contrary to policy.

**Q. WHAT ARE YOUR PRINCIPAL RECOMMENDATIONS?**

A. I recommend the Commission:

1. Adopt a rate of return recommendation consistent with the requirements of PURA Sec.36.052 to recognize the poor quality of services TCC now provides.

2. Direct TCC to return to the lower level of estimated meter readings it reported for each customer class prior to the inception of the retail Choice Pilot project.

3. Deny TCC's request for a good cause waiver of Subst. R. § 25.342(f)(D)(ii)(III) Other services. Thus, The Commission should direct TCC to apply the $2,542,584.34[1] profit TCC has failed to record as a revenue credit in this proceeding to reduce the total revenue requirement in this case.[2]

4. Immediately place a moratorium on TCC's acceptance of new Transmission Construction contracts. The moratorium should not be lifted until (a) TCC demonstrates compliance with Subst. R. §25.342(f)(D) Other service, or, as a preferred alternative, (b) separates Transmission Construction Services completely from unregulated utility operations in ERCOT.

5. Immediately place a moratorium on TCC's acceptance of new ABD O&M contracts until (a) TCC demonstrates compliance with Subst. R§ 25.342(f)(D) Other Service and (b) TCC implements the REP-survey recommendations listed below.

6. Direct TCC to implement the following changes to its Discretionary Service tariff fees, terms and conditions:

---

[1] Profit from Updated Response to Cities 17-14, provided in Workpapers.

[2] Response to Staff BA1-5. Margins received from third-party contracts for transmission services were booked to FERC Account No. 417-Revenues from Non-utility operations.

a) 6.1.2.1.8 Inaccessible Meter Fee should remain a Denial of Access to Meter Fee. TCC should retain responsibility to document, upon request, customer denial of access.

b) 6.1.2.1.6 Special Meter Reading Fee should not be charged when a REP requests an actual meter read on an outstanding bill with estimated usage.

c) An Account History Fee should not be charged to end-users, REPs or aggregators of record.[3]

d) 6.1.2.1.13 Copying Fee, 6.1.2.15 Special Products/Service Fee or other fee may not be charged as a substitute for the Account History Fee.

e) 6.1.2.1.16 Special Billing Services Fee, 6.1.2.1.13 Copy Fee or 6.1.2.15 Special Products/Service Fee shall not be charged to REPs or aggregators requesting a Detailed Billing and Invoicing Analysis.

f) TCC's terms and conditions are not in compliance with Consumer Protection Rules as proposed. TCC should be directed to conform its tariff to the rule adopted in Docket No. 27084.

7. Deny TCC's request to defer any bad debt expense incurred in providing service to REPs and deny TCC's request for grant of authority in this rate proceeding to include such costs in TCC's next base rate case.

8. Direct TCC to file as non-confidential the "B Report" portion of TCC's Quarterly Performance Report that ERCOT now files confidentially on behalf of TCC.

---

[3] The Account History Fee does not appear in the tariff as a proposed or existing discretionary service and so has no tariff reference number.

**Q.   PLEASE PROVIDE THE LIST OF REP-SURVEY RECOMMENDATIONS YOU REFER TO IN YOUR FIFTH RECOMMENDATION ABOVE.**

A.   The list is:

- Increase dedicated resources and reorganize job responsibilities so each REP has a dedicated REP relations person. (Now there is one person "dedicated" to all REPs).

- Create and apply job performance metrics to reward job performance relating to REP satisfaction.

- At no charge, prepare a Detailed Billing and Invoicing Analysis for different classes of meters and services for each REP or aggregator that requests it.[4]

- Schedule and offer at least one face-to-face meeting between REPs and their customer service representatives annually.

- Provide current usage information to aggregators upon request for all active premise locations ("ESI-IDs") that have provided a letter of authorization for their usage information to be released to the aggregator.

- Annually perform an anonymous Customer Satisfaction Survey for REPs and aggregators.[5]

- Provide Commission staff with a software and staffing improvement plan identifying timetables, targets and budgets for Customer Service business and

---

[4] Alternatively, TCC should produce a manual of information necessary for the REP/aggregator to perform detailed analysis. A Detailed Billing and Invoicing Analysis includes the breakout and definition of each charge type which underlies any composite charge provided, so that the bill or invoice may be readily understood and interpreted.

[5] The survey should be modeled on the anonymous telephone survey now being performed by CenterPoint TDSP for REPs. Perform this survey until granted waiver of this requirement by the Commission. File the results publicly with the Commission.

related Information Technology operations to improve TCC's performance with protocols and other measures of quality of service discussed here.

Q. **HOW ARE YOUR RECOMMENDATIONS RELATED TO YOUR FINDINGS?**

A. My recommendations lay out what is necessary for the PUCT to do in this proceeding to (1) gain control over the unnecessary costs that TCC is imposing on the ERCOT market by providing poor service quality at retail and (2) eliminate the cross-subsidies of wholesale operations that TCC is providing from retail ratepayers.

**B.    ORGANIZATION OF TESTIMONY**

Q. **HOW IS YOUR TESTIMONY ORGANIZED?**

A. This concludes Section I, Principal Findings and Recommendations. In Section II, I evaluate the Customer Service TCC provides to the retail market. Section III addresses TCC's request for good cause exception to §25.342(f)(D)(ii)(III) and includes compliance issues related to TCC's provision of unregulated wholesale service. Section IV addresses TCC's proposed discretionary service fees and Section V addresses TCC's request for certain treatment of REP bad debt expense. The testimony concludes with support for rate case expenses in Section VI.

**II.  CUSTOMER SERVICE PROVIDED BY TCC TO THE RETAIL MARKET**

Q. **WHAT ARE YOUR FINDINGS?**

A. (1) AEP has unnecessarily imposed significant costs on the market, on market participants, and thereby, on the quality of service the market delivers to end use customers.

(2) AEP lacks concern for TCC's retail customers. This lack of concern results in missed opportunities to improve market performance at little or no cost to TCC.

(3) AEP management understaffs and undersupports TCC customer service functions necessary for market development and for the delivery of acceptable service quality to end users.

(4) Without regulatory action in this proceeding, TCC will continue to provide a case study in how TDSP interests fail to align with market needs.

## A. STANDARD OF EVALUATION

### 1. DESCRIPTION OF UNNECESSARY COSTS

Q. WHAT DO YOU MEAN BY "UNNECESSARY COSTS"?

A. Unnecessary costs are costs imposed when a TDSP fails to perform acceptably in all dimensions of service: (1) quality and timeliness of communication, (2) speed of response, (3) pro-active problem solving, (4) dedication of resources and (5) accuracy of response. When any one of these dimensions of service deteriorates, the customer begins to experience unnecessary costs of doing business. Said differently, a TDSP that is able to excel in these performance areas is contributing to minimizing the costs of doing business in the market, and probably minimizing its own long-term costs of providing customer service as well. End-use customers are the ultimate beneficiaries when a TDSP is performing acceptably in all dimensions of service, thereby avoiding unnecessary costs to market participants and consumers.

**Q. HOW ARE END-USE CUSTOMERS HARMED BY UNNECESSARY COSTS?**

A. Customers are harmed in three ways:

First, a customer suffers directly from unnecessary delay and inaccuracy. A delayed bill means the customer cannot budget or exercise control over electricity costs. Second, customers are harmed by prices higher than they need to be. And, third, customers are harmed because it is not rational for REPs to market, develop a reputation or differentiate their products on the basis of service quality.

**Q. WHY ARE PRICES HIGHER THAN THEY NEED TO BE?**

A. There are two paths by which prices to end-use customers increase. Economists understand that in competitive markets, any increase in a suppliers' cost of doing business must ultimately lead to a price increase. Unnecessary costs increase the REP's cost of doing business. Because REPs must ultimately pass along service costs imposed by an inefficient TDSP to end use customers, these unnecessary costs can be thought of as an implicit or hidden tax on REPs, and ultimately on end-use customers.

**Q. WHAT IS THE SECOND PATH TO HIGHER PRICES?**

A. By raising all REPs' cost structures, unnecessary costs operate as an implicit reduction in headroom. This understanding is why the Commission has been concerned since before the onset of Customer Choice with "headroom". The reduction in headroom is the second path whereby unnecessary costs result in a price increase to end users. A reduction in headroom can limit entry or force market exit of otherwise worthy suppliers. In turn, this tends to raise prices to end-users by limiting the size, number or extent of diversity among suppliers.

**Q. WHAT IS THE PROBLEM CREATED FOR RETAIL SERVICE QUALITY?**

A. With Customer Choice, REPs have become the closest link to customers for enrollment, billing, and customer care services. Yet, the quality of service the REP can provide can be no better than what the REP receives upstream from ERCOT or the monopoly TDSPs. Thus, it makes no sense for REPs interested in differentiating their service from their peers on the basis of superior service quality to invest in resources that would allow them to do so, until risks associated with TDSP service quality are controllable. This important dimension of REP competition cannot take root without reliably acceptable upstream service quality from TDSPs and ERCOT.

## 2. PURA STANDARDS: WHEN UNNECESSARY COSTS BECOME UNACCEPTABLE COSTS

**Q. WHAT PURA STANDARDS ARE INSTRUCTIVE FOR AN ASSESSMENT OF RETAIL SERVICE QUALITY?**

A. First, PURA provides some qualitative standards for assessing service quality. For example, Sec. 38.022 recognizes that an electric utility may not engage in a practice that tends to restrict or impair competition. As just discussed, poor TDSP service quality is such a practice in the context of an emerging competitive market.

Second, within the Customer Safeguards for Retail Competition section, (PURA Sec. 39.101), the Commission must establish customer protection standards that entitle customers to, among other things, bills presented in a clear format and in language understandable by customers; accuracy of metering and billing; and other information or protections necessary to ensure high-quality service to customers. The customer is also entitled to prompt resolution of disputes with its chosen REP and TDSP.

PURA recognizes the tendency of suppliers to deteriorate service quality as a method of cost-cutting and so provides for the assessment of civil and administrative penalties to enforce customer safeguards.

Q. DOES PURA PROVIDE OTHER STANDARDS?

A. Yes, PURA prohibits service from deteriorating relative to standards established under integrated utility operation. PURA directs the PUCT to modify its current customer protection rules on or before June 30, 2001 "to ensure at least the same level of customer protection against potential abuses and the same quality of service that exists on December 31, 1999 is maintained in a restructured electric industry." (PURA Sec. 39.101(f)).

Finally, PURA provides for a timely enforcement action and the exercise of some "incentive regulation," in that PURA requires the PUCT to consider quality of service when setting the rate of return. (PURA Sec. 36.052).

### 3. PURA/ECONOMIC FRAMEWORK: THE ALIGNMENT STANDARD

Q. ARE YOU OFFERING AN ECONOMIC FRAMEWORK FOR ANALYSIS THAT YOU DERIVE FROM PURA'S STATUTORY STANDARDS?

A. Yes, I am. There is a simple way to understand how service quality provided by TDSPs can deteriorate relative to the integrated utility world of December 1999.

Q. PLEASE EXPLAIN.

A. In the integrated utility/captive customer model, "the market" consisted of captive customers, and captive customers or their representatives accessed the regulatory process to provide effective feedback on utility operations. This regulatory model encouraged the private incentives of utility management concerning quality of service

to be, depending on specifics of management and regulation, more or less aligned with the interests of end-use customers (or at least aligned with regulatory perceptions of end-user requirements).

**Q. HOW SO?**

A. Regulation could create incentives for the utility to align its expenditure pattern with customer service requirements. In rate proceedings, regulators set prices and imposed service standards. This kind of regulation provided readily available ways for end-use customers or their representatives to access the regulatory process and express dissatisfaction with rates, services, service offerings (rate design) and service quality. Considering the total dollars at risk in generation, transmission and distribution combined, utility efforts to respond to customers and manage customer relations were a necessary asset-preservation investment strategy. Absent effective regulation, there was no need to consider regulatory feedback effects on its balance sheet when making cost/quality decisions.

**Q. HOW HAVE THINGS CHANGED?**

A. A new problem introduced by Customer Choice is one of "incentive alignment" for the remaining regulated utility, the TDSP. One of the purposes of regulation is to create incentives for a utility to "internalize" important externalities, in other words, to create incentives for the utility to take into account the effects of its decisions and actions **on costs borne by others** when this "internalization" is in the public interest.

Q.  ARE YOU SAYING THAT AEP ISN'T PROVIDING TCC WITH ENOUGH RESOURCES DEDICATED TO RETAIL CUSTOMER SERVICE QUALITY?

A.  Yes, and I am saying more. Although a misallocation of resources is a part of the answer, it is not the full answer.

Q.  PLEASE EXPLAIN.

A.  One can explain the poor quality of customer service at TCC as a consequence of cost-cutting by AEP management in response to financial pressures (such as those created by recent failed investments in unregulated businesses).[6] To manage needed cash flow, AEP allows the service quality offered by the regulated business to deteriorate in order to compensate for cash flow lost by unregulated operations. This describes a situation of unacceptable and impermissible cross-subsidy of the unregulated operations by misallocation of resources from the regulated business.

Although the evidence is consistent with this view, I believe this unacceptable cross-subsidy is a symptom as well as a contributing factor to problems with customer service at TCC. Said differently, even if AEP were not cross-subsidizing losses, due to the incentive alignment problem I describe, we would still find TCC's service quality to deteriorate with the arrival of retail choice in ERCOT.

Q.  WHY AREN'T AEP-TCC'S INCENTIVES TO PROVIDE QUALITY SERVICE PROPERLY ALIGNED NOW?

A.  Incentives have changed because the odds have changed. Especially in the case of AEP, significant assets are no longer at risk in this regulatory proceeding. AEP has

---

[6] See for example, the $5.8 million in trading losses that appears against Miscellaneous Income in TCC's Rate Filing Package, WP II-E-5. See also AEP's Annual Report for 2002.

sold or will sell ERCOT assets upstream and downstream of its TDSPs. Unlike the other TDSPs in ERCOT, AEP no longer has significant investment in affiliated REP operations whose service quality depends, at least in part, on the service quality it receives from the TDSP. Moreover, AEP is prohibited under its agreement with Centrica from entering the ERCOT market as a residential and small commercial REP until 2006.[7]

From a utility management perspective, generation is no longer subject to rate-of-return regulation by Texas regulators. In ERCOT, the individual utility transmission investment decision is now subjected to an ERCOT-wide priority planning process and then annual costs are socialized. In subjecting major transmission projects to ERCOT staff and stakeholder review, the ERCOT planning process tends to operate like a pre-investment prudence review, reducing disallowance risks (except perhaps for cost overruns) for larger transmission investments. Thus, compared to the old world, the dollars at risk or exposure from poor service quality are significantly reduced. End-use customers' dissatisfaction with service from the distribution utility no longer poses the potential threat to revenues or profits that it once did.

From an end-user perspective, finding the responsible party has become more difficult and once found, the payoffs for effort are simply lower. With socialized transmission costs, end-use customers of the TDSP are no longer directly responsible for paying the costs of their TDSP's transmission investments. Thus, the payoff to

---

[7] Notice and Request for Approval of Changes in Ownership and Affiliation of Mutual Energy CPL, LP and Mutual Energy WTU, LP, May 22, 2002 Docket No. 25957, Attachments.

end-use customers in terms of cost/bill reductions from using the regulatory process to address concerns with service quality has declined.

Moreover, the complexity and interdependence of market transactions necessary in order to provide end-user services has increased, requiring the coordinated efforts of TDSPs, ERCOT and REPs. Not surprisingly, Customer Choice engendered unprecedented levels of electricity customer complaints.[8] If customers are unsure where responsibility lies, this complexity further reduces the pay-off to end use customers or their representatives of holding a TDSP accountable for its contribution (or lack thereof) in setting the level of service quality the market is capable of providing.

Q. **WHAT KIND OF STANDARDS HAS THE COMMISSION SET FOR TDSPS, ERCOT AND REPS ?**

A. The Commission has set quantitative standards for certain electronic transactions and numerical and qualitative standards throughout its Customer Protection Rules.

Q. **WHY HAS THE COMMISSION SET QUANTITATIVE STANDARDS FOR CERTAIN ELECTRONIC TRANSACTIONS?**

A. Essentially, the Commission has set quantitative standards for certain electronic transactions in order to create accountability among parties for the success of highly interdependent transactions.

---

[8] See Report to the 78th Texas Legislature, Scope of Competition in Electric Markets in Texas, Public Utility Commission of Texas, January 2003, page 106

**Q.  PLEASE EXPLAIN.**

A.  ERCOT is the central registration agent for retail premises and the electronic hub for all retail electronic "enrollment" transactions. Electronic transactions are necessary for customers to change REPs, change premises, receive electric service, etc. At the beginning of the market, technical problems were affecting the ability of parties to timely "turnaround" the necessary transactions.

**Q.  WHAT KIND OF STANDARDS APPLY TO TDSPS?**

A.  Standards are established for certain transactions by ERCOT Protocols. Some standards also appear in TDSP tariffs. For example, when ERCOT sends a TDSP a notice of a switch request, the ERCOT Protocol requires the TDSP to send an electronic acknowledgement of the request back to ERCOT within two business days of receipt. TDSPs are also required to send their invoicing out to REPs within tariff-established time frames.

**Q.  WHAT ARE THE QUARTERLY PERFORMANCE REPORTS?**

A.  Among other things, Quarterly Performance Reports provide technical information about several electronic transactions. To identify how successful ERCOT, TDSPs and REPs are in moving electronic transactions over their interconnected networks and in completing the necessary electronic lifecycles in a timely and accurate fashion, the technical report examines some of the 47 standard electronic transactions in the Texas market (Texas SET) that can occur.[9]

---

[9] Developed in response to early problems in turning around electronic transactions, the Performance Measure Reports require that ERCOT report transaction volumes and "success rates" in completing electronic transactions within established Protocols. The Commission established a benchmark for success rates equal to 98%. In other words, ERCOT, the TDSPs and REPs should strive to complete the electronic transactions that are their portion of the turnarounds within Protocol, 98% of the time.

Q. DO THE QUARTERLY PERFORMANCE REPORTS PROVIDE OTHER TECHNICAL INFORMATION?

A. Yes. Due to early market problems, a shadow system of "workarounds" or "safety net" transactions came into being bypassing ERCOT and requiring the direct coordination of TDSPs and REPs. The Quarterly Report requires some limited reporting by TDSPs and REPs on these manual/electronic transactions and on inter-company invoicing. I will be referencing some of this data later in my testimony.

Q. WHAT OTHER STANDARDS WILL YOU BE REFERENCING?

A. The PUCT has promulgated specific standards within its Consumer Protection rules. A reading of these rules suggests that the qualitative standards I have suggested above describe the essential elements that together can make or break service quality.[10]

Q. HOW DO THESE FIVE DIMENSIONS OF SERVICE QUALITY RELATE TO THE ALIGNMENT STANDARD FROM ECONOMIC THEORY?

A. Deficiencies in any one of these will impose unnecessary costs on the market.

Q. HOW DID YOU DECIDE TO PROCEED?

A. In order to investigate the quality of service provided to REPs, I decided to survey REPs active in the TCC service area regarding service quality.

---

[10] These are: (1) Quality and Timeliness of Communication, (2) Speed of Response, (3) Pro-active Problem solving, (4) Dedication of Resources and (5) Accuracy of Response.

**B. SURVEY DESCRIPTION AND RESULTS**

      **1. INTRODUCTION AND ORGANIZATION**

Q. **HAS AEP-TCC SURVEYED REPS REGARDING THEIR EVALUATION OF TCC SERVICE QUALITY?**

A. No.

Q. **HAVE OTHER AEP TDSPS IN STATES WITH RETAIL CHOICE SURVEYED REPS REGARDING THEIR EVALUATION OF TDSP SERVICE QUALITY?**

A. No. There has been no survey.[11] Moreover, there is no incentive structure in place at AEP or TCC to reward employees according to REP perceptions of service quality.[12]

Q. **HAVE ANY OTHER ERCOT TDSPS SURVEYED SERVICE QUALITY?**

A. Within the last month, I understand that an anonymous telephone survey by a market research firm is being conducted on behalf of CenterPoint, the TDSP in the Reliant service territory. To my knowledge this is CenterPoint's first formal survey of its REP customers. ERCOT also has announced plans for its first customer survey.[13]

Q. **HOW DID YOU PROCEED?**

A. To investigate TCC service quality, I created and sent a REP Customer Satisfaction Survey to all REPs active in the TCC service territory. I surveyed four areas of importance to REP service quality: (1) Responsiveness to REP inquiries, (2) Educational programming and outreach to REPs, (3) Responsiveness in resolving

---

[11] Response to Cities 2-97.

[12] Response to Cities 2-96.

[13] Ercot Report to RMS, 1/14/04.

market problems generally, and (4) specifically, with respect to FasTrak issues. The survey and cover letter is provided as Exhibit SJG-1.

Q. **HOW IS THIS SECTION OF YOUR SERVICE QUALITY TESTIMONY ORGANIZED?**

A. First, I will introduce the survey. Second, I will report the numerical results of responses on relative and absolute rankings of TCC. Third, I will review each of the four topic areas for which I solicited comments. For ease of exposition, I will not be discussing all the survey responses. However, I have included them all in matrix form within the body of my testimony. I will be discussing some representative responses that appear in the matrix.

Q. **DID YOU EVALUATE THE RESPONSES YOU RECEIVED?**

A. Yes. Research and discovery permitted me to directly evaluate some of the REP responses to the Customer Satisfaction Survey. I have supplemented the REP responses with additional examples or illustrations related to assessing unnecessary costs imposed on the market by TCC's service quality failures.

Q. **WHY WAS THERE A NEED FOR AN ANONYMOUS SURVEY?**

A. Because of the day-to-day working relationship with TCC, and fear of possible retaliation, REPs suggested the need for anonymous survey response. Even so, several REPs I contacted indicated that they would not be responding due to confidentiality concerns.

Q. **DO YOU BELIEVE FEAR OF RETALIATION IS RATIONAL?**

A. Yes. REPs depend upon the cooperation of TDSP personnel. It is rational to fear forms of retaliation such as assigning a new employee to work an critical issue for a

particular REP, working orders from one REP before another, responding to emails or phone calls more promptly, etc. that discriminate but are difficult to detect.

Q. **ARE THERE SOME OTHER REPS YOU DID NOT EXPECT TO PARTICIPATE?**

A. Yes, based on economic self-interest it seemed less likely that I would receive responses from REPs affiliated with AEP or REPs affiliated with other TDSPs.

Q. **HOW LARGE THEN WAS YOUR POTENTIAL POOL OF RESPONDENTS?**

A. These considerations leave 26 or 27 REPs as potential respondents. Roughly 1/3 of these potential respondents completed and returned the survey. The respondent group of REPs included those who had been in the market from the beginning and those entered later; REPs serving Residential, Commercial and Industrial customers (or some combination thereof), and REPs with different market shares and distributions of overall market share in AEP.

## 2. NUMERICAL RESULTS

Q. **YOU SAID EARLIER THAT YOU WOULD BE PROVIDING DIRECT QUOTES FROM THE SURVEY IN ITALICS AS REPRESENTATIVE OF YOUR FINDINGS FOR EACH AREA. DO YOU HAVE A REPRESENTATIVE RESPONSE FOR THIS SECTION?**

A. Yes. *It all comes down to communication and responsiveness. Resource constraints may play a role but CenterPoint and Oncor find themselves well in front of AEP and TNMP.* The relative ranking of AEP-TCC is consistent with the individual respondent's statement .

Q. **HOW DID YOU PROCEED IN THIS AREA?**

A. For each of the four survey areas (responsiveness to inquiries, education and outreach, resolving market problems and FasTrak), I requested that respondents provide a relative ranking of the four ERCOT TDSPs, from 1 (best) to 4 (worst). For the four survey areas combined, respondents provided 30 relative rankings for AEP-TCC.

The distribution of these ranks is represented by the following chart.



**Figure 1: Relative Rank of TCC Among ERCOT TDSPs**

Q. **PLEASE DESCRIBE THE CHART.**

A. The relative rankings are clustered at number 3, with a few outliers. The chart may be read as indicating that for the Inquiries responses, indicated by solid black, 7 respondents gave TCC a 3rd, while 1 respondent gave AEP a 2nd and the other gave AEP a 4th or Worst. For Education and Outreach, indicated by the diagonal stripe, 7

respondents gave AEP a 3rd and 1 respondent gave TCC a 4th. That one respondent did not rank TCC on the question is indicated by a "0." (The "0"s indicate non-responses). While AEP does best on FasTrak, notice that there were only 6 responses indicated by the hatch marks of 4 giving AEP a 3rd, 1 giving TCC a 2nd and 1 giving TCC a 1. Some respondents indicated that they had not initiated FasTrak issues with TCC. Others indicated they had little experience with TCC in this area. TCC fairs worst on resolving market problems. While it is tempting to discuss the outliers, it would be a mistake to give them too much attention, since some variation in opinion is to be expected and the sample is small.

Q. **DID YOU ALSO PROVIDE RESPONDENTS AN OPPORTUNITY TO GRADE TCC?**

A. Yes. For each survey area, I requested that respondents provide a grade with A=excellent, B=good, C=fair, D=poor, and F=fail. The resulting frequency distribution shows more variation in this small sample than the one above. This results express differences in the graders' standards as well as differences of opinion.

Q. **DO YOU HAVE A REPRESENTATIVE RESPONSE FOR THIS RANKING?**

A. Yes. *Management needs to make customer service a priority.*

Q. **DO REP RESPONSES SHOW A DIVERSITY IN STANDARDS?**

A. Yes. Those REPs that want to use service quality as a competitive distinction will be sensitive to TDSP service quality, since their ability to distinguish themselves depends upon the TDSP's service quality. REPs competing on the basis of price are less sensitive to service quality issues (as long as other REPs are getting the same

level of service quality that they do). The distribution of REP grades is provided in the following chart:

**Figure 2: TCC Grade Distribution**
from REP Survey



Q. WHAT IS TCC'S GRADE POINT AVERAGE?

A. Using 4.0 for A, 1.0 for D and 0 for F, TCC's overall grade point is 1.834.

Q. WHAT ARE YOUR COMMENTS ON THIS CHART?

A. Although the numerical results are interesting, they lack the consistency that appears across the repeated written responses. The frequency distributions that result visually from the ranking exercises provide information about where most responses lie (central tendency) but also report some inconsistencies that exist in the responses. The qualitative responses are much more uniform.

Q. HOW IS THE PUCT STANDARD THAT YOU RECOMMEND RELATED TO THESE REP STANDARDS?

A. The PUCT standard is more stringent because the PUCT has the responsibility of evaluating service quality in light of all market costs, costs to REPs, to the market, to the competitive process and to end-users.

Q. IF YOU WERE GRADING TCC, WHAT GRADE WOULD YOU GIVE TCC?

A. Applying the standard I urge the Commission to adopt, and based on the evidence I will present, I would give TCC a grade of unacceptable, a D or an F.

### 3. QUALITATIVE RESULTS

Q. HOW WILL YOU PROCEED IN THIS SECTION?

A. This section is divided into four subsections for each of the four survey areas. The survey asked REPs for comment on TCC practice, and on best practices, whether AEP-TCC could achieve best practice and, if so, how. For each survey area, I created tables to catalogue all the narrative responses I received. There are three table rows. The rows are: (1) TCC Practice, (2) Best Practice Standards/Suggestions for Improvement and (3) Issue Subject to Further Analysis and/or Testimony Recommendations for this area. Comments are further classified by the columns of the table. Table columns identify the dimension of service quality to which the comment most pertains. These service quality dimensions, which have been discussed above, are: Quality and Timeliness of Communication, Speed of Response, Pro-Active Problem Solving, Dedication of Resources, and Accuracy of Response.

**LACK OF RESPONSIVENESS TO REP INQUIRIES**

Q. WHAT ARE YOUR GENERAL FINDINGS IN THIS AREA?

A. REPs found TCC slow to respond to inquiries and poor at maintaining communication. They had many suggestions for improvement. A representative statement of response is the following: *At the REP relations level we are rarely able to reach TCC representatives via telephone. Issue resolution usually takes between 2-4 weeks when we are able to reach a representative via phone. Issue resolution, when communicated via email, usually takes 4-6 weeks. We attribute many of these problems to lack of resources. We have one contact who handles all issues, from ESI ID questions to tariff questions. This contact is the only contact for many other REPs.*

In contrast, REPs report that other TDSPs had a habit of maintaining communication regardless of whether there was an outstanding issue or not. *Other TDSPs routinely send back data within 2 days without follow up contact.* The following table summarizes results.

| Figure 3 Responsiveness to REP Inquiries | Dimensions of Service Quality | | | | |
|---|---|---|---|---|---|
| | Quality and Timeliness of Communication | Speed of Response | Pro-active Problem Solving | Dedication of Resources | Accuracy of Response |
| TCC Practice | At the REP relations level we are rarely able to reach TCC representatives via telephone. Issue resolution usually takes between 2-4 weeks when we are able to reach a representative via phone. Issue resolution, when communicated via email, usually takes 4-6 weeks. We attribute many of these problems to lack of resources. We have one contact who handles all issues, from ESI ID questions to tariff questions. This contact is the only contact for many other REPs. | TCC is slow in responding to historical usage requests. For example, in a [redacted] letter of authorization was sent to TCC with multiple ESI IDs. TCC was contacted [redacted] times and has not responded. Often have to follow up on usage requests and resend LOAs multiple times to get usage data back<br><br>We do not have a lot of ESI-IDs in the AEP territory so we do not need a lot of help. However, when we have needed responses to issues timing has been slow. Improvement in the supplying of historical data when requested with an LOA is needed. | | TCC has relatively limited account management resources available to REPs to handle inquiries outside the scope of day to day operational issues. Responses to business practices and policies, tariffs, etc. are often delayed if one or more contacts are unavailable.<br><br>From our experiences, the poor responsiveness is not due to performance, but due to resource constraints on the Customer Relations Rep. | |

| Figure 3 (cont.): Responsiveness to REP Inquiries | Dimensions of Service Quality | | | | |
|---|---|---|---|---|---|
| | Quality and Timeliness of Communication | Speed of Response | Pro-active Problem Solving | Dedication of Resources | Accuracy of Response |
| **Best Practice Standards/ Suggestions for Improvement** | Other TDSPs were and are in constant contact with our REP, not just in cases of problem or transaction resolution.<br><br>Other Customer Relations Reps make it a point to communicate on a weekly or biweekly basis to ensure customer care.<br><br>Go out and meet the REPs they represent and make it a policy to answer all emails. | We generally receive responses from other TDSPs in 2 days.<br><br>Other TDSPs: Routinely send back data within 2 days without follow up contact.<br><br>Other TDSPs: Very fast response to requests.<br><br>Need: Quicken response times to requests for historical information. (2 REPs) | Need: Annual meetings to "get to know" the company and individual REP relations managers.<br><br>Other TDSPs have: Redundancy of transaction procedures (i.e., workarounds through email, fax and telephone) | Need: a designated point of contact -- name and personal email. Someone to develop a working relationship with. Also, [need] knowledgeable support Reps who have escalation support if they need it. | |

## NO EDUCATIONAL PROGRAMMING AND OUTREACH TO REPS

Q.   WHAT WERE YOUR FINDINGS?

A.   The strong consensus of opinion in the numerical rankings on this aspect of TCC service is confirmed in what REPs had to say on this issue. Four respondents were unaware of any educational or outreach program. Another commented that *TCC has never hosted any informational workshops for REPs.* This respondent continued: *No proactive measures have been taken to inform REPs of TCC's business practices regarding customer enrollment, billing, service order processing or issue resolution. When attempting to obtain answers to these types of day to day operational questions answers are at times inconsistent and the appropriate personnel are difficult to contact.*

Q. WHAT UNNECESSARY SERVICE COSTS ARE CREATED BY THIS FAILURE TO COMMUNICATE?

A. Labor costs associated with manual interventions and reparative software costs. The REP responded: *TCC provides very little outreach to help educate REPs. For example, TCC altered the format of usage data responses. We had no advance notice of the change. Our systems are configured to automatically upload usage data. The change in format did not work with our systems. This caused operational problems until we recognized the change and were able to alter our systems.* This REP contrasted TCC with Oncor, reporting that Oncor also altered its format for usage data responses but provided ample advance notice and an example of the new format. This advance notice permitted system changes and the avoidance of operational problems.

Q. WHAT IS YOUR OBSERVATION ABOUT THESE COMMENTS?

A. TCC's poor ranking on education and outreach show a lack of interest not a lack of resources. This is not a situation where TCC must incur significant costs to support market development. This is simply a lack of pro-active customer focus. For example, a comment was: *Holding workshops and proactive communication are attainable goals for AEP; There is no clear reason why TCC should not be able to host such workshops for REPs. This should not only improve the operating efficiency of REPs but that of TCC as well.*

Q. **HAVE YOU PROVIDED SPECIFIC RECOMMENDATIONS RESULTING FROM YOUR ANALYSIS OF THIS CUSTOMER SERVICE ISSUE?**

A. Yes. These recommendations are included in summary at the beginning of my testimony.

| Figure 4: Educational Programming and Outreach | Dimensions of Service Quality | | |
| --- | --- | --- | --- |
| | Quality and Timeliness of Communication | Pro-active Problem Solving | Dedication of Resources |
| **TCC Practice** | Three REPs: To respondent's knowledge, no education or outreach provided.<br><br>We are not aware of any educational programs offered by TCC. However, we have received email updates/correspondence regarding TCC processes. | To date, TCC has never hosted any informational workshops for REPs. No pro-active measures have been taken to inform REPs of TCC's business practices regarding customer enrollment, billing, service order processing or issue resolution. When attempting to obtain answers to these types of day to day operational questions answers are at times inconsistent and the appropriate personnel are difficult to contact.<br><br>TCC provides very little outreach to help educate REPs. For example, TCC altered the format of usage data responses. We had no advance notice of the change. Our systems are configured to automatically upload usage data. The change in format did not work with our systems. This caused operational problems until we recognized the change and were able to alter our systems. | |

| Figure 4: Educational Programming and Outreach | Dimensions of Service Quality | | |
| --- | --- | --- | --- |
| | **Quality and Timeliness of Communication** | **Pro-active Problem Solving** | **Dedication of Resources** |
| **Best Practice Standards/ Suggestions for Improvement** | Three REPs: Oncor and CenterPoint have regular workshops designed to educate REP. This is helpful because it keeps REPs up to date on changes with the TDSPs and also allows us interaction with our CSRs in person. We never had a physical meeting with main contact at TCC.<br><br>CenterPoint holds meetings as necessary to discuss procedural or market changes that REPs need to know. | Invited to office and provided Detailed Billing Analysis notebook of all accounts. Breakout and definition of each type and explained how to interpret the bill.<br><br>Other TDSP's meetings provide: gaining a better understanding of internal TDSP processes, an opportunity to address specific issues or concerns and an opportunity to meet and greet. We would like to see TCC offer these programs as well.<br><br>They[Oncor] also cover any upcoming tarriff [sic] changes and cover updates to their web site.<br><br>CenterPoint holds meetings as necessary to discuss procedural or market changes that REPs need to know. (Two REPs) | Other TDSPs offer periodic training & seminars. Also, have one specific rep relation person assigned<br><br>Other TDSPs: (Two Reps commented) Meetings provide opportunity to meet representatives face to face. |

**INACCURACIES AND UNRESPONSIVENESS WORSEN MARKET PROBLEMS**

Q.    WHAT IS THE NEXT AREA OF EVALUATION?

A.    The next area is how well TCC responds in resolving market problems. This subject area elicited the longest and most numerous responses. Before presenting the tabulated responses, I want to present the results of my investigation of a general, but repeated allegation.

Q. **WHAT WAS THE REPEATED REP ALLEGATION YOU INVESTIGATED?**

A. A REP respondent stated: *TCC is also usually the first group to complain about a change in the market and the last to get their software updated. TCC often appears to want to do just what is required and nothing more.* Another REP made the same point more diplomatically, stating: *AEP is generally somewhat inflexible in changing their internal practices to accommodate market concerns.*

Q. **IS THIS ALLEGATION OF PARTICULAR INTEREST IN YOUR FRAMEWORK?**

A. Yes. These allegations are another way of identifying the alignment problem. In failing to accommodate market concerns, these REP statements imply that TCC is imposing costs on the market that directly diminish the quality of service delivered to ERCOT retail market participants.

Q. **WERE YOU ABLE TO FIND SOME EVIDENCE SUPPORTING THIS ALLEGATION?**

A. Yes. But before reviewing it, having a bit more background about electronic transactions in ERCOT is helpful.

Q. **WILL YOU BE DESCRIBING THE REASON FOR MOVING FROM THE CURRENT VERSION OF TEXAS SET, VERSION 1.6 TO A NEW SERIES RELEASE, TEXAS SET 2.0?**

A. Yes. At the present time, service orders, such as requests for switching a customer's REP, moving a customer either in or out of an existing premise, providing connection, reconnection or disconnection, requests for changing when a meter is read or for current or historical usage data, etc. all arrive to the TDSPs in

chronological time. When orders arrive in chronological time but out-of-sequence for the implied cycle of transactions on a single active premise location (ESI ID), rejects occur. 47% of rejects are caused by this type of problem.[14]

In these cases, the TDSPs and REPs must manually intervene and workaround the reject. These manual workarounds in turn give rise to other problems. Texas Set 2.0 will solve the problem of multiple non-sequential transactions on a single ESI ID via a "parking lot" or stacking solution. Over the last few months, ERCOT information technology and customer service employees have been offering training seminars to acquaint market participants with these changes. The ERCOT Protocols contain gray-tone provisional sections incorporating new Protocol standards once Texas SET 2.0 is in place.

The seminars are necessary because Texas SET is literally the standard for how electronic data transactions between market participants must interface, so it is mandatory that each market participants be able to fully execute Texas SET. Everyone who participates in the market must update their systems with changes in Texas SET. Substantial market benefits are anticipated from this major upgrade.[15]

Finally, in the document below references to MACSS is to a customer information system internal to the AEP system. References to the "parking lot" are references to ERCOT's problem resolution embodied in the release of Texas Set 2.0.

---

[14] ERCOT, Solution to Stacking Educational Seminar, 12/9/03 available from RMS (Keydoc's) section at www.ercot.com.

[15] ERCOT, Solution to Stacking Educational Seminar, 12/9/03 lists expected benefits as: significant reductions in rejects, significant reduction in the need for Safety Net Move-ins, better manages customer expectations regarding dates, billing, etc, fewer backdated clean up efforts, fewer cancel/rebills, helps keep systems in synch, reduces unaccounted for energy, reduces transaction volume, expedites connecting and billing the customers by the correct REP and improves transactions reliability.

**Q.  WHAT IS THE DOCUMENT YOU ARE PROVIDING BELOW?**

A.  Reproduced below is a Customer Choice Operations Business Case Analysis provided by TCC in discovery. This document rather perfectly illustrates my thesis: absent Commission action in this case, TCC will disregard significant market costs it imposes on others by its actions. Narrow profitability concerns are driving TCC service quality decisions. TCC has actively resisted improvements benefiting the market. The evidence corroborates the REP survey allegations I have quoted above.

**Q.  WHY DO YOU INCLUDE THE ENTIRE BUSINESS CASE ANALYSIS?**

A.  The document itself is important and the complete context of the document is an important reference. The business case analysis does a good job of describing the significant costs being imposed on the market by delaying the implementation of Texas Set 2.0. Then, when discussing alternatives to the necessary investment the analyst says: *The parking lot will benefit the overall functioning of the market and will benefit CRs [competitive retailers or REPs]. Due to the minimal benefit to AEP TDSP, we have attempted to delay implementation through negotiation in working groups.*

The author's use of the past tense is disturbing.

**FIGURE 5: BUSINESS CASE, CUSTOMER CHOICE OPERATIONS**

Business Case

Business Unit: *Customer Choice Operations*

Project Name: *CCPR/L TX Service Order Parking Lot (Texas SET 2.0)*
Project ID: *CHG000000724085*

Start Date:　　　　　　End Date:

Executive Summary: *AEP is required to conform to the ERCOT Protocols as specified in Texas Standard Electronic Transactions (SET.) Texas SET will make periodic releases to address market issues and it is mandatory that AEP make all changes necessary to comply. Consistent with the planned release of TX SET 2.0, AEP will need a new application for Texas to properly sequence multiple future-dated service orders for a single premise. The BU and IT sponsors are Jim Sorrels and Bill Vogel, respectively.*

Current Situation and Problem Statement: *Today, transactions are received in the order they are sent from market participants, not necessarily in chronological order. Service orders entered into MACSS that are not in chronological sequence cannot be completed. These out-of-sequence orders either must be manually processed or rejected back to the CRs for resequencing. Either of these options requires significant manual effort to resolve. Each TDU in Texas has this same problem and the market has decided that the appropriate solution is for each TDU to modify their systems to deal with out-of-sequence transactions.*

Project Description: *Functionality will be established to ensure that as the transactions are received by MACSS, they will be "parked", or held, until just before the event when the specific transaction is needed (to provide time for other orders to arrive). The transactions will then be properly sequenced to the work management system and allowing each to complete appropriately, instead of being exceptioned for manual processing or being rejected back to the CRs.*

Solution Overview: *Implementation would allow AEP to comply with TX SET and reduce the workload associated with fixing problems resulting from out-of-sequence transactions.*

Solution Detail: *MACSS has estimated a delivery cost of $106,080. There is lost opportunity costs in that other projects that have revenue benefit will be delayed. An unquantified, but tangible benefit would be the reduction in manual processing necessary to fix out-of-sequence transactions. The risk of not implementing these changes is that we would be in non-compliance with TX SET, with potential regulatory repercussions.*

**Alternatives Considered: *The parking lot will benefit the overall functioning of the market and will benefit CRs. Due to the minimal benefit to AEP TDSP, we have attempted to delay implementation through negotiation in working groups.***

Implementation Summary: *The anticipated delivery date for this market requirement is May 2004, subject to formal approval of a schedule by ERCOT.*

Relationship to other Initiatives: *This project is consistent with other system modifications and enhancements required in the TX marketplace.*

Metrics: *Success will be measured by the successful implementation of Texas SET 2.0 and our associated internal transaction processing. The benefits should be seen in the marketplace immediately.*

Q. HOW HAVE REPS CHARACTERIZED OTHER WIRES COMPANIES' PARTICIPATION IN WORKING GROUPS?

A. In describing best practices among other wires companies, one REP said: *Other Wires Companies have got a lot of active members involved in many market committees and subcommittees. These members are taking the time to improve the market place through new software, faster hardware, better logic, improved communication between REPs and more accurate market reporting. They are proactively seeking solutions to lingering problems and trying to clear out all of the old ones.*

Q. BEFORE YOU LEAVE THIS TOPIC, IS THERE OTHER EVIDENCE PERTINENT TO TCC'S SUPPORT OF MARKET WIDE SERVICE IMPROVEMENTS AND COST REDUCTION EFFORTS?

A. Yes. TCC lags significantly behind Oncor and CenterPoint in providing the resource investment needed for Texas SET 2.0. Oncor is 95% through the design stage and 90% through the build stage for Texas SET 2.0. CenterPoint is 85% through the design stage and 25% through build. In contrast, AEP is 20% into the design stage with no build and TNMP is 10% in the design stage with no build, according to recent self-reports.[16]

Q. IS THERE ANOTHER CHARACTERIZATION OF TCC THAT IS ALSO CAUSE FOR CONCERN?

A. Yes. *AEP has a history of taking unilateral action against Market Rules e.g., billing customers for T&D charges who showed no REP of Record.*

---

[16] The complete ERCOT presentation is provided in Workpapers.

Q. WERE YOU ABLE TO INVESTIGATE THIS ALLEGATION?

A. Not definitively. It's clear that TCC spoke with Commission staff concerning unbilled customers. In the early stages of the market there were customers for whom either the TDSP and/or ERCOT had no "REP of record." TCC decided to direct bill these customers without a REP of record and it appears that in the test year, this brought in over $1.2 million to TCC.[17] Whether TCC sent the letter first and discussed it with Staff after the fact or visa versa, I do not know. I was also unable to determine to what extent the Commission itself had an opportunity to comment on TCC's action.

Q. WERE YOU ABLE TO INVESTIGATE THIS ALLEGATION OF UNILATERAL ACTION USING OTHER INFORMATION?

A. Yes. I asked about whether TCC had ever discouraged a REP from using the FasTrak process. TCC responded: In fewer than a dozen instances, TCC has asked certain REPs not to utilize FasTrak for particular billing and payment issues.

In the discovery response quoted, TCC reasoned that it was burdensome for TCC to use FasTrak and so substituted its own databases and archives to track the disputes. TCC opined that FasTrak in its present form "is not necessarily the best to tool to use in the instances discussed above."[18]

Q. WHAT DO YOU MAKE OF THIS UNILATERAL ACTION?

A. The unilateral decision to bypass market processes can impose market costs. While it may be burdensome at times for market participants to use FasTrak in cases where

_____

[17] TCC Workpaper II-E-5 line 40 "CWRR"

[18] Response to Cities 15-3

multiple premises share a common transactional problem, FasTrak is the means by which ERCOT, as the central registration agent, monitors and identifies transaction problems, trends and prioritizes needs for improvement. Once logged, FasTrak issues are never deleted. They become part of the knowledge base of historical information for each active premise and can be searched by individual ESI-ID when needed to provide background and/or resolve issues.[19] Here, again TCC seems to show a basic disregard for the effects of its decisions on the market as a whole.

Q. **WILL YOU BE PRESENTING OTHER EVIDENCE THAT CORROBORATES REP'S STATEMENTS OF CONCERN ABOUT TCC PERFORMANCE?**

A. Yes, but first I will review specific survey findings. Although I have tried to categorize responses in this section by quality dimension, in fact, it seems that most examples indicate a combination of factors are responsible for performance problems. The first two examples focus on the role of inaccuracies as the source of later market problems. In the instances described, inaccuracies impose direct costs on REPs and end-use customers and may impose a second round of costs because of slow responsiveness in resolving the initial inaccuracies:

The first example addresses errors in TCC's data at ERCOT:

*TCC still has a lot of issues with inaccurate address/ESI-ID information at ERCOT. Many consumers in the TCC region are affected by un-authorized switches due to incorrect information in the ERCOT portal and information TCC provides by phone to the CR.*

---

[19] See Day to Day FasTrak Issues Users Manual 10/24/2003 -Version 4.0 available from www.ercot.com.

The second example shows the effects of inaccurate use of a Texas SET transaction sequence. This may also be evidence of a resource or training problem at TCC.

*There have been instances where a meter exchange had occurred and TCC was sending 814_20 transactions [create/maintain/retire ESI-ID request] indicating a meter removal. Then, TCC would send an 814_20 transaction indicating a meter add. Once this Texas SET error was acknowledged by TCC it still took 4 months for them to correct the problem. This incorrect use of the ESI-ID transaction caused REPs additional workload, including REPs contacting the customer via telephone to question the reason for the meter removal, the submission [of] final invoices to the customer and the creation of new customer accounts.*

**Q. WHAT ABOUT BEST PRACTICE IN THESE AREAS?**

A. With respect to speed and accuracy, REPs responded that other wires companies: *provide timely and accurate connections based on 814-04/05[switch notification and enrollment] transactions and safety-net/priority connections; are in synch with ERCOT relating to address and ESI-ID information; and respond to inquiries within a 2-hour time frame.*

| Figure 6: Responsiveness in Resolving Market Problems | Dimensions of Service Quality | | | | |
|---|---|---|---|---|---|
| | Quality and Timeliness of Communication | Speed of Response | Pro-active Problem Solving | Dedication of Resources | Accuracy of Response |
| TCC Practice | It all comes down to communication and responsiveness. Resource constraints may play a role but CenterPoint and Oncor find themselves well in front of AEP and TNMP<br><br>AEP has a history of taking unilateral action against Market Rules e.g., billing customers for T&D charges who showed no REP of Record.<br><br>When issues arise multiple emails must be sent before answers provided. | An isolated example of poor resolution of a market issue occurred when TCC issued market transactions with inaccurate meter data. The issue was identified and brought to the attention of TCC in [redacted]. After multiple follow up phone calls and emails the majority of the impacted ESI IDs with inaccurate meter data were finally corrected and the issue was resolved entirely in [redacted]. During this [7 month period] time, no pro-active measures were taken by TCC to identify and correct the relevant ESI IDs affected during this period.<br><br>Unmetered service resolution takes 4-6 weeks.<br><br>Meter re-reads and cancel re-bills are not timely. | *AEP is generally somewhat inflexible in changing their internal practices to accommodate market concerns*<br><br>Responds well but other TDSPs more helpful.<br><br>We have repeatedly requested a report from TCC regarding outstanding invoices and TCC has failed to acknowledge or respond to voicemail or email inquiries...Then, after months of making requests, TCC sent a spreadsheet with [redacted] invoices indicating they were past due. Of those, [redacted] were never received [before] and were over 60 days old; [redacted] were duplicates; [redacted] were rejected [redacted]... | TCC is also usually the first group to complain about a change in the market and the last to get their software updated. TCC often appears to want to do just what is required and nothing more.<br><br>All are good except for TNMP. TCC could probably improve ranking with more staff. | TCC still has a lot of issues with inaccurate address/ESI-ID information at ERCOT. Many consumers in the TCC region are affected by Un-authorized switches due to incorrect information in the ERCOT portal and information TCC provides by phone to the CR.<br><br>There have been instances where a meter exchange had occurred and TCC was sending 814_20 transactions [create/maintain/retire ESI-ID request] indicating a meter removal. Then, TCC would send an 814_20 transaction indicating a meter add. Once this Texas SET error was acknowledged by TCC it still took 4 months for them to correct the problem.<br> This incorrect use of the ESI-ID transaction caused REPs additional workload, including REPs contacting the customer via telephone to question the reason for the meter removal, the submission [of] final invoices to the customer and the creation of new customer accounts based on the new meter information. |

| | | | | | |
|---|---|---|---|---|---|
| **TCC Practice (cont'd)** | | Many other TDSPs send back IDR and non-IDR data much faster than TCC. The IDR data is especially slow in arriving to us. A quicker turnaround would be most helpful.<br><br>Luckily I have not had a lot of problems with TCC in quite a while. However, when there is a problem the response is fairly slow. | ..it was [only] through our employees research that these issues were discovered. TCC did not offer any resources or assistance in evaluating the contents of the spreadsheet.<br><br>No ESI-IDs account notation is made when a CR calls in, so there is no history kept on any ESI/ID. | | TCC also does not perform a connection on move-in on the dates they confirm from the 814-04/05. (For example, if the CR receives an 814-04/05 from TCC with a connect date of 12.09.03, the service may not be connected until 12.14.03 or 12.15.03. Even though TCC has a safety net/priority connect process, they never follow through when a request is made. |
| **Best Practice Standards/ Suggestions for Improvement** | Other Wires Companies : have got a lot of active members involved in many market committees and subcommittees. These members are taking the time to improve the market place through new software, faster hardware, better logic, improved communication between REPs and more accurate market reporting. They are proactively seeking solutions to lingering problems and trying to clear out all of the old ones.<br><br>AEP TCC can be assured that if they are actively involved and listen to their customers, ERCOT can only evolve into a better market than we have now. | Other wires companies: provide timely and accurate connections based on 814-04/05 transactions and safety-net/priority connections; are in synch with ERCOT relating to address and ESI-ID information. Respond to inquiries within a 2 hour time frame. | [TCC] management needs to make customer service a priority.<br><br>CenterPoint and Oncor both take what they are given from the CR's and actively participate at WMS, RMS, and Texas SET to reach out and assist the evolution of the best in deregulated markets in the U.S. today.<br><br>Yes, [best practice is achievable by TCC]. TCC has the ability to improve capability for working around market problems through structured procedures and contacts for resolution. | Best practice is to follow through on issues. Most issues resolved easily but those that are more difficult following through are important to customer service.<br><br>CNP and Oncor have the better capability for working around market problems through structured procedures and contacts for resolution. | |

**BILLING AND INVOICING: FOUNDATIONS FOR ERROR**

Q. DID YOU INVESTIGATE ISSUES RELATING TO THE ACCURACY OF BILLING AND INVOICING?

A. Yes. In this section I discuss TCC's use of estimates for meter reads and related problems of billing and invoicing. Prompt and accurate billing and invoicing are foundational issues because poor processes here can snowball into additional problems. Any deficiencies in dedicated resources appear more severe when underlying processes or systems are prone to error. Another REP provided a good example of the relationship between data inaccuracy and slow response:

*An isolated example of poor resolution of a market issue occurred when TCC issued market transactions with inaccurate meter data. The issue was identified and brought to the attention of TCC in [redacted]. After multiple follow up phone calls and emails the majority of the impacted ESI IDs with inaccurate meter data were finally corrected and the issue was resolved entirely in [redacted]. During this [7-month period] time, no pro-active measures were taken by TCC to identify and correct the relevant ESI IDs affected during this period.*

Another REP noted: *Meter re-reads and cancel re-bills are not timely.*

Prompt and accurate billing and invoicing are foundational issues. Wires charges include kW and kWh charges and invoices must be cancelled and re-billed when underlying usage data is incorrect. In the ERCOT protocols, a meter read error gives rise to four separate electronic transactions, a cancel and rebill of the associated usage data and a cancel and rebill of the associated invoice.

Moreover, timeliness and accuracy are both important service dimensions, but they are not independent. Estimated meter reads can become a source of inaccuracy. Inaccuracy can become a drag on responsiveness as the number of errors that have to be corrected increase. In turn, the volume of cancel/rebills increases and rebillings take longer to send out because the necessary corrective actions for usage information strain existing resources.

Q. **DOES THE COMMISSION SET STANDARDS FOR BILLING ACCURACY?**

A. No, however, Subst. R.§ 25.25 provides limits to the use of estimated bills. When questioned as to policy concerning the use of estimates versus actual meter reads, TCC said that its policy concerning the use of estimated versus actual meter reads is to comply with the rule.[20] The rule says: An electric utility may submit estimated bills for good cause provided that an actual meter reading is taken no less than every third month.

Further, under existing consumer protection rules, REPs must notify customers if the REP is unable to issue a bill based on an actual meter reading due to TDSP or other failure to timely provide actual usage and inform the customer of the reason for the issuance of an estimated bill.[21]

Q. **HOW ACCURATE ARE TCC'S ESTIMATED METER READS?**

A. The PUCT has no standards specifying particular methodologies for usage estimation. TCC has provided documents describing the AEP estimation programs in use by TCC since 1/1/2002. The estimation methods rely on simple extrapolations of historical

---

[20] TCC Response to Cities 15-1.

[21] See Subst. R. §25.479(e).

meter reads or historical estimates. The estimates are not adjusted to recognize differences in weather as a factor affecting usage.[22]

Q. WHAT IS AEP'S VIEW?

A. AEP must agree with me that its estimation method needs improvement. In response to a discovery request provided 2/4/04, AEP provided a business case started 12/04/03 titled Load Research Analysis Preliminary Plan for MACSS Bill estimation improvement. The plan includes a more statistically sophisticated approach and a weather-related adjustment for some customers. Expected completion date is May 2004.[23]

Q. ARE THERE OTHER POTENTIAL ACCURACY ISSUES ASSOCIATED WITH TCC'S USE OF ESTIMATED METER READS?

A. Yes. TCC's current approach allows TCC to "dial up or dial down" its acceptable level of accuracy.

TCC explains that in its approach to estimation, the acceptability of estimates depends on the TCC's choice of an accuracy tolerance limit. If the tolerance limit is loosened, more estimates are accepted as "good." When TCC is unable to create estimates that are good enough, then the account is a "no bill" for the current reading date with obvious cash flow implications for TCC.[24] It is not surprising that one of the measures TCC tracks for customer operations functions is the level of no bill accounts more than 10 days old, and that there are very, very few of these.[25]

---

[22] Response to Cities 15-2, Attachment 1.

[23] Response to Cities 35-2, Attachment 1.

[24] Response to Cities 16-6.

[25] Response to Cities 30-14 attachment page 4 of 6.

**Q. WHAT HAPPENS IF TCC'S AUTOMATED SYSTEM TRIES TO ESTIMATE A THIRD MONTH IN A ROW?**

A. PUCT rule §25.25 requires an actual meter read every third month. TCC says: If the automated system tries to estimate for a third month, then efforts are made to obtain an actual reading. This may result in manual estimation. Because the automated system will not estimate accounts with demand greater than 10 kW, all estimates for these larger accounts are manual. Except for a small pilot program using remote meter reading, all other meter readings require a premise visit.[26]

**Q. WHAT HAS HAPPENED TO THE VOLUME OF TCC ESTIMATED METER READS SINCE CUSTOMER CHOICE?**

A. It has exploded in all rate classes.

**Q. WHAT INCENTIVE ALIGNMENT PROBLEM DOES THIS SUGGEST?**

A. Obviously, for every estimated meter read, a premise visit may be avoided. Provided data indicates the cost-savings to TCC. Using TCC's fully embedded cost estimate to a REP requesting a re-read or out-of-cycle read, the savings per avoided read would be about $17.00. Eliminating supervisory overheads, and using just direct meter read avoided costs saves $5.60 on the meter reader and $1.98 on the truck.

**Q. WHAT DATA DO YOU HAVE TO SUPPORT YOUR STATEMENT THAT THE VOLUME OF METER READS HAS EXPLODED IN ALL RATE CLASSES?**

A. TCC provided data on the percentage of estimated meter reads by customer class since January 2000, well before Customer Choice began. The data series continues

---

[26] Response to Cities 16-6.

through November 2003.[27] The graphic below visually demonstrates the change in TCC's reliance on estimated meter reads, beginning roughly with the Pilot Program for Choice.

As the graphic makes clear, there has been a dramatic increase in estimated meter reads, beginning roughly at the time of the Pilot Project. As could be expected from this visual view of the data, the observed differences in means before and after

## Figure 7: Meter Reading Accuracy
Percent Estimated Meter Reads
Integrated Utility vs Retail Choice



the onset of choice are statistically significant for each customer class.[28]

---

[27] Response to Cities 15-1, Attachment 1.

[28] So as not to influence the results, I have removed the month in which Hurricane Claudette led to use of estimated meter readings from the data provided.

Q. HOW MANY ESTIMATED METER READS DO THE PERCENTAGES DEPICTED REPRESENT?

A. In discovery, TCC reported a total of 594,632 automated estimated meter reads since 1/1/02 and 55,332 manual estimates since 1/1/02. Thus, since 1/1/02, TCC has relied upon approximately 650,000 estimated meter reads in total.[29]

Q. HOW MANY ESTIMATED METER READS WERE THERE BEFORE CUSTOMER CHOICE?

A. By my estimates, there would have been only about 100,000 or so estimated meter reads (through November, 2003) if TCC had continued its pre-Choice practices.[30]

Q. HOW MUCH HAS THE NUMBER OF ESTIMATED METER READS INCREASED?

A. The number of estimated meter reads have increased by 550,000 over the 23 month period since Choice began. This indicates that at current customer levels, some 100,000 estimated meter reads rather than the 650,000-meter reads would have occurred by now had historical norms continued.

Q. HOW MUCH MONEY IS TCC SAVING THROUGH ITS CHANGED PRACTICE?

A. Using $5 for net avoided cost for TCC, on an annual basis the increase saves TCC about $1.4 million annually. The net avoided cost approach recognizes that there will be cost impacts to TCC, for example in higher levels of cancel/rebill transactions.

---

[29] Response to Cities 16-6.

[30] The actual calculations are provided in Workpapers. Depending on assumptions the range of baseline or pre-Choice estimated meter reads runs from 83,000 to 180,000 and, correspondingly the range of increase runs from 567,000 to 470,000 expressed cumulatively.

For illustration, I am assuming a net savings of $5 from TCC's decision to increase the use of estimated meter reads.

**Q. WHAT ARE THE EFFECTS OF 550,000 ADDITIONAL ESTIMATED READS ON END-USE CUSTOMERS, REPS AND THE MARKET?**

A. The Company provided an analysis of AEP-wide data on this topic. The AEP analysis suggests that approximately 50% of AEP's required billing adjustments each year relate to bill estimation. For AEP, 27% of customer calls are related to high bill concerns, including estimations. Over the period January through July 2003, 4.7% of all AEP billing complaints were for inaccurate estimations.[31]

**Q. CONSIDER END-USERS. WHAT COSTS ARE IMPOSED ON END-USERS?**

A. First, depending on the contact option chosen, the end-use customer will need to call the REP or possibly, TCC directly to inquire about the bill. The customer may feel the need to escalate the inquiry into a complaint, engaging in the necessary phone calls and other transactions.

Second, a surprised customer is not a happy customer. REPs have indicated that they must respond to customers' bill shock associated with estimated reads, particularly where a seasonal rate is employed. In this context, the REP must decide whether a request for re-reads is in order, and, depending on the arrangements, either the REP or the customer becomes subject to the Special Meter Reading Fee.

---

[31] TCC Response to Cities 15-2, Attachment 1.

Third, use of estimates followed by an ultimate true-up when the meter is read makes it more difficult for customers to judge savings they receive from their chosen REP. As a limiting case, the customer may feel the need to search for and switch to another REP.

Q. **WHAT COSTS ARE IMPOSED ON ERCOT MARKET PARTICIPANTS?**

A. The relationship between estimated meter reads and the need for cancel and rebill transactions suggests that TCC will have a higher level of cancel and rebill transactions than otherwise. Since four transactions accompany every cancel with rebilling, these unnecessary transactions strain ERCOT resources and, where any manual input is involved, potentially gives rise to errors and rejected transactions.

Q. **WHAT COSTS ARE IMPOSED DIRECTLY ON REPS AND THEREBY INDIRECTLY ON END-USERS?**

A. The REP now bears the customer relations costs associated with the inquiring, unhappy or complaining customer. There is also an expected cost to checking the accuracy of the estimated meter read. TCC proposes to charge $17.00 as a Special Meter Reading Fee. The tariff says the REP will not be charged for a re-read if the new reading indicates the original reading was in error. So, the REP faces an uncertain cost of $0 or $17. During the test year, TCC earned $385, 735 on 25,716 occurrences where the REP took the gamble and lost.[32] Said differently, the REP may have mixed incentives for following up with a re-read request on an estimated bill (regardless of whether the REP or the end-use customer will pay).

---

[32] Response to Cities 23-4, Attachment.

As discussed previously, costs placed on REPs must ultimately be passed to end-use customers. Even so, the costs imposed on REPs still have an effect. They will affect the REP's perceptions of the ultimate costs of serving the customer, and thereby affect REP's pricing and service offers and possibly decisions about when or whether to enter or remain in TCC's market area.

Q. **CAN YOU QUANTIFY ANY OF THE COSTS YOU'VE CONSIDERED HERE?**

A. I can illustrate some of the potential costs. Remember that TCC will incur some costs too. The alignment problem is that TCC considers only its net savings, in this case estimated to be $5/estimated meter read, when deciding policy on the extent to use estimated meter reads. **My point is simply that when the potential costs to all other parties are considered, if these costs exceed TCC's net $5 saving per estimated meter read, TCC has made the wrong customer service decision based on the alignment standard.** An illustration of costs imposed on others by the change in meter reading policy toward estimated meter reads appears below: The "x"s reflect the distribution of costs and the "Illustrative Unit Costs" column provides hard estimates from discovery information. So, for example, the "x" across from the Call Center Calls row in the end-user cost column and the REP cost column identifies the fact that both of these parties may incur these kinds of costs.

| Figure 8 | | | | |
|---|---|---|---|---|
| 550, 000 Additional Estimated Meter Reads--Potential Market Costs | | | | |
| | | | Impacted Parties | |
| Additional Transactions Required | Illustrative Unit Costs | End-User Costs | REP Costs | Market and PUCT Costs |
| | | | | |
| Inspect and Determine Action | ? | x | x | |
| Cancel and Rebill – electronic | 1 min x 40/hr = 0.66 | | x | x |
| Cancel and Rebill – manual | 15 min x 40/hr =$10 | | x | |
| Call Center Calls | 3.5 min x 1.00 | x | x | |
| Calls Forwarded | 8 min x 1.00 | | | x |
| Field Rep Trips | $17/no error | x/ | /x | |
| High Bill Complaint Customer Service | 1 hr x 34/hr | | x | x |
| Opportunity Costs of Time | ? | x | | |
| Higher Market Prices | ? | x | | x |
| Bill "surprise" and Degradation of REP reputation | ? | x | x | x |
| Delayed Bill | | x | x | |
| "?" signifies difficult to quantify costs Estimates from Response to Cities 15-2 Attachment 1 And Schedule IV J-2 p. 18 | | | | |

**Q.** EARLIER YOU STATED THAT HIGH LEVELS OF ESTIMATED METER READS COULD BE EXPECTED TO LEAD TO MORE CANCEL AND REBILL TRANSACTIONS FOR METERS AND INVOICES.

**A.** Yes. The available data for TCC demonstrates this. In the data below, I have had to combine two incomplete series -- one provided in discovery and the other based on confidential and privileged information.

**Q.** IS THE DATA ON CANCELLATIONS CONSISTENT WITH ESTIMATED METER READS AS ONE REASON FOR THE LEVEL OF CANCELLATIONS AND REBILLINGS?

**A.** Yes.

[FIGURE 9 REDACTED]

**Q. HOW MANY CANCEL/REBILL TRANSACTIONS DO THE PERCENTAGES IN FIGURE 9 REPRESENT?**

A. TCC sends out about 1 million bills annually. So a **[redacted]** rate of cancel/rebills is **[redacted]** cancel/rebill transactions annually.

**SLOW OR NO GO ON FASTRAK RESOLUTIONS**

**Q. WHAT ARE FASTRAK ISSUES AND WHY ARE THESE IMPORTANT IN DEFINING SERVICE QUALITY?**

A. FasTrak is an issues-resolution system sponsored by ERCOT. FasTrak is the primary tool and entry system used by REPs and TDSPs to communicate with ERCOT regarding problems with electronic customer enrollment. Problems reported through FasTrak could include, for example, missing usage data or other information not in the ERCOT system that is associated with a customer/premise location, rejected transactions, requests for cancellation of transactions, inadvertent switches, or whether or not ERCOT received a specific transaction, etc.

For issues submitted to ERCOT, ERCOT will follow up with the TDSP for thirty days to obtain requested transaction(s). After thirty days, the issue will be reassigned as a Non-ERCOT issue, and the submitting REP and TDSP will be left to continue efforts to resolve. Alternatively, some issues are initially submitted as Non-ERCOT when the issue is "point-to-point" between a REP and a TDSP). No FasTrak issue is deleted. Resolved or rejected issues are archived and available for search purposes.[33]

---

[33] ERCOT FasTrak Day-to-Day User Manual -- Version 4.0 available from www.ercot.com.

REPs depend on TDSPs to take responsibility for Non-ERCOT issues and to assign sufficient resources to help resolve all FasTrak issues promptly. Resolution also requires good communication because ERCOT will not generate missing transactions when manual corrections are needed.

Q. **WHAT GENERAL EXPLANATIONS DID REPS PROVIDE FOR THEIR RANKINGS OF TCC IN THIS AREA?**

A. Being quick to resolve FasTrak issues is the key service quality dimension for FasTrak. Two REPs made this point, stating that TCC was slow to respond to FasTrak issues. A customer with "very few customers in AEP territory" said: *TCC is generally responsive to FasTrak issues, however they rarely answer their 800-line for REP support and are very slow to respond to emails and voicemails.*

Another REP linked the slow response to lack of dedicated resources: *The personnel that are working FasTrak are very helpful and knowledgeable but seem overwhelmed with the volume of FasTrak issues requiring their attention. [TCC needs] more trained personnel.*

Q. **DID YOU RECEIVE ANY SPECIFIC EXAMPLES?**

A. Yes. A respondent commented: *TCC is generally quicker than other TDSPs to acknowledge new logged FasTrak issues. However, once acknowledged, there is an average resolution time of 3 weeks, with outliers up to 8 weeks. We have noted that TCC is quicker to respond to logged FasTrak issues relating to enrollment and less responsive to ongoing maintenance issues related to monthly meter reads and ESI ID maintenance issues.* Not all survey participants have logged FasTrak issues with

TCC so some answered the survey questions with N/A. The remaining responses are provided below.

| Figure 10 Responsiveness in Resolving FasTrak Issues | Dimensions of Service Quality | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quality and Timeliness of Communication | Speed of Response | Pro-active Problem Solving | Dedication of Resources | Accuracy of Response |
| **TCC Practice** | We have very few customers in AEP territory...AEP is generally responsive to FasTrak issues, however, they rarely answer their 800-line for REP support and are very slow to respond to emails and voicemails.<br><br>Not many issues for us since we have so few customers in territory. Issues generally resolved in a timely, accurate matter. | Timeliness is the biggest issue with FasTrak resolution. TCC is slow to respond to FasTrak issues (2 responses)<br><br>TCC is generally quicker than other TDSPs to acknowledge new logged FasTrak issues. However, once acknowledged, there is an average resolution time of 3 weeks, with outliers up to 8 weeks. We have noted that TCC is quicker to respond to logged FasTrak issues relating to enrollment and less responsive to ongoing maintenance issues related to monthly meter reads and ESI ID maintenance issues. | | The personnel that are working FasTrak are very helpful and knowledgeable, but seem overwhelmed with the volume of FasTrak issues requiring their attention. Need more trained personnel. | |

| Best Practice Standards/ Suggestions for Improvement | Other TDSPs keep you well informed on the status of FasTrak issues and respond very quickly.<br><br>It is much easier to call a CSR contact at the other TDSPs and not get voice mail. Also, callbacks are much faster when you do leave a message. | Timeliness is key to resolving issues on FasTrak. Other TDSPs are extremely proficient in processing requests in a timely manner.<br><br>Others often have same day resolution. They are much quicker, requiring a few days or at most a week. | Same day response, knowledgeable and well-trained Reps, update FasTrak ticket without having to be asked, notify monitoring party by email when action has been taken/ticket updated, resolving action is accurate. | Other TDSPs provide direct contacts and personnel representatives.<br><br>Recommended Action: Assignment of a customer representative for our company.<br><br>Best Practice is Achievable by TCC [with] training and operational efficiency<br><br>Yes, if their staffing is adequate. | (See response in Column 3) |
|---|---|---|---|---|---|

Q.   DO YOU HAVE EVIDENCE CORROBORATING THAT TCC IS SLOW ON FASTRAK?

A.   Yes.  As indicated above, ERCOT personnel are also involved in FasTrak issues. Among the many reports that ERCOT personnel present at the monthly ERCOT Retail Market Subcommittee (RMS) meetings is a report on FasTrak activities.  The most recent available evidence suggests that TCC is slow on resolving its FasTrak issues with ERCOT.

Q.   PLEASE EXPLAIN.

A.   Here too, it is necessary to briefly discuss what is involved in making certain market transactions succeed.  ERCOT periodically receives from TDSPs final monthly meter reads and notifications of an initial meter read on service orders that have been cancelled in ERCOT service order recording systems.  ERCOT recognizes various types of service order cancels.  ERCOT cancels service orders when it receives cancel requests from the REP (perhaps due to manual or concurrent re-processing of the original service order), cancel requests due to customer request, customer objection

(e.g., during the switch rescission period, the customer exercises the right not to switch providers), cancels due to a necessary permit not being received (e.g., on a move-in transaction where construction may be needed) or for other reasons. That the TDSP has sent ERCOT a meter read for this service order can indicate an "out-of-sync" condition in which TDSP records and ERCOT records may fail to agree on which REP is providing service.

To manage these situations, ERCOT initiated a process on November 7, 2003. In this process, ERCOT initiates a weekly FasTrak issue with the appropriate TDSP as the resolving party for these transactions. ERCOT requests the TDSP to provide a response either updating the FasTrak issue if the service orders are canceled in the TDSP system or, if complete in the TDSP system, identify the out-of-synch condition with ERCOT and initiate an effort to clear the out-of-sync conditions.

With respect to these November 7, 2003 cancelled service orders, the last column of the second table below indicates that among the four major TDSPs TCC is the only TDSP with ERCOT still waiting for responses as of the January 14, 2004 Report. The following figure is Figure 11.


**ERCOT** 867s received on Canceled Service Orders

| TDSP | Total | 12/31/03 | 12/19/03 | 12/12/03 | 12/5/03 | 11/28/03 | 11/21/03 | 11/14/03 | 11/7/03 |
|---|---|---|---|---|---|---|---|---|---|
| AEP | 127 | 12 | 23 | 23 | 9 | 12 | 10 | 34 | 4 |
| CenterPoint | 237 | 16 | 31 | 20 | 18 | 34 | 34 | 67 | 17 |
| ONCOR | 287 | 14 | 166 | 11 | 14 | 26 | 32 | 16 | 8 |
| Sharyland | 17 | 2 | 2 | 2 | 3 | 3 | 0 | 2 | 3 |
| TNMP | 275 | 12 | 94 | 92 | 21 | 17 | 17 | 16 | 6 |
| Grand Total | 943 | 56 | 316 | 148 | 65 | 92 | 93 | 135 | 38 |

| TDSP | Total | Cancelled by TDSP (In-Sync) | Completed by TDSP (Out-of-Sync) | Awaiting TDSP Response |
|---|---|---|---|---|
| AEP | 127 | 9 | 51 | 67 |
| CenterPoint | 237 | 164 | 73 | 0 |
| ONCOR | 287 | 187 | 100 | 0 |
| Sharyland | 17 | 0 | 8 | 9 |
| TNMP | 275 | 275 | 0 | 0 |
| Grand Total | 943 | 635 | 232 | 76 |

The full ERCOT presentation is provided in Workpapers.

Q. **DID REPS HAVE ANY RECOMMENDATIONS FOR TCC THAT YOU HAVE NOT INCLUDED IN SECTION I OF YOUR TESTIMONY?**

A. Yes. These were generally specific requests for better performance on the service quality dimensions. REP suggestions to TCC not already captured in my specific recommendations are that TCC should:

- provide faster customer service;

- respond at first request rather than requiring multiple contacts;

- be more pro-active informing REPs about changes to procedures;

- provide additional/more knowledgeable and qualified personnel to respond to inquiries or issues;

- provide additional educational programs regarding TCC's internal processes and procedures;

- provide historical usage in a user friendly format; and

- provide quicker turnaround on IDR and non-IDR data.

## C. REBUTTAL TO TCC WITNESSES GORDON AND HOOPER

### 1. ISA SERVICE QUALITY

#### SUMMARY FINDING

**Q. HAVE YOU REVIEWED ALL THE REPORTS FILED WITH THE PUCT PURSUANT TO TCC DUTIES TO REPORT THE CUSTOMER SERVICE STANDARDS THAT TCC NEGOTIATED IN THE ISA?**

A. Yes, and I have done additional discovery on these matters.

**Q. WHAT IS YOUR OVERALL IMPRESSION OF TCC'S PERFORMANCE ON ISA REQUIREMENTS?**

A. TCC owes fines in the form of customer credits based on inability to satisfy targets that its predecessor companies had a hand in negotiating.[34] As is clear from review of its required reports, TCC has not been able to demonstrate sustained or full compliance with negotiated targets. TCC's offers to fix reporting problems that "explain" the non-compliance are still promises rather than realities.

---

[34] See Direct Testimony of Dr. A. D. Patton.

**Q. PLEASE SUMMARIZE THE INTEGRATED STIPULATION AND AGREEMENT (ISA) WITH RESPECT TO CUSTOMER SERVICE (NOT RELIABILITY) ISSUES.**

A. The Integrated Stipulation and Agreement was entered into by TCC's predecessor companies in May 1999. Included within the ISA in Section 7 are Customer Service Standards as well as the Reliability Standards discussed in the testimony of Cities Witness Dr. A.D. Patton. TCC Witness Gordon provides ISA Section 7 in his Exhibit HRG-4.

**Q. WHAT KIND OF CUSTOMER SERVICES ARE MEASURED IN THE ISA?**

A. The agreement provides for measurement in four areas: (1) a time-to-connect standard for new service installation where no construction is required, and (2) where installation construction is required, a time-to-connect standard for (a) standard facility construction and (b) a time-to-connect standard for non-standard facility construction. There is also a time-to-restore/replace standard for (3) security and streetlight outages, and time-to-average-answer standard for (4) telephone response of call center employees.

**Q. DID YOU REVIEW THE TESTIMONY ON ISA STANDARDS OF TCC WITNESS GORDON?**

A. Yes. Mr. Gordon describes performance in the areas of new service requiring standard construction and non-standard construction and with respect to lighting replacement for outages, what I have called items 2(a and b) and Item 3 above.

As Mr. Gordon shows, TCC has failed to meet target for new service involving standard construction in the third and fourth quarters of 2002 and in every quarter reported thus far for 2003. He blames the problem on a newly initiated automated customer information system. And, he is convinced that the problem lies in the reporting system rather than performance.

Q. HAS TCC FIXED ITS REPORTING SYSTEM FOR TRACKING STANDARD CONSTRUCTION TIME-TO-CONNECT?

A. Mr. Gordon reports that problems still exist with the reporting system. Although a discovery response now asserts the reporting system has been fixed, the assertion is based on the "planned implementation" of new software and order management systems.[35]

Q. DOES MR. GORDON REPORT PERFORMANCE FOR NON-STANDARD CONSTRUCTION REQUESTS?

A. Yes. He minimizes the failure to meet targets by explaining that there are very few requests of this nature.

Q. WHAT ABOUT LIGHTING REPLACEMENTS?

A. Here again, TCC does not meet targets but feels that reporting problems are to blame.

In response to a follow-up question, TCC explains that the order tracking system identified by Mr. Gordon[36] is still unable to differentiated between standard and non-standard lighting replacement. A procedural change relying on functionality

---

[35] Response to Cities 29-13. Moreover, the discovery response suggests that, to the extent that TCC may subjectively evaluate "customer readiness," TCC may reset this variable thereby restarting the clock. Full discovery responses to Cities 29-13 are provided in Workpapers as is Response to Cities 16-21 which identifies the readiness requirements.

[36] Direct Testimony of Mr. Gordon at 34.

to be implemented should be able to report actual performance by the last quarter of 2004.

Q. **HOW DO YOU CHARACTERIZE PERFORMANCE ON THE TWO AREAS DISCUSSED BY MR. GORDON?**

A. Like the filed reports, for each failure, the reporting incident brings with it either an excuse, a promise, or evidence of a promise unkept. These excuses and explanations also characterize Mr. Gordon's testimony.

## REPORTED PERFORMANCE FOR THE ISA

Q. **WHAT ARE THE REPORTING REQUIREMENTS OF THE ISA?**

A. The ISA imposed three annual reporting requirements: a Customer Service Survey of Texas Customers and a Customer Service Report to be filed with the PUCT, and a Utility Scorecard to be sent to its customers. A fourth report to the PUCT is triggered by failure to meet minimum service standards for any two months within a 12-month period.

Q. **HAS TCC BEEN ABLE TO CONSISTENTLY MEET THE TARGETS IT NEGOTIATED FOR ITSELF IN THE ISA?**

A. No.

Q. **PLEASE EXPLAIN.**

A. First, TCC never filed all the reports contemplated by the ISA. In December 2001, before any annual reports had been filed, TCC filed a petition requesting modification of the standards in the ISA. By agreement with Staff, TCC was permitted to forego providing the ISA-required Annual Utility Scorecard to customers. So, in February 2002, TCC filed 2001 data for the other two annual reports.

**(1) 2001 data**

Q. WAS TCC IN COMPLIANCE WITH ALL ITS ISA TARGETS?

A. No, TCC was not in compliance for light replacement. TCC explained that the data was contaminated by inclusion of more complex repairs that those called for in the performance measure. TCC opined that a system modification in January 2002 would allow TCC to demonstrate better, and presumably, compliant performance.

Q. WERE THERE OTHER INCIDENTS OF NON-COMPLIANCE?

A. Yes. In April, 2001 TCC notified the PUCT that it had experienced three months in a row where average speed of answer was too slow, relative to the target. TCC identified the combination of extreme weather, rising gas prices and changes in the volume, duration and nature of calls as causes.

**(2) 2002 data**

Q. WHAT ABOUT 2002 DATA?

A. TCC was out of compliance for both lighting replacement and for connection requiring standard installations. In February 2003, TCC filed its 2002 data under agreement with Staff that TCC provide only the same information as TCC provided in 2001. Although TCC had modified its work order system in January 2002, TCC was again unable to demonstrate compliance or improved lighting replacement performance as predicted/ hoped for last year in TCC's explanatory comments. The measure for connection requiring standard installation was also out of compliance.

TCC explained that the conversion from the CSW to the AEP Customer Information System (known as Marketing And Customer Services System), combined with workarounds necessitated by electronic exchange problems under Customer

Choice had resulted in the need to reconstruct lost data such as construction completion dates. Thus, the reported 2002 data for connection times for standard and nonstandard installation was based on recollections of people in the field, and so, not totally accurate.

**WITNESS HOOPER**

Q. **WHAT MEASURES DOES WITNESS DAVID L. HOOPER DISCUSS?**

A. He discusses what I have called Item 4, "time-to-average-answer standard for telephone response of call center employees." Presumably he also discusses what I have called Item the " time-to-connect standard for new service installation where no construction is required."

Q. **WHY DO YOU SAY "PRESUMABLY"?**

A. Because Mr. Hooper does not report the proper measure for time-to-connect, as contemplated in the ISA. I discuss this below.

Q. **WHAT IS THE FIRST MEASURE MR. HOOPER DISCUSSES IN HIS TESTIMONY?**

A. The target for average speed of answer (ASA) set by the ISA is within 60 seconds. As I discussed above, under certain stresses, TCC was unable to satisfy the standard, and had to provide an improvement plan to the PUCT as required by the ISA.

Q. **WHAT ARE THE RESULTS OF THE IMPROVEMENT PLAN?**

A. Using the Virtual Call Center, Mr. Hooper suggests, TCC has been able to drop the ASA to 38 seconds, year to date. However, since then the ASA seems to be creeping up again. The updated ASA through 12/31/04 is 42 seconds.

**Q. AVERAGES ARE NICE. DOES VARIANCE MATTER?**

**A.** Yes. As in the April 2001 event, TCC has not consistently met target in all months. Arguably it is most important to have a timely response when the system is under stress from external events that are generating the customer calls. Events in October 2003 forced the monthly average above the target, suggesting that consistency of achievement on the ASA target is still in some question.[37]

**Q. WHAT IS HIS SECOND MEASURE?**

**A.** Mr. Hooper uses the term "existing meter" connects, and then asserts that this is what is supposed to be measured by the ISA. The ISA doesn't use this term. An "existing meter" connect is a "left in hot" or energized meter. TCC has a fully automated process for connecting these meters on a move-in or switch transaction, if they have a meter reading within five days prior to the requested date.[38] And, we know if they don't, they can complete the automated process, keeping these performance statistics up, by use of an estimated meter read.

The question, of course, is what happens with more difficult move-in transactions. Thus, we really don't know whether TCC is meeting the 95% target when the reported data is properly expanded to include all new service installations. Moreover, TCC reports that it is exceeding the PUCT target of 95% in Subst. R.§25.490. Subst. R. §25.490 governs the ending of the moratorium on disconnects which the PUCT instituted early on to address re-connection problems. Here again, TCC is describing a left-in hot or energized meter situation. Like all the other TDSPs

---

[37] Response to Cities 30-14 Attachment 1.

[38] Response to Cities 16-20.

who report on this measure, TCC is meeting this target for reconnection on energized meters. TCC is reporting a measure based on less than full scenarios.

### TCC REPORTED BILLING ACCURACY MEASURE

Q. DOES MR. HOOPER REPORT ANY OTHER STATISTICS?

A. In addition to his ISA reporting, Mr. Hooper reports a measure he describes as the percentage of bills that require no adjustments and indicates that for the period January through August this number is 98.74%. The 2003 measure is 98.78%.[39] He claims that this statistic is a good indicator of meter reading and billing success.

Q. WHAT DO YOU MAKE OF HIS CLAIM?

A. First, there is no definition showing how the statistic is constructed and what data are used. Although Mr. Hooper provides no definition for his statistic, it appears to be the same statistic that TCC has reported previously as the one measure TCC decided to include in the ISA reports to the PUCT that was not specifically asked for: the BILLADJ measure. Perhaps, BILLADJ was provided in response to a general ISA request to include billing error information.

Second, if this is BILLADJ, it is interesting to notice that this measure, unlike the other ISA reported measures, shows very little variability: For 2001 the statistic is 99.79. For 2002 the statistic is 99.86. For 2003, through August, as reported by Mr. Hooper, the statistic is 98.74 and updated for all of 2003, the statistic is 98.78. For example, if BILLADJ is measuring every bill that TCC sends, not just bills based on meter reads to retail customers, but a larger universe of billings, then one would expect this statistic to behave as it does. That is, the reason it has such low variability

---

[39] Response to Cities 30-13.

may be because, as a statistical measure, BILLADJ isn't really providing much information of value from the perspective of assessing regulated utility billing quality.

Third, if my suppositions above are all wrong, then I will simply point out that TCC is not currently meeting its Texas target for BILLADJ, which TCC reported in its 2001 ISA filing to the PUCT as being 99%.

And fourth, other billing data provided by TCC in discovery, some filed confidentially and some not, indicate less than 99% billing accuracy when what is being measured is the sending of bills to REPs. The reported measure here is simply inconsistent with utility-specific data on estimated meter readings, cancellations and rebillings, etc. provided to me by TCC in this proceeding.

## 2. SERVICE QUALITY REPORTING: RECOMMENDATION

Q. DO YOU HAVE ANY CONCLUDING REMARKS FOR THIS SECTION?

A. First, confidential reporting of TDSP performance measures is contrary to good regulation and results solely from an anomaly created in drafting the rule rather than from regulatory intentions. The reporting of performance measures by regulated utilities is a tool for regulation, not a means to secrecy. The intention of Subst. R. §25.88 is not to put information concerning a regulated TDSP with no competitors and subject to rate regulation on par with information pertaining to competitive entities such as REPs. For example, none of the ERCOT performance measures are confidential because ERCOT files on behalf of itself. That ERCOT also files on behalf of the TDSPs has created the anomalous result that information pertaining to

TDSP performance requested by the Commission is not available for analysis to anyone other than Staff able to review the confidential filings.[40]

Second, public reporting of TDSP performance measures is in the public interest. The public reporting of TDSP performance information can create benchmarks for further assessment and identification of the most pressing problems by those who have an interest in seeing performance problems identified and fixed.

Thus, the Commission should direct TCC to file as non-confidential the "B Report" portion of TCC's Quarterly Performance Report that ERCOT now files confidentially on behalf of TCC.

### III. REQUEST FOR GOOD CAUSE EXCEPTION

**A. NEITHER ABD O&M SERVICES NOR TRANSMISSION CONSTRUCTION SERVICES COMPLY WITH SUBST. R. §25.342(f)(D) OTHER SERVICE**

**1. REGULATED UTILITY PROVISION OF UNREGULATED SERVICES: DEFINITIONS AND DISTINCTIONS**

**LEGAL FRAMEWORK**

Q. **WHAT FRAMEWORK WILL YOU USE TO EVALUATE TCC'S REQUEST?**

A. I will be using the Substantive Rules governing Unbundling. Specifically, I will be discussing §25.341 "Definitions" and §25.342 "Electric Business Separation," and in particular, § 25.342 (f) "Separation of transmission and distribution utility services," of which the "Other service" rule is a part.

---

[40] This is data reported by ERCOT on the TDSPs behalf. ERCOT may send or sends this data to the TDSP under its right to contest the accuracy of the ERCOT Report. ERCOT must report TDSP information as confidential since any information relating specifically to any other entity (unless the Commission determines otherwise) must be confidentially reported. *See* Filing Requirements For Performance Measure Reporting Pursuant to PUC Subst. R. 25.88.

**Q. WHAT IS THIS FRAMEWORK?**

A. The general objective of unbundling regulation is to promote fair and full competition by protecting the competitive process and to recognize and address the economic problems inherent in the offering of non-regulated services by a regulated utility.

When adopting §25.342, the Commission explained:

.... the commission seeks to prohibit practices between regulated and competitive activities that may unreasonably restrict, impair, or reduce the level of competition during the transitional separation of personnel, information flow, functions, and operations, and after a competitive market is established.[41]

**Q. WHAT ARE THE SPECIFIC CONCERNS WHEN REGULATED OPERATIONS ARE PERMITTED TO OFFER UNREGULATED SERVICES?**

A. There are three potential abuses: (1) cross-subsidy where the total cost of service borne by ratepayers is too high when ratepayer dollars are used to support wholesale operations, and these ratepayer dollars are potentially placed at risk for recovery; (2) cross-subsidy where resources, management attention and effort are diverted from retail regulated operations thereby degrading the quality of retail service and (3) anti-competitive restriction or retardation of potential or developing energy services competition. Evidence indicates all three abuses are occurring here.

**Q. WHAT IS THE SPECIFIC RULE APPLICABLE TO TCC?**

A. The specific framework applicable to TCC is §25.342(f) "Separation of transmission and distribution utility services." This section distinguishes among five specific

---

[41] Order on adoption in Project No. 21083 at 2.

services. Three of these five, namely "system" service, "discretionary service," and "other service", are important here.

**Q. WHAT IS SYSTEM SERVICE?**

A. System service is defined in §25.341 "Definitions." At the most basic level, System Service is service essential to the transmission and distribution of electricity. Recognizing that what is essential may change over time with market evolution, the Commission provides an explicitly non-exhaustive list.

**Q. WHAT IS DISCRETIONARY SERVICE?**

A. Discretionary Service is defined in §25.341 "Definitions." Discretionary Services are related to, but not essential to, the transmission and distribution of electricity. TCC includes what used to be called "miscellaneous services" among its Discretionary Services, and charges Discretionary Services only to retail customers. Substantive Rule further distinguishes between System and Discretionary Services through the rate design required: System Service costs apply to all REP T&D customers whereas Discretionary Services are designed as an explicit user-fee and charged (via the REP) to the end-use customer who purchases the service.

**Q. HOW IS "OTHER SERVICE" DEFINED BY RULE?**

A. There is no definition for Other Service in §25.341 "Definitions." Rather, the Other Service exception is defined by what is permitted. The complete Other Service rule is:

§25.342(f)(1) continued

(D) **Other service.**

    (i) The offering of any other services shall be limited to those services which:

        (I) maximize the value of transmission and distribution system service facilities; and

        (II) are provided without additional personnel and facilities other than those essential to the provision of transmission and distribution system services.

    (ii) If the transmission and distribution utility offers a service under clause (i) of this subparagraph, the transmission and distribution utility shall:

        (I) track revenues and to the extent possible the costs for each service separately;

        (II) offer the service on a non-discriminatory-basis, and if the commission determines that it is appropriate, pursuant to a commission-approved tariff, and;

        (III) credit all revenues received from the offering of this service during the test year after known and measurable adjustments are made to lower the revenue requirement of the transmission and distribution utility on which the rates are based.

**Q. PLEASE DISCUSS.**

A. Allowed TDSP offerings are for those services which: (1) maximize the value of transmission and distribution system service facilities; and (2) are provided without additional personnel and facilities other than those essential to the provision of transmission and distribution system services. Furthermore, the revenues from

maximizing value from better utilization of essential, and thus required TDSP resources, are to be credited fully (after adjustment) to reduce system rates.

## THE *QUID PRO QUO* IN RULE-COMPLIANT OTHER SERVICE

Q. WHY PERMIT A REGULATED UTILITY TO PROVIDE OTHER SERVICE?

A. There is a potential upside for both ratepayers and the regulated utility. Revenues earned must ultimately be credited to ratepayers, but the regulated utility benefits from use of these revenues until the crediting occurs. This utility benefit is called "regulatory lag."

Q. WHAT EXACTLY IS REGULATORY LAG?

A. Regulatory lag is the financial benefit a regulated utility achieves when its actual revenues exceed its last rate case forecasted revenues. For revenue credits, the test year adjustment which is applied to reduce the current revenue requirement also operates as a forecast of future revenues to be credited. Thus, when the forecast is too low, the utility has the use of revenues exceeding forecast until the next rate case.

Q. PLEASE PROVIDE SOME EXAMPLES.

A. In the UCOS proceeding, TCC forecasted revenues subject to revenue credit of about $ 21 million and made this adjustment to reduce rates. Actual revenues exceeded the forecast by about $16 million.[42] Until this rate proceeding, TCC has had the benefit of these revenues exceeding forecast. This benefit can be likened to a zero interest loan from ratepayers to the utility.

---

[42] Response to Cities 2-19 supplemental.

In the present proceeding, TCC is not providing adjustments for all on-going ABD projects.[43] Also, TCC has proposed three new (or remodeled) Discretionary Service fees, Customized Maintenance Service, Facilities Monthly Maintenance Service and Emergency Maintenance Service. Although each of these is being offered "at the request of end-use customers,"[44] TCC provides no revenue credit for these in this proceeding.

Q. **DOES THE REGULATORY PROCESS SUPPORT REGULATORY LAG?**

A. Yes. The known and measurable standard for adjustments helps to bias the adjustment/forecast downward relative to all expected revenues. Thus, TCC's provision of these emerging ABD and Discretionary Services can be expected to contribute to regulatory lag.

Q. **BUT WON'T THE UTILITY MAKE A COUNTER LOAN TO RATEPAYERS WHEN THE FORECAST PROVES TO BE TOO HIGH, CREATING A KIND OF "REVERSE" REGULATORY LAG?**

A. No. In actual operation, there is no symmetry. Because the utility has the option of coming in for a rate increase when its forecast of costs is too low, but must be brought in at some opportunity cost of the use of regulatory resources if "over-earnings" are suspected, regulatory lag does not operate symmetrically but benefits the utility.

Q. **WHAT DOES THE OTHER SERVICE RULE ACHIEVE FOR RATEPAYERS?**

A. Ratepayers get revenue credits, reducing the total revenue requirement.

---

[43] See Response to Cities 29-7.

[44] Response to Cities 20-1b and also Byrne Direct Testimony at 12.

**Q. HOW DOES THIS OCCUR WHEN OTHER SERVICE OFFERINGS ARE RULE-COMPLIANT?**

A. Quite simply, compliant offerings indicate that the utility has found a way to squeeze out more revenue from the facilities and personnel that the ratepayer is already obligated to pay for. Using the rule language, rather than pay all the necessary fixed cost associated with essential but not-fully utilized facilities needed to serve them, ratepayers benefit when the utility finds a way to "maximize the value of the T&D service facilities." The utility finds a way to provide some "other service" from "T&D system service facilities" without additional personnel and facilities other than those "essential to the provision of T&D system services."

**Q. DO RATEPAYERS ALWAYS BENEFIT WHEN THERE ARE REVENUES TO CREDIT AGAINST THE TOTAL REVENUE REQUIREMENT?**

A. No, ratepayers are assured benefit only under rule-compliant offerings as just described. Offerings which are not rule-compliant are an invitation to abuse of retail ratepayers through the kinds of cross-subsidies I identify above.

As I show below, the possibility that personnel as well as idle capital may be used to provide other services, is to see that opportunity for abuse of the Other Service exception is readily available to TCC. In my view this is why the Commission crafted the Other service exception very narrowly.[45]

---

[45] Order on adoption, pps. 132-135.

## DEFINING "ESSENTIAL" FOR RULE-COMPLIANCE

**Q. WILL YOU OFFER SOME GUIDELINES FOR IDENTIFYING WHEN WHOLESALE SERVICE OFFERINGS MIGHT COMPLY WITH THE OTHER SERVICE EXCEPTION?**

A. Yes. In this section, I suggest some necessary but not sufficient conditions for compliance.

**Q. HOW MUST PERSONNEL AND FACILITIES "ESSENTIAL TO THE PROVISION OF TRANSMISSION AND DISTRIBUTION SYSTEM SERVICES" BE DEFINED FOR RULE COMPLIANCE?**

A. Essential personnel and facilities have both a productive or process aspect and an economic or "least cost" aspect. In other words, to assume ratepayers will benefit from TCC's offering of Other Service, not only is the production or process required to be essential to regulated utility operations, it must be the least cost way of getting the job done.

**Q. DO YOU HAVE AN EXAMPLE?**

A. Yes. Consider the off-system sales that FERC and the PUCT have historically permitted to regulated generation utilities. In this situation, there is idle generation capacity and associated necessary labor. In other words, both the generator (with its attendant size and performance characteristics) and its full-time operator are essential in producing necessary retail electricity. Furthermore, and importantly, this method of organizing production represents a least-cost method of organizing because retail ratepayer costs are minimized. Said differently, to reliably and cheaply provide the electricity needs of retail customers, it is necessary to have both generation which

may exhibit excess or idle capacity at times and full-time labor capable of operating the generator at all times. No other form of capital-labor organization minimizes costs at retail.

Q. **WHY DO YOU STRESS THIS LEAST COST ASPECT WHEN DEFINING ESSENTIAL SYSTEM SERVICE?**

A. Because some other arrangement would essentially permit "slack" or unnecessary labor resources that weren't really essential to the retail service. Putting these "slack" or unnecessary labor resources on the retail payroll is just an implicit way of creating "additional personnel" for a non-retail purpose in contradiction of the Other Service exception.

Moreover, *showing that this definition of "essential" is satisfied is required to assured that ratepayers are getting an unambiguously good deal from regulated provision of Other services.* In the alternative, the regulated operation is simply a shill for development of unregulated services, and ratepayers are experiencing inflated costs in a general or across-the-board way, reflecting the fact that production is organized for purposes other than efficient delivery of retail services.

Cross-subsidy would be reflected in the kind of excess administrative and general expenses that Dr. Patton finds is characteristic of TCC relative to peer TDSPs.

Q. DO YOU HAVE AN ECONOMIC DEFINITION OF WHAT KIND OF TECHNOLOGIES OR PROCESSES USED TO PROVIDE T&D SYSTEM SERVICES COULD POTENTIALLY COMPLY WITH THE OTHER SERVICE EXCEPTION?

A. Yes. Capital-only technologies are good candidates to comply. For example, land essential to the provision of T&D system services, if used for cattle-grazing and requiring no "additional personnel or facilities" for grazing would comply. During the test year, TCC provided facilities rental to Small Hydro of Texas and a land lease to Textel Tower Development. Assuming TCC can demonstrate that (1) these utilized facilities are essential to the provision of T&D system services and (2) no additional personnel or facilities were necessary to effectuate this Other Service use, then these two TCC offerings would comply.

Q. DOES YOUR UNDERSTANDING OF THE COMMISSION EXCEPTION MEAN THAT "CAPITAL-ONLY" TECHNOLOGIES ARE THE ONLY KINDS OF ESSENTIAL SYSTEM FACILITIES THAN CAN COMPLY?

A. No. The Commission rejected PG&E's request that the Other Service limitation require only idle utility assets or capacity be used to offer Other Service. In other words, the Commission rejected the standard that no labor (personnel) services used in providing essential facilities may be used to support Other Service. In characterizing PG&E's request as unnecessary, the Commission said: The ommission

notes that "other services" will be very limited in scope and will be approved only after careful review.[46]

As the Commission indicated when adopting the rule, satisfying the requirements for compliant Other Service offerings requires careful review. However, this review of TCC Other Service offerings has not occurred.

### 2. TCC HAS YET TO DEMONSTRATE COMPLIANCE WITH THE OTHER SERVICE EXCEPTION

Q. WHAT IS YOUR PURPOSE IN THIS SECTION OF YOUR TESTIMONY?

A. In this section of testimony, I explain that TCC has not attempted to show compliance with the limitations on offering Other Service. Although TCC Witness Crowder tries to suggest otherwise, this is a case of first impression for the Commission, regarding whether or not any of TCC's ABD service offerings (including Transmission Construction Services) comply with the rule.

### THIS IS A SITUATION OF FIRST IMPRESSION

Q. WHY IS THIS A CASE OF FIRST IMPRESSION?

A. TCC's discovery response shows that the issue of whether the actual services offered by TCC comply with the rule has not been before the Commission.[47] First, TCC has no definition or standards (such as those I suggest above) by which it decides whether its service offerings comply with the Other Service requirements. TCC's position is

---

[46] In addition to capital-only technologies, technologies and/or processes known as fixed proportions technologies could potentially qualify. For a regulated generation utility, the example provided previously of fixed proportions or ratio of labor operations necessary for least cost generation is such a technology.

[47] Response to Cities 25-68.

that it decides on a case-by-case basis.[48] Second, all prior discussion before the Commission, i.e., in the business separation proceedings, have always been couched in terms of "plans" and, of course, these have not been explicitly approved.[49]

Third, the discovery response and attachments show that plan descriptions themselves were simply pledges that the actual operations would satisfy the rule. Said differently, there was nothing for the Commission to approve.

Q. **HOW HAS TCC SHOWN COMPLIANCE NOW THAT OTHER SERVICES ARE BEING MARKETED?**

A. A pledge, rather a demonstration of compliance, continues to be TCC's approach,[50] even now, with at least 15 kinds of ABD O&M services offered and Transmission Construction Service projects, too.

Q. **WHAT JUSTIFICATION DOES TCC GIVE FOR HAVING NO COMPLIANCE SHOWING?**

A. Mr. Crowder reasons that there are Commission orders approving stipulated agreements in a series of cases transferring transmission facilities to LCRA. In these cases, he says, parties knew TCC would be providing construction-related O&M services to LCRA, but nobody objected, therefore everything must be okay.[51]

---

[48] Specifically, TCC responded: TCC does not limit or restrict O&M services it provides to a list of distinct named services. Rather, TCC offers itself as an O&M services provider and determines on a case-by-case basis whether to provide a requested service. Response to Cities 25-69c

[49] See Response to Cities 25-68.

[50] See Mr. Crowder's Direct Testimony at 23-24.

[51] See Response to Cities 25-68. See also Mr. Bailey's Direct Testimony for a discussion of the Transmission Construction Services cases before the Commission.

Q. DOES MR. CROWDER'S DIRECT TESTIMONY FAIL TO DEMONSTRATE COMPLIANCE?

A. Truly, Mr. Crowley offers not a shred of evidence that any ABD services comply with the Other Services exception.

**INSTRUCTION TO CSW: NO ADDS SOLELY FOR OTHER SERVICE**

Q. WHAT EVIDENCE DOES TCC NEED TO PRESENT?

A. As I suggested above, "essential" must be defined in a way that holds ratepayers harmless for non-utility operations. Second, I suggested properties of possibly compliant technologies. And, third, the Commission has given CSW (TCC's predecessor) clear additional instruction.

Q. WHAT ADDITIONAL INSTRUCTION DID THE COMMISSION PROVIDE TO CSW?

A. In accepting CSW's suggestion to remove a requirement that only existing personnel and facilities may be used, the Commission said:

The commission agrees with CSW that over time a T&D utility will add facilities and employees; however the utility may not add facilities or employees for the sole purpose of providing "other services."[52]

_____

[52] Order on Adoption p.135.

Q. WHAT COMPLIANCE ANALYSIS HAS TCC DONE WITH RESPECT TO THE COMMISSION'S DIRECTIVE THAT NO FACILITIES OR EMPLOYEES BE ADDED FOR THE SOLE PURPOSE OF PROVIDING OTHER SERVICE?

A. None. The exact question Cities posed was:

Has AEPSC [AEP Service Corporation] performed any analysis of when activity levels associated with AEPSC ABD work require the addition of AEPSC personnel and/or other resources to maintain service levels to affiliates? If so provide. If now [sic], explain why not? Provide all responsive documents whether analyses or not.

In response, TCC simply said:

It has always been understood that no additional employees would be hired, therefore there was no need to perform an analysis. Accordingly, no such documents exist.[53]

Such pledges are no substitute for compliance, especially when the potential for cross-subsidy and other abuse is so pronounced.

**TWO EXAMPLE VIOLATIONS AND RELATED CROSS-SUBSIDIES**

**(1) Preplanning Expenses**

Q. CAN YOU PROVIDE SOME EXAMPLES WHERE TCC HAS ADDED EMPLOYEES FOR THE SOLE PURPOSE OF PROVIDING OTHER SERVICE?

A. Yes. The first example is cross-subsidy via preplanning expenses.

---

[53] Response to Cities 25-70.

**Q. WHAT ARE PREPLANNING COSTS?**

A. Preplanning expenses are costs incurred to offer third-party services that are not directly associated with a specific third-party project but which support overall third-party activities. These are primarily AEPSC ABD expenses but also include TCC expenses that are not associated with a specific ABD contract.[54]

**Q. IDENTIFY THE VIOLATION ASSOCIATED WITH PREPLANNING EXPENSE.**

A. TCC has hired additional personnel solely for the purpose of providing other service in violation of the rule. First, TCC admits, quite logically, that the total level of preplanning costs is dependent only on the level of ABD activity performed.[55] In other words, AEPSC adds personnel with increasing levels of ABD activity performed.

Second, under cost causation principles, this bigger "pie" of AEPSC ABD personnel costs is then allocated to operating companies on the basis of kwh sales and/or number of transmission pole miles (for both O&M and Transmission Construction Services). Of course, these allocations are simply a way of distributing these costs to operating companies. Said differently, TCC takes an increasing hit of dollars when ABD activity levels increase, all else equal. Thus, under AEP allocation rules, TCC has **hired additional personnel solely for the purpose of providing "other services,"** thereby violating the Commission's rule.

---

[54] Direct Testimony of Calvin Crowder at 24.

[55] Response to Cities 25-78.

**Q. HOW DOES THIS AFFECT THE *QUID PRO QUO* YOU DESCRIBED EARLIER BETWEEN RATEPAYERS AND THE REGULATED UTILITY ESTABLISHED IN THE OTHER SERVICE RULE?**

A. There is no sense in which the AEPSC personnel performing the preplanning function bears any resemblance to an underutilized resource at TCC that is essential to the core business. An expansion of ABD business activities in Ohio, when it requires the addition of AEPSC personnel performing preplanning activities, can lead to additional personnel costs in Texas as the overhead increases, but TCC's share of the allocation pie remains the same.

As long as AEP insists on charging AEPSC overheads to TCC for ABD service projects, whether O&M or Transmission Construction services, I believe TCC cannot comply with the rule.

**Q. WHY?**

A. Extensive use of allocations to assign costs to operating companies creates an operating cost structure for the regulated operating utility which is in a fundamental way uncontrollable by the operating company. This amounts to a situation of "forced hiring" of additional personnel solely for the development of the ABD function.

**(2)    Use of TCC personnel in ABD O&M**

**Q. DO YOU HAVE A SECOND EXAMPLE OF NON-COMPLIANCE?**

A. Yes, use of TCC personnel in ABD O&M. The violation is not compelled to occur as it is with AEPSC overheads. In other words, TCC has some discretion over whether it adds a direct hire solely to support the Other Services function. However, in the test year, TCC exercised this discretion in direct contradiction to PUC rule.

Q. PLEASE EXPLAIN.

A. Mr. Crowder provides an example which directly violates the rule. He explains that ABD losses exist because TCC has only recently begun to offer ABD service. He says, "The ABD employee primarily responsible for developing TCC ABD services was hired at the end of 2001 and began actively pursuing ABD opportunities in 2002."[56]

Q. HOW LARGE ARE THE CROSS-SUBSIDIES?

A. I don't actually know, but I can provide some indication in the analysis that follows. For example, the required reversal of the negative test year margin of $133,850 in Exhibit JCC-3 simply represents the tiptop of the potential cross-subsidy iceberg. It became exposed when it was revealed as that part of the total amount that retail ratepayers were initially asked to bear to support wholesale operations but then had to be reversed because of poor results, i.e., insufficient wholesale revenue.

## THE EXTENT OF CROSS-SUBSIDY

Q. WHAT EFFECT IS THERE ON RATEPAYERS WHEN TCC HIRES ADDITIONAL PERSONNEL FOR THE SOLE PURPOSE OF PROVIDING "OTHER SERVICES"?

A. What appear to be revenue credits are actually charges of AEPSC overhead to retail ratepayers first with possible "net" revenue credits second. As indicated above, this is why Mr. Crowder had to zero out the negative test year margin of $133,850 before crediting the cost of service.

---

[56] Witness Crowder at 33.

Exhibit JCC-3 makes it clear that the $149,803.88 in overheads allocated to TCC ratepayers were not fully offset by the distribution related revenues earned. TCC had to re-absorb the difference between the allocated AEPSC personnel costs and the revenues earned.

Q. **WHAT DOLLARS ARE ASSOCIATED WITH CROSS-SUBSIDY OF ABD O&M SERVICES?**

A. For O&M ABD services, preplanning expenses for ABD O&M are charged as common costs for all O&M services. In the test year, about $125,530 in preplanning expenses were assigned to transmission revenues and $149,803 were assigned to distribution revenues. Of the $125,530, $114,262 were AEPSC ABD preplanning costs and $11,268 were TCC ABD preplanning costs; of the $149,803, $93,594 were AEPSC ABD preplanning costs and $56,210 were TCC ABD preplanning costs.[57] Thus, another way of looking at this cross-subsidy is to see that in the absence of these expenses, revenue credits associated with O&M services would have been about $275,000 more than they were in the test year.

Q. **TO WHAT EXTENT ARE AEPSC PREPLANNING COSTS INCORPORATED INTO TCC'S CHARGES FOR TRANSMISSION CONSTRUCTION SERVICES?**

A. Preplanning costs are not charged as common costs, so the amount depends upon the specific project. TCC provides third-party transmission services using primarily independent contractors and AEPSC personnel. Specifically for third-party transmission construction contracts, for LCRA AEPSC costs were about $19,444,000;

---

[57] Response to Cities 25-70c.

for MVEC, AEPSC costs were about $158,138 and for Sharyland, AEPSC costs were $172,947. For the test year, AEPSC charged TCC $3.8 million dollars.[58] In providing this service, TCC uses primarily AEPSC personnel to provide the management function and oversight of the independent contractors.

Q. **COULD THE ACTUAL ADJUSTMENTS THAT TCC PROVIDES TO RATEPAYERS TO RECOGNIZE THE USE OF THESE "ADDITIONAL" AND NON-ESSENTIAL EXPENSES (IMPROPERLY PLACED ON RATEPAYERS) BE TOO LOW?**

A. Definitely. The reason is because the potential for cross-use of personnel between regulated and unregulated activities at TCC is so widespread.

Q. **HOW HAVE YOU ILLUSTRATED THIS CROSS-SUBSIDY POTENTIAL?**

A. I asked TCC to fill in a matrix showing the extent to which personnel performing ABD Service work can do other categories of work, i.e., system service, discretionary service, etc. In the matrix, the "yes" answers mean that the job title/person is transferable between and among "yes" activities.

Q. **PLEASE ILLUSTRATE HOW TO READ THE MATRIX "POTENTIAL FOR CROSS-SUBSIDY OF WHOLESALE OPERATIONS BY RETAIL OPERATIONS (BY JOB TITLE)".**

A. In the matrix below, the first entry is for CSA or Customer Service Associate. Reading across from this job title, the "yes" responses mean this person could be employed in providing ABD Services, or AEPSC services or System services or Discretionary services but would not be a direct employee of TCC or another

---

[58] Direct Testimony of Mark A Bailey at 28.

operating company. The "yes" entries represent the great extent of fluidity or transferability of personnel resources across and among regulated and unregulated operations.[59]

| Figure 12<br>Potential for Cross-Subsidy of Wholesale Operations By Retail Operations<br>(By Job Title) | | | | | | |
|---|---|---|---|---|---|---|
| ABD Services | AEPSC | TCC | Affiliate | System | Discretionary | Competitive Work (2) |
| CSA, SR CSA, Lead CSA | Yes | no | no | yes | yes | no |
| Admin Assoc- Admin Assoc III | Yes | yes | yes | yes | yes | no |
| Billing Specialist I-III | Yes | no | no | yes | yes | no |
| Pricing/Costing Analyst I-III | Yes | no | no | yes | yes | no |
| Market Transaction Coordinator | Yes | no | no | yes | yes | no |
| Engineer I – IV | Yes | yes | yes | yes | yes | yes |
| Supervisor | Yes | yes | yes | yes | yes | yes |
| MV-90 Analyst | Yes | no | no | yes | yes | no |
| Load Research Data Analyst I-III | Yes | no | no | yes | yes | no |
| General Servicer (union position) | No | yes | yes | yes | yes | yes |
| Meter Electrician (union position)--Meter Electrician A | No | yes | yes | yes | yes | yes |
| Field Operations Specialist (union) | No | yes | yes | yes | yes | no |
| Meter Reader (nonunion) | No | yes | yes | yes | yes | no |

(1) The company does not track job titles of employees used by contractors hired by the Company.
(2) Employee classifications noted with a yes indicate that the job classification would be available to perform emergency repair services as defined in the PUCT rules.

Source: Response to Cities 29-6, Attachment 1

To the extent AEP-TCC corporate objectives are to develop in-house expertise in non-regulated areas, I expect TCC to seek as much cross-subsidy with its attendant artificial inflation of retail costs, diversion of resources and degradation of retail quality as the Commission will tolerate.

---

[59] The Response to Cities 29-6a is included in Workpapers.

Q. **WHAT ADJUSTMENT HAS TCC PROVIDED IN THIS CASE TO REMOVE THE EXPENSES OF PERSONNEL WORKING ON ABD PROJECTS?**

A. TCC provides an adjustment of $523,533 to Miscellaneous General Expenses to remove these expenses.[60] Mr. Crowder explains the activity[61] but **no one at TCC has demonstrated that this adjustment fully reflects the proper split between personnel for regulated versus unregulated activities.** If TCC cannot track (as required by rule) and thus prove up this adjustment, I believe the Commission has a *prima facie* case of cross-subsidy.

### PROBLEMS OF DETECTION

Q. **WHY IS IT DIFFICULT TO DETECT CROSS-SUBSIDY OF ABD SERVICES?**

A. Basically, as long as ratepayers receive revenue credits (as required by rule), TCC can get away with any level of cross subsidy it wants, provided no one is able to challenge that a particular person was improperly assigning time/resources between retail and wholesale projects, and/or a particular adjustment to remove the ABD-related expenses of TCC personnel was not correct.

I say this is possible as long as ratepayers receive revenue credits because, as TCC knows, customers are unlikely to object to revenue credits and consultants are unlikely to question them. But in this case, in its quest for cash flow, TCC put these credits "under water"[62] and had to adjust its booked loss out. In zeroing out the loss

---

[60] Rate Filing Package, Schedule II D 2, Attachment Page 11 of 12, Adjustment 17.

[61] Direct Testimony of Calvin Crowder at 25.

[62] Distribution Revenue losses of $133,849.63. Exhibit JCC-3 page 1.

in order to provide the revenue credit, TCC explicitly recognizes that its adjustment to remove the effects of TCC workers doing ABD work was too low. In other words, TCC had to further "adjust" its adjustment provided in the Rate Filing Package. Since this is so, the original adjustment is not correct.

Q. IS THERE ANOTHER WAY OF SEEING THAT THIS ADJUSTMENT OF $133, 850 BEGAN LIFE AS AN EXPLICIT CROSS-SUBSIDY?

A. Yes, another way of seeing this is that truly idle TCC resources, and truly *essential* resources as I have identified them above, when engaged in permissible additional economic activity on behalf of ratepayers *never book a loss*.

EVIDENCE OF ANTI-COMPETITIVE POTENTIAL

Q. HOW CAN CROSS-SUBSIDY RETARD DEVELOPMENT OF POTENTIALLY COMPETITIVE SERVICES?

A. Cross-subsidy permits the retail regulated firm, when pricing at wholesale to charge less than its full costs. Thus, it can charge prices below the market price and drive out competitors. In response to Cities discovery, TCC could not make the required showing that it prices at market for ABD services.

Q. WHAT IS THE STATE OF POTENTIALLY COMPETITIVE ENERGY SERVICES IN TCC?

A. The PUCT has recently recognized the poor state of potentially competitive energy services in the TCC service territory. First, the Commission recently granted exceptions permitting TCC to provide certain discretionary services (at retail) that

neither Oncor nor CenterPoint are permitted to provide.[63] The Commission permitted these exceptions, finding that certain competitive energy service offerings were not sufficiently developed at the present time in TCC's territory.

Second, in an effort to stimulate competition, the Commission had required TCC to seek to exit certain services by finding buyers for TCC's non-roadway lighting systems. Yet, TCC's efforts failed to find potential buyers/competitors, although two of the four entities approached were "involved in the construction and maintenance of non-roadway and roadway lighting systems."[64]

Of course, an anticompetitive opportunity is presented when potential competitors are also potential contractors.[65] However, I was unable to compare the identity of these potential competitors with the list of contractors TCC employs in providing ABD Services. A further competitive consideration is the fact that AEP has an unregulated affiliate, Diversified Energy Contractors Company, LLC, in the energy contracting business.[66]

As indicated above, it is disturbing that TCC can readily find sufficient contractors to help it successfully perform transmission construction projects,[67] yet fails to find contractors having T&D O&M/construction capabilities willing to purchase non-roadway lighting assets.

---

[63] These five maintenance and rental Discretionary Services are described in the Direct Testimony of AEP Witness Byrne and the proposed tariffs are presented as Exhbits RB-1-5.

[64] Response to Cities 2-86 and 87.

[65] Independent contractor costs are at least 44% of TCC Transmission Construction Services costs. Response to Staff BA1-4.

[66] Response to Cities 16-24, Attachment, page 1.

[67] The list of contractors used by TCC on three projects was provided in Response to Cities 25-71. See also Response to Cities 25-72s.

**Q. IS THERE ANOTHER COMPETITIVE ISSUE?**

A. Transmission Construction projects, unlike its O&M services, do not carry common costs of preplanning or other overheads. Rather, TCC allocates AEPSC overheads to individual projects.[68] This form of allocation may permit discriminatory pricing that allows TCC some ability to recognize or assign overheads up and down depending on how competitively TCC needs to price to win the project.[69] The ability to assign AEPSC personnel costs first to TCC retail ratepayers (discussed above) may permit undetectable cross-subsidy, thereby transferring actual wholesale overheads to retail costs. These opportunities can permit TCC to engage in potentially anticompetitive pricing ("limit pricing") to frustrate competitors and discourage them from competing with TCC's transmission construction projects. Finally, Witness Crowder points out that a third-parties choice of TCC may be due to a lack of other providers.[70]

**B. THE THIRD VIOLATION: TRANSMISSION CONSTRUCTION SERVICE IS NOT AN ESSENTIAL TDSP SYSTEM SERVICE**

**Q. TCC SAYS TRANSMISSION CONSTRUCTION IS DIFFERENT FROM OTHER THIRD-PARTY SERVICES IT PROVIDES. HOW SO?**

A. Yes. What Mr. Crowder is saying at page 35 of his direct testimony, lines 12-22 is that TCC provision of Transmission Construction complies with some requirements of the Other Service exception, nothing more.

---

[68] Response to Cities 29-5.

[69] See Response to Staff, BA1-4.

[70] Direct Testimony at 25.

**Q. PLEASE EXPLAIN.**

A. TCC's discussion provides a nice distinction with its other ABD services. TCC notes that construction personnel are "like" capital assets in that costs of construction personnel are capitalized in rate base along with the asset they construct. TCC's use of these personnel are not expensed. When they are performing construction work for others, TCC argues, they bear no expense to TCC. What TCC has described here is a production process using fixed proportions of capital and labor, that, as I indicated earlier, may comply with requirements of the rule.

**Q. WELL THEN SHOULD TCC'S WAIVER BE GRANTED?**

A. Not so fast. The fixed proportions requirement is a necessary but not sufficient condition for compliance. Recall the need for a showing of essential service. In other words, TCC must show that this production process used for Other Service is necessary or required for ratepayers to receive retail services.

Yet, unlike TCC, other TDSPs provide TDSP services without having to be in the Transmission Construction Services business. TCC provides its Transmission Construction Service almost entirely with independent contractors and AEPSC personnel, not TCC operations personnel.[71] It strains credibility to suggest that Transmission Construction Service is simply further utilization of resources essential for essential transmission and distribution system service.

---

[71] Response to Staff BA1-4.

Q. **BUT ISN'T HAVING AEP IN THE TRANSMISSION CONSTRUCTION BUSINESS IN THE PUBLIC INTEREST?**

A. Maybe so. However, it does not follow that the regulated utility, TCC or its ratepayers, should be in the Transmission Construction Services business. If AEP wants to spin off its construction business from TCC, this is fine, and AEP can make all the profits it wants as a separate unregulated operation. Considering the potential for cross-subsidy, I recommend that TCC spin off its Transmission Construction business.

## C. EFFECTS OF GRANTING A GOOD CAUSE EXCEPTION

Q. **WHAT WILL BE THE EFFECTS OF GRANTING TCC'S REQUEST FOR GOOD CAUSE EXCEPTION?**

A. The compliance issues I have identified create problems for public interest regulation. There is no "good cause" for granting the exception. TCC already benefits from regulatory lag.

Q. **WHAT ABOUT REVENUE CREDITS?**

A. If the waiver is granted, revenue credits will be split in half. On its face, this is "a tails I win, heads you lose" proposition for ratepayers .

Moreover, the PUCT should not force captive ratepayers to be in the for-profit transmission construction business with TCC.

Q. HOW WILL INCENTIVES CHANGE IF TCC IS ALLOWED TO PROFIT DIRECTLY FROM PROVIDING TRANSMISSION CONSTRUCTION SERVICES WITHIN THE REGULATED UTILITY OPERATION?

A. Up to now, ABD services have been offered in TCC's own and adjacent service areas. It is TCC's position that Commission rule does not limit these offerings geographically.[72] It is TCC's position that its offerings are not confined to the distinct O&M services listed on Witness Crowder's Exhibit JCC-3.[73] I can readily imagine significant personnel shifts as TCC becomes the staging area or profitable conduit whereby AEP grows its transmission construction capabilities.

With the new ability to pocket profits, all the support services in TCC capable of assisting the Transmission Construction opportunities can be brought to bear and even more resources and attention will be stripped from TCC retail operations. AEPSC overheads and TCC support personnel can be utilized as needed and either priced in or priced out of the Transmission Company bids in order to generate additional transmission construction business

Q. WHAT BENEFITS ARE ACHIEVED IN SEPARATING THE TRANSMISSION CONSTRUCTION SERVICES BUSINESS AS YOU RECOMMEND?

A. First, cross-subsidies from retail operations are eliminated. Second, with Transmission Construction Services as a separate entity, TCC employees will have a career path into the Transmission Construction Services company by demonstrating

---

[72] Response to Cities 25-79.

[73] Response to Cities 25-69.

productivity as a TCC employee, rather than by diverting productivity from retail activities to benefit the in-house Transmission Construction Services company.

## IV. PROPOSED DISCRETIONARY SERVICE FEES

Q. **WHAT PRINCIPLE ORGANIZES YOUR RECOMMENDATIONS REGARDING THE LEVEL AND STRUCTURE OF DISCRETIONARY SERVICE FEES?**

A. Pursuant to the unbundling requirements of SB7, the Commission more carefully crafted distinctions among types of services. These distinctions serve to support the development of a competitive market. This purpose should be reflected in the design of permissible discretionary service fees, terms and conditions.

Q. **WHAT DISTINCTION BETWEEN SYSTEM AND DISCRETIONARY SERVICES EXISTS NOW?**

A. The current definitional distinction between system and discretionary services was adopted in rule effective on or before January 1, 2002 in response to requirements for unbundling. While system services are "essential" to the regulated function, discretionary services are related to, but not essential to the regulated function.

Q. **HOW HAS TCC INTERPRETED THIS DISTINCTION?**

A. In the UCOS proceeding, TCC created (1) fees for traditional services that were previously not priced (i.e., copying fee, routine connect fee), (2) restructured and raised fees (e.g. for service calls, meter tests, dispatch orders and denial of access to meter) and (3) introduced new fees. These new for-fee services included Special Products/Services, Non-Standard Communication and Special Meter Read services and fees. The higher fees to be charged for existing services were raised to recover

supervisory overhead and fully loaded labor rates, consistent with requirements for "fully embedded cost pricing" of discretionary service fees.

Q. **HOW HAS THE COMMISSION INTERPRETED TCC'S DISTINCTIONS SO FAR?**

A. The Commission Order accepted a stipulation among the parties. Thus, the Commission permitted all charges as proposed except it did not approve the Retail Electric Provider Set-up Fee as proposed by CPL or the Account History Fee as proposed by CPL. In addition, the Commission required that Staff be notified by CPL in each instance where an assessment pursuant to the Non-Standard Communication Fee Rate Schedule was made.[74] All we know is that the Commission accepted the negotiation among the parties.

Q. **IS THE DISTINCTION BETWEEN SYSTEM AND DISCRETIONARY SERVICES AN EVOLVING AREA?**

A. That this is an evolving area is also made clear by the lack of standardization of discretionary service charges and prices across the TDSPs tariffs.

Q. **WHY IS IT IMPORTANT TO KEEP THE DISTINCTION BETWEEN SYSTEM AND DISCRETIONARY SERVICES IN MIND?**

A. First, as markets evolve, services that were non-essential may become essential. As markets evolve, the level, construction and design of services subject to fees, that is discretionary service fees, can influence the behavior of the TDSP, REPs and end-users.

---

[74] Application of CPL Company for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Substantive Rule § 25.344.

Second, to an economist, a market price is just another piece of information (albeit an important piece). One cannot walk the halls of the Commission or ERCOT without hearing a call for "more price transparency." Of course what is being requested is low cost access to or the dissemination of information that market participants need to make better choices, so markets function more efficiently and effectively.

In other words, account history and usage information is more akin to an "essential" or system service than to a discretionary service. It is interesting to note how rapidly an essential service can be created by events.

Q. DO YOU HAVE AN EXAMPLE?

A. Yes. For example, in CPL's last rate case prior to restructuring, Docket No. 14965, stipulating parties agreed to modify CPL's proposed "history account" charge by adding clarifying language that it applies only to requests for account history information that is more than two years old.[75] Using the language of Subst.R§25.341, historical usage information that was two or more years old was "nonessential" while more recent information was an essential or system service.

Q. HOW HAS TCC PROPOSED TO CHARGE FOR ACCOUNT HISTORY?

A. TCC proposes to charge for every account history request unless the account history information is required to be provided at no cost by PUCT rule. Specifically, TCC says:

---

[75] Proposal For Decision PUC Docket No. 14965 at 271.

The Account History Fee is an hourly-rate fee charged to the customer or the customer's authorized representative (the requester) to complete each request for account history except requests for information that is required to be provided at not cost by the PUCT's Substantive Rule. (The hourly fee is $24.11 and materials costs are charged separately).[76]

Q. **TO WHICH RULE DOES TCC REFER?**

A. The current rule which addresses account history charges is Subst. R.§25.472(b). This rule addresses rights of individual customers to historical usage data from REPs. The rule does not speak to charges by a TDSP to end-use customers or its representatives, such as an aggregator or REP. The rule says that an individual customer is entitled to request a 12-month usage history from its REP without charge **at least** [emphasis added] once every 12 months.

As written, notice that the rule permits the REP at its option to offer individual usage history more often than once every 12 months without charge. Thus, even considering an aggregator or REP as a customer,[77] the rule is permissive, allowing a REP to make no charge for access to historical usage information.

---

[76] Schedule IV-J-2 page 24 of 27 (Sponsored by TCC Witness Moncrief).

[77] Whether the rule even applies to an aggregator at all is open to debate. Typically, an aggregator is a buyers' agent, not a customer as defined by PURA. The Customer Protection Section of PURA Section 17.002 (Definitions) define a customer as any person in whose name service is billed, including government units, and any other entity with legal capacity to be billed for service. Aggregators operating as buyers' agents are not liable for payment of bills. An aggregator may not inherently be a customer of the REP (or as TCC seeks to analogize in this case, the TDSP).

Q. **WHAT HAS BEEN TCC'S CURRENT PRACTICE?**

A. With respect aggregators, TCC's position is that it has a right to charge for any usage request for any active premise if the aggregator requests usage information more than one time in a 12-month period.

Q. **IS THIS A DISCRIMINATORY CHARGE?**

A. It may be. REPs, for example, have certain rights to usage information that aggregators do not. I do not know what TCC policy is regarding REP requests for historical usage information pursuant to either a switch request or pursuant to an ad hoc request for historical usage.

Q. **WHAT RIGHTS TO USAGE INFORMATION DOES A REP HAVE?**

A. ERCOT protocols specify clear rights to timely usage information. A REP has a right to timely monthly usage information so that it may bill promptly. When a REP requests historical usage information on a switch transaction, the TDSP is to provide 12 months of usage information if available within two business days of the request so that the REP may receive the information within three business days from the time the TDSP receives notice of the REP's request for historical usage data.[78]

Q. **HOW DOES THE TIMELY RECEIPT OF HISTORICAL USAGE INFORMATION ASSIST THE REP?**

A. The REP must bargain upstream of its operations, matching power supplies with its anticipated loads. With good usage information, REPs can reduce forecast error, thereby lowering costs and better managing risks in power supply acquisition. These

---

[78] See ERCOT Protocols, Section 15: Registration, 15.1.1.2 Provision of Historical Usage with a Switch Request, November 1, 2003.

costs reductions are ultimately passed on to customers. Knowledge the REP gains can also aid the REP in improving the marketing and pricing of its products.

**Q. WHAT IS YOUR RECOMMENDATION REGARDING TCC'S PROPOSED ACCOUNT HISTORY FEE?**

A. I recommend that the service provided be a system service and costs associated be part of the cost of service. The Account History Fee has provided no recordable revenue for discretionary services as it has no test year revenue registered. Second, unimpeded customer, REP of record, and aggregator of record access to current usage information is necessary to support the competitive process. In other words, account history and usage information is more akin to a system service than a discretionary service. Said differently, TCC should not be permitted to erect barriers to the free flow of important market information. Thus, there should be no charge for providing account history information upon request to an end-user, aggregator or REP.

**Q. PLEASE EXPLAIN THE REASONS YOU INCLUDE AGGREGATORS IN YOUR RECOMMENDATION.**

A. One of the largest aggregators in Texas performs aggregation services for government agency customers of TCC. This aggregator is the South Texas Aggregation Project or STAP.

**Q. WHAT IS STAP?**

A. STAP is a non-profit political subdivision formed to combine the individual electric requirements of its members into an aggregated pool in order to realize volume savings on purchasing electric services to its members. Membership to STAP is open to any political subdivision that purchases electricity for their respective public

facilities. The current membership of STAP consists of 40 cities, a regional transit authority and a river authority.

Q. HOW IS STAP'S ECONOMIC FUNCTION LIKE THE REPS' ECONOMIC FUNCTION?

A. STAP operates as a buyers' agent. Potentially, aggregation is a way to gain at least part of the economic benefit that pooling provides to REP suppliers for STAP members in the form of reduced prices.

REPs do the same thing on behalf of individual members, which is part of the reason why individual REPs "specialize" in serving particular customers. REPs' profit margins are, in part, a return for providing this pooling benefit to individual customers.

But STAP aggregation has other helpful economic functions for the market, too.

Q. PLEASE DESCRIBE STAP'S ECONOMIC FUNCTIONS IN MORE DETAIL.

A. STAP performs three distinct economic functions. First, STAP provides information to REPs about the cost of serving the load represented by STAP. Thus, the more accurate and timely this information is the better REPs are able to judge actual costs and the lower the risk premium for uncertainty will be in the REPs' bids. Also, good quality information supports the REPs' ability to recognize, match, and thus differentiate their bids to reflect the value of STAP load to their particular operation.

Second, STAP's access to information allows it to better judge the received bids. From the buyers' side, this increases accuracy in selecting the best parties for further negotiation. (From an economic efficiency point of view, the "best parties"

are those for whom contracting with STAP creates the largest gains for both STAP and the REP relative to other possible pairings). Both these first and second functions, then, have to do with making the size of the bargaining "pie" as large as possible. The third function addresses how the pie gets sliced. For this, STAP uses information to bargain to increase its members' share of potential gains.

Q. **WHAT DOES STAP NEED TO PERFORM ALL THREE ECONOMIC FUNCTIONS WELL?**

A. If STAP is to perform all three functions well, then timely access to accurate, good quality, usage and cost (billing) information is key. Moreover, if STAP is to have bargaining power vis-a-vis REP offers, then this requires STAP to have the same kind of access to this kind of information that REPs have.

Q. **WHAT ARE THE DOWNSIDES WHEN STAP'S ACCESS TO INFORMATION IS NOT ON A PAR WITH REPS?**

A. When STAP access to information is not on par with REP access, then bargaining between them is not "symmetric" but biased in favor of the better-informed REPs. From a market point of view, this is not the greatest loss, however. STAP's basic role as a source of information to the market to help identify the best "supply fit" is also compromised. This second loss reflects an inefficiency imposed on the entire market. The inefficiency is created when there is excessive cost in getting economically valuable information into the market. Like other market participants acting in self-interest, a byproduct of STAP's self-interested desire for and use of better quality information is that market decisions will be made based on better quality information.

Q. SO, YOU ARE RECOMMENDING THE ELIMINATION OF THE ACCOUNT HISTORY FEE FOR STAP ON THE BASIS AS YOU ARE RECOMMENDING IT FOR OTHER MARKET PARTICIPANTS?

A. Yes, I am.

Q. BUT WON'T PROVIDING ACCOUNT HISTORY SERVICES FOR FREE LEAD TO ABUSE?

A. It is hard to imagine a request for Account History information from an end-user, REP of record or Aggregator of record that would not be a *bona fide* request. From the requester's side, the transaction is not costless. However, should TCC identify abuse, TCC can request the ability to institute a charge for providing this information. However, TCC should not be allowed to substitute other charges in place of the Account History charge.

Q. DO YOU HAVE OTHER RECOMMENDATIONS TO SUPPORT THE DISSEMINATION OF INFORMATION IMPORTANT TO THE MARKET?

A. Yes. TCC indicates that Special Meter Reading fee applies when an estimated bill is outstanding.[79] This charge should be prohibited, particularly given the volume of TCC's use of estimated meter reads. The proposed 6.1.2.1.6 Special Meter Reading Fee should not be charged when a REP, aggregator or end-user requests an actual meter read on an outstanding bill with estimated usage.

---

[79] Response to Cities 15-2.

That this fee not be charged in the case of an outstanding estimated bill is especially important since TCC has counter-incentives to creating the information. For example, I identified incentives for TCC to create regulatory lag earlier to gain the benefits from actual revenues exceeding test-year projections/adjustments.

When it comes to meter reading it appears that the cost savings from using estimated readings (as considered earlier in Section III) are only enhanced by regulatory lag revenue opportunities. TCC introduced the Special Meter Reading Fee in the UCOS case. TCC earned $ 385,000 on 25,716 occurrences. These Special Meter Read earnings create a counter-incentive to return estimated meter reads to levels which existed prior to Customer Choice.

Q. **DO YOU HAVE OTHER RECOMMENDATIONS TO BETTER ALIGN INCENTIVES WITH MARKET NEEDS?**

A. Yes. First, the proposed Inaccessible Meter Fee should remain as a Denial of Access Fee. (However, the editorial change from "Company's" to "Billing" Meter, as proposed to implement the Competitive Metering Rulemaking, should be permitted). Not only does modifying the existing charge in the way TCC proposes create an incentive for even more estimated meter reads, but there is not potential recourse for the REP. TCC is not responsible for showing evidence of denial, and there is no way REPs or ratepayers have of assuring that the Meter Reader didn't just take a donut break and chalked it up as an Inaccessible Meter Fee.

Second, the 6.1.2.1.16 Special Billing Services Fee, 6.1.2.1.13 Copy Fee or 6.1.2.15 Special Products/Service Fee shall not be charged for the educational service of providing a detailed billing and invoicing analysis and report to requesting REPs

and aggregators, upon request, or to provide a manual with equivalent functionality in its place. The provision of this service, at no cost, will move TCC toward practices of other TDSPs in ERCOT.

### V. REQUEST FOR PRE-APPROVAL OF DEBT RECOVERY

Q. **WHAT IS TCC REQUESTING?**

A. Essentially, TCC is requesting pre-approval for a specific accounting treatment of a possible future debt. In other words, TCC is asking the PUCT to pre-approve a regulatory asset contingent on REP bad debt expense. TCC states its request as: Approve TCC's request to defer any bad debt expenses incurred in providing service to REPs and include such costs in TCC's next base rate case.[80]

Another way of explaining this request is that TCC is effectively requesting the right to a guaranteed payment from ratepayers for REP bad debt expense it might incur. Lamenting its inability to get a credit deposit upfront from REPS under existing rule,[81] TCC is effectively asking for one from ratepayers by virtue of the requested pre-approval.

Q. **OF WHAT BENEFIT TO TCC IS THIS PRE-APPROVAL?**

A. TCC explains that GAAP does not permit TCC to record a loss for possible future recovery in the event of a CR bankruptcy without some form of assurance of future

---

[80] Direct Testimony of TCC Witness Carpenter at 61.

[81] Direct Testimony of TCC Witness Laine, at 20-25 and Exhibit JLL-2, See also Direct Testimony of TCC Witness Hamlett at 44-45.

recovery.[82] So absent permissive statute, rule or order, TCC cannot book a regulatory asset in the form of a future receivable from customers.[83]

Q. **WHAT WILL TCC DO IF THE REQUEST IS NOT APPROVED?**

A. If the request is not approved, bad debt expense cannot be recognized as a regulatory asset. And, the Commission's treatment of any bad debt expense that TCC books now will not be determined in this proceeding.[84] However, TCC must still create an accounting transaction to recognize recovery and/or write-off.

Q. **WHAT HAS BEEN TCC'S EXPERIENCE THUS FAR WITH RESPECT TO THE TCE BANKRUPTCY?**

A. In discovery, TCC provided a summary proof of claim that the company filed in May with the Bankruptcy Court for approximately $3.5 million. Within that claim, TCC shows a deposit recoupment of about $600,000 or a net claim of about $2.9 million dollars.[85]

TCC filed a supplemental discovery response on February 2, 2004 indicating that it had set up an accounting transaction to recognize its TCE bankruptcy claims. In its response, however, TCC did not it explain why TCC chose to recognize only

---

[82] Response to Cities 16-8c(4).

[83] See Direct Testimony of Witness Hamlett at 45.

[84] Based on TCC's description of current practice with respect to potential uncollectibles, what TCC will do is recognize the debt. TCC has the option to deemed such debt uncollectible and charge off a portion or all of it, or not, depending on the likelihood of subsequent payment. The Company will determine a net uncollectible amount after applying any security or other valid credit. Subsequent repayment on a previously charged-off amount can be recognized in a re-invoicing of the debt. See Response to Cities 8-6

[85] Exercising the delinquency provision as permitted under its existing tariff Deposit Requirements (Section 4.5.1), TCC had required a deposit from TCE in the amount of $740,000, which TCE provided as a Letter of Credit.

$ 1.5 million as the potential amount subject to write-off of the $3.086 million TCC now claims it is owed by TCE.[86]

**Q. WHAT ELSE HAS TRANSPIRED SINCE TCC FILED ITS PROOF OF CLAIM?**

A. In December 2003, TCE announced a reorganization plan. The TCE press release indicates that all creditors, including TDSPs, receive 100% payback of negotiated debt. TCE goes on to detail the nature of the new financing that will "enable TCE to continue its business growth."[87]

**Q. DID THE MARKET LEARN FROM THE TCE BANKRUPTCY?**

A. Yes. The market has and is responding to reduce the likelihood that the facts leading to the TCE bankruptcy will occur again. First, as I understand it, TCE followed a purchasing strategy that made the REP uniquely vulnerable to swings in Balancing Energy Schedule (otherwise known as spot market) prices. Second, in response to TCE's bankruptcy, ERCOT reviewed and tightened its collateral requirements for Balancing Energy market participation.[88] Third, a recently completed PUCT Staff investigation indicates that TXU's ability to operate as a pivotal bidder may have contributed to the unexpectedly high Balancing Energy Schedule prices that TCE paid. The Staff investigation suggests options to address this price-setting ability.[89]

---

[86] Updated Response to Cities 8-9.

[87] TCE Press Release of December 12, 2003 provided in Workpapers.

[88] Effective September 1, 2003, ERCOT revised Protocols to calculate additional collateral requirements for Qualified Scheduling Entities intending to utilize the Relaxed Balance Schedules more than 20%. Protocol Revision Request No. 431PRR available from www.ercot.com.

[89] See generally, Staff Inquiry into Allegations Made by Texas Commercial Energy regarding ERCOT Market Manipulation, Project No. 25937, Market Oversight Division, January 28, 2004.

Q. WHAT KIND OF ANALYSIS HAS TCC DONE TO SUPPORT ITS REQUEST?

A. None. The company characterizes its Highly Sensitive Response 1-37 as an analysis. It is not an analysis. What TCC calls financial exposure is simply a calculation of monthly invoiced amounts by REP. Thus, all TCC has done is calculated how many dollars TCC could hold, interest free, if TCC were able to obtain a credit deposit from every REP active in its service territory from the time the REP began to serve in its territory.

In discovery, TCC has also provided its record of invoice delinquencies for each REP.[90] While Mr. Laine suggests this information is somehow useful in identifying bankruptcy exposure risk, I accept the alternative view, presented by Mr. Hamlett, that pending bankruptcy may be unrelated to prior payment patterns, including invoice delinquencies. My review of the REP invoice delinquency record provided in discovery also supports Mr. Hamlett's view.[91]

Q. IS GRANTING THE REQUEST PREMATURE?

A. Yes, for six independent reasons. First, The PUCT is in the process of rule improvement that will help REPs better manage debt exposure from end-use

---

[90] Highly Sensitive Response to Cities 2-32, Attachment 1.

[91] See Response to Cities 8-21.

customer payment patterns. This, in turn, can be expected to improve cash flow management by REPs.[92]

Second, TCC said it has not analyzed the effects of ongoing and potential improvements in the ERCOT settlement process because it impacts REPS, not TDSPs.[93] However, quicker settlements have an effect on REP cash management practices, and thus again are responsive to TDSP concerns about the likelihood of REP bankruptcies and TDSP potential financial exposure.

Third, as discussed above, TCC should be careful in analogizing from the TCE situation as to the likelihood of bankruptcy and TDSP potential exposure.

Fourth, the Commission made a clear policy choice in prohibiting TDSPs from imposing credit requirements beyond those currently permitted.[94] TCC provides no cost-benefit analysis for why existing policy should be changed.

Fifth, TCC's actual request is for a PUCT promise-to-pay, which permits TCC to employ its requested regulatory asset accounting. Yet, TCC provides no evidence to support the underlying judgment and balancing of interests that a promise-to-pay would force the PUCT to make in this proceeding.

---

[92] Specifically, the Commission has proposed revisions to §25.478 Credit Requirements and Deposits. The rule preamble states that the current revision of the Consumer Protection Rules, as proposed, is expected to help REPs better manage their bad debt exposure. Instead of the higher of 1/6 annual billing or the sum of estimated billings for the next two months, the Commission proposes to allow a maximum deposit of one-fifth estimated annual billings. The Commission explains that this is roughly equivalent to 80 days of usage a REP is likely to pay before service to a non-paying customer can be terminated. Under § 25.483 Disconnection of Service, the Commission proposes to allow non-affiliated REPs a new right to disconnect small commercial and residential for non-payment beginning June 1, 2004. For non-residential customers, the REP may require the customer to pay an initial or additional deposit if the customer cannot demonstrate satisfactory credit to the REP. (§ 25.478(b)). Project No. 27084, Staff Draft Proposal as approved at the October 9, 2003 Open Meeting.

[93] Response to Cities 8-23.

[94] See Preamble, Order on Adoption, §25.107 and §25.108, Project 21082.

Finally, as TCC recognizes, the promise-to-pay would provide justification for TCC's real objective which is a change in PUCT policy to permit the TDSP to extract credit deposits regardless of REP creditworthiness. This, too, is contrary to existing PUCT policy.[95]

## VI. RATE CASE EXPENSES

Q. **PLEASE IDENTIFY THE FEES AND EXPENSES CHARGED TO CITIES FOR YOUR WORK IN THIS CASE.**

A. As of January 31, 2004 I have billed Cities $54,589.20 in fees and my associate, Mr. King has billed $9,874.50. I have incurred $84.78 in non-fee expenses provided in this case. These figures include hours charged as follows:

| Name | Hourly Rate | Hours |
|------|-------------|-------|
| Sarah Goodfriend | 275 | 198.50 (decimal) |
| Kelso King | 150 | 65.83 (decimal) |

Q. **DO YOU HAVE AN OPINION CONCERNING THE REASONABLENESS OF THE TOTAL AMOUNT CHARGED TO CITIES?**

A. Yes. The hours charged and expenses incurred were necessary to perform the assigned tasks in a professional and timely manner. The out-of-pocket expenses were incurred to aid in the provision of such services.

TCC is the first TDSP to come before the Commission in a traditional rate proceeding since Customer Choice began, and so many of the decisions in this case may become precedential in establishing standards for the regulation of TDSP

---

[95] See existing and proposed Consumer Protection Rules which distinguish end-user credit requirements the REP may impose according to creditworthiness of end-use customers. Project No. 27084, Staff Draft Proposal as approved at the October 9, 2003 Open Meeting.

companies in the new era. The scope and length of my testimony reflect this fact. Moreover, there has been constant revision and turnover in market rules and substantive rules as ERCOT stakeholder groups and the PUCT have struggled to keep pace with constantly changing market issues. This is a very challenging situation for policy evaluation and requires intense levels of investigation and fact gathering. These case attributes are reflected, for example, in the size of TCC's original filing, its revisions, and the extent of information requests filed by intervenor groups. Under these conditions, I conclude that the amounts charged are reasonable.

Q. **BRIEFLY DESCRIBE THE SERVICES PROVIDED BY YOUR FIRM.**

A. I was retained by Cities to investigate the quality of service that market participants, and REPs, in particular, are receiving from TCC. I was retained to identify any discriminatory and/or anti-competitive issues associated with TCC's proposed tariff offerings and to spot and develop positions on other requests made in TCC's filing that could negatively impact the competitive market or the PUCT's stewardship in ensuring the development of a competitive retail market as envisioned by PURA.

Q. **DOES YOUR FIRM CHARGE A REASONABLE HOURLY RATE?**

A. Yes. The hourly rate shown above is my normal billing rate and based on my experience, is comparable (or lower than) the hourly rates charged by other regulatory consultants with similar background, experience and training providing similar services. This is based on my experience in many utility rate cases and review of consulting fees charged by other consultants with comparable background and experience.

Q. DID YOU OR MR. KING BILL IN EXCESS OF 12 OR MORE HOURS IN ONE DAY?

A. No.

Q. DO YOUR EXPENSES INCLUDE HOTEL OR LODGING COSTS IN EXCESS OF $100.00 PER NIGHT?

A. No.

Q. HAVE YOU CHARGED CITIES FOR MEAL EXPENSES IN EXCESS OF $25.00 PER PERSON?

A. No.

Q. DID YOU USE NON-COMMERCIAL AIRCRAFT OR FIRST-CLASS AIR TRAVEL?

A. No.

Q. DO YOUR RATE CASE EXPENSES INCLUDE ANY LUXURY ITEMS SUCH AS LIMOUSINE SERVICE, SPORTING EVENTS, ALCOHOLIC DRINKS, HOTEL MOVIES OR OTHER ENTERTAINMENT?

A. No.

Q. HAVE YOUR FEES AND EXPENSES BEEN DOCUMENTED?

A. Yes. The monthly invoices submitted to the Cities include the time billed, the hourly rate charged, and a description of professional services rendered. The invoices accurately reflect the time spent and expenditures I incurred on Cities behalf. Similarly, Mr. King's monthly invoices submitted to Cities include the time billed, the hourly rate charged, and a description of professional services rendered.

Documentation of long distance, copying and delivery expenses are attached to the invoices.

**Q. PLEASE DESCRIBE ANY STEPS YOU TOOK TO KEEP FEES AND EXPENSES TO A MINIMUM.**

A. First, Goodfriend Consulting is working under a phased contract with a spending limit established by estimate before the work was done. Goodfriend Consulting must obtain prior approval from the Cities for any billings in excess of the estimate.

Second, my familiarity and experience as a regulatory decisionmaker and as an expert witness in proceedings involving the AEP-CSW companies has helped reduce hours expended, as has prior experience in providing advice and consulting services to REPs active in the ERCOT market. Third, anticipating the many novel issues in this proceeding, I brought Mr. King in at the outset of the proceeding to assist me with data gathering and issue analysis in order to reduce the overall cost of my services. Finally, since I am located in Austin, expenses associated with this case will also be kept to a minimum.

**Q. DO YOU ESTIMATE INCURRING COSTS BEYOND JANUARY 2004?**

A. Yes. There are several tasks to be completed, including finalization of issues, finalization of testimony, preparing for hearing and appearing to testify. I will also aid counsel in preparing cross-examination, briefs, and exceptions as requested. I estimate that I will spend 70 hours and will incur additional fees and expenses of $19,360 to complete this case before the PUCT. If the case is appealed, I may be called upon to assist counsel through the appellate courts incurring costs of approximately $550. In total, I estimate future fees and expenses of $19,910.

In order to reduce the reliance on estimates, I intend to submit an affidavit identifying the actual incurred costs prior to completing the case.

**Q.** **DOES THIS CONCLUDE YOUR DIRECT TESTIMONY?**

A. Yes, it does.